**Michael Alan CROOKER, Appellant,**

v.

**BUREAU OF ALCOHOL, TOBACCO & FIREARMS, et al.**

No. 80–1278.

United States Court of Appeals, District of Columbia Circuit.

Argued May 28, 1981.

Decided Dec. 8, 1981.

As Amended Dec. 16, 1981.

Katherine A. Meyer, with whom David C. Vladeck and Alan B. Morrison, Washington, D.C., were on the brief for appellant.

Michael Kimmel, Atty., Dept. of Justice, with whom Thomas S. Martin, Acting Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellees. John A. Terry, Michael W.

Farrell and Barry M. Tapp, Asst. U. S. Attys., Washington, D.C., also entered appearance for appellees.

Victor H. Kramer and Douglas L. Parker, Washington, D.C., were on the brief for amicus curiae, Jordan and Wasserstrom urging affirmance.

Before ROBINSON, Chief Judge, and WRIGHT, TAMM, MacKINNON, ROBB, WILKEY, WALD, MIKVA, EDWARDS and GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge EDWARDS.*

Concurring opinions * filed by Circuit Judge MacKINNON, Circuit Judge MIKVA and Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge WILKEY.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | BACKGROUND | 1053 |
| II. | EXEMPTION 2 AND ITS LEGISLATIVE HISTORY | 1055 |
| | A. The Structure of FOIA | 1055 |
| | B. The Language and Legislative History of Exemption 2 | 1056 |
| | 1. FOIA in the Senate | 1057 |
| | 2. FOIA in the House | 1059 |
| III. | OTHER INDICATIONS OF CONGRESSIONAL INTENT | 1061 |
| | A. Section (a) (2) (C) | 1062 |
| | B. Section (b) (7) (E) | 1063 |
| IV. | CONCLUSIONS TO BE DRAWN FROM THE LEGISLATIVE HISTORY | 1065 |
| V. | THE CASE LAW ON EXEMPTION 2 | 1066 |
| | A. Supreme Court Precedent | 1066 |
| | B. D.C. Circuit Case Law | 1066 |
| | C. Case Law in Other Circuits | 1077 |
| | 1. Cases Relying on Section (a) (2) (C) | 1077 |
| | 2. Cases Relying on Exemption 2 | 1071 |
| VI. | DISPOSITION OF THE PRESENT CASE | 1072 |
| VII. | CONCLUSION | 1075 |

EDWARDS, Circuit Judge:

In *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), the Supreme Court left undecided the question whether Exemption 2 of the Freedom of Information Act (FOIA)[1] per-

* Chief Judge ROBINSON and Circuit Judges WRIGHT, MacKINNON, ROBB, WALD, MIKVA and GINSBURG concur in the opinion by Circuit Judge EDWARDS. Circuit Judge TAMM concurs in the result in Circuit Judge EDWARDS' opinion. Circuit Judge ROBB concurs in the opinion by Circuit Judge MacKINNON. Circuit Judges MacKINNON, ROBB and EDWARDS concur in the opinion by Circuit Judge MIKVA.

1. 5 U.S.C. § 552(b)(2) (1976). The Freedom of Information Act may be found at 5 U.S.C. § 552 (1976 & Supp. III 1979). In relevant part, FOIA provides:

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

mits a federal agency to withhold documents whose "disclosure may risk circumvention of agency regulation."[2] In the present case we are presented squarely with that question.

This appeal involves a claim by the Government that portions of an agent's training manual of the Bureau of Alcohol, Tobacco & Firearms (BATF) should not be released pursuant to FOIA since to do so "would benefit those attempting to violate the law and avoid detection."[3] Careful analysis of the statutory language of FOIA, its legislative history, and the case law leads us to conclude that Congress enacted Exemption 2 to shield from disclosure materials such as the portions of the BATF manual at issue here. Accordingly, we hold that since the document for which disclosure is sought meets the test of "predominant internality," and since its disclosure significantly risks circumvention of federal statutes or regulations, the document is exempt from disclosure under Exemption 2.

Nothing in this decision should be taken to question the result reached in our previous decision in *Jordan v. United States Dep't of Justice*, 591 F.2d 753 (D.C.Cir.1978) (*en banc*). While our decision may appear inconsistent with one of the bare legal holdings in *Jordan, see id.* at 771, we nevertheless believe that from the facts as presented in *Jordan*, the *result* in that case would be identical under the test we announce today. It is the rationale in *Jordan* we reject insofar as it suggests that virtually all law enforcement manuals must be disclosed under FOIA.

## I. BACKGROUND

In mid-1978 Michael Crooker filed a FOIA request with the Bureau of Alcohol, Tobacco & Firearms, seeking a copy of an agency manual entitled "Surveillance of Premises, Vehicles and Persons—New Agent Training." Complaint ¶ 5, *located in* Record (R.) at 1. BATF initially denied Crooker's request in its entirety; however, following an administrative appeal, G. R. Dickerson, the Director of BATF, ordered the release of the manual except for portions of pages eight through twenty-nine. In his affidavit to the District Court, Director Dickerson wrote that "[t]he deletions which appear in the document released to Mr. Crooker are all based on 5 U.S.C.

---

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

**2.** 425 U.S. at 369, 96 S.Ct. at 1603. *See id.* at 364, 96 S.Ct. at 1600.

(E) each amendment, revision, or repeal of the foregoing.

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register; and

(C) administrative staff manuals and instructions to staff that affect a member of the public;

unless the materials are promptly published and copies offered for sale. . . .

(3) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

.   .   .   .   .

(b) This section does not apply to matters that are—

.   .   .   .   .

(2) related solely to the internal personnel rules and practices of an agency;

.   .   .   .   .

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would. . . . (E) disclose investigative techniques and procedures.

**3.** Affidavit of G. R. Dickerson, Director, Bureau of Alcohol, Tobacco & Firearms, *located in* Record (R.) at 10.

§§ 552(a)(2)(C) and (b)(2) [Exemption 2]," [4] and that portions of the manual were withheld because their release "would benefit those attempting to violate the law and avoid detection." Affidavit of G. R. Dickerson, R. at 10.[5]

After receiving Director Dickerson's decision on his administrative appeal, Crooker filed a *pro se* complaint in the District Court seeking to compel BATF officials to produce the entire BATF manual. Complaint ¶ 15, R. at 1. Crooker subsequently moved for summary judgment, but did not support his motion with any affidavits or other documents.[6]

In response, the Government filed a "Motion to Dismiss or, in the Alternative, for Summary Judgment." R. at 10. In support of its motion, the Government included Dickerson's affidavit, as well as original and updated versions of the BATF manual for *in camera* inspection. The Government's "Statement of Material Facts As to Which There Is No Genuine Issue" consist-

ed solely of the first eight paragraphs of Dickerson's affidavit. *See* R. at 10.

Crooker responded to the Government's motion by filing a memorandum of points and authorities, and renewing his own plea for summary judgment. *See* Reply Memorandum, R. at 12. Crooker submitted no affidavits with his Reply Memorandum, and he made no attempt to contest the assertion in Dickerson's affidavit that release of the entire BATF manual "would benefit those attempting to violate the law and avoid detection." Rather, Crooker argued that "we are dealing with a manual that directly affects the public at large: surveillance of members of the public by federal authorities. The citizenry certainly has a significant interest in the manner in which they are spied on by agents of the federal government." Reply Memorandum, R. at 12.[7]

After examining the BATF manual *in camera*, the District Court granted the Government's motion for summary judgment and denied Crooker's motion for sum-

---

4. Despite the Director's reliance in his affidavit on § (a)(2)(C), *reprinted in* note 1, *supra*, the only issue on appeal is the applicability of Exemption 2. In its petition to this court suggesting a rehearing *en banc*, the Government expressly disclaimed reliance on § (a)(2)(C). *See* Petition for Rehearing with Suggestion of Rehearing *En Banc* at 8 n.4.

5. Paragraph 8 of Dickerson's affidavit states:
   8. Although it was possible to segregate the disclosable information from the nondisclosable information on pages 8 through 18, that was impossible with respect to pages 19 through 29. Therefore, these pages were withheld from disclosure in their entirety. The deletions which appear in the document released to Mr. Crooker are all based on 5 U.S.C. §§ 552(a)(2)(C) and (b)(2). Since ATF P 4510.4 [the designation of the manual in question] is a law enforcement manual detailing methods and procedures for conducting surveillance of criminal suspects and contains extensive information concerning methods, strategies, techniques, and guidelines to be employed by ATF special agents in performance of their duties and since this material would benefit those attempting to violate the law and avoid detection, and possibly endanger the lives or safety of ATF special agents and others, and since this information is not secret law, we may properly withhold this information in accordance with the authority set out above.

6. Crooker included with his motion for summary judgment a statement of material facts as to which there was no genuine issue; the statement simply listed the different actions taken during the processing of his FOIA request. *See* Plaintiff's Statement of Material Facts Not in Dispute, R. at 4.

7. Because Crooker did not contest the Government's assertions that release of the deleted portions of the manual "would benefit those attempting to violate the law and avoid detection," Rule 56(e) of the Federal Rules of Civil Procedure requires this court to take the Government's assertions as true. Rule 56(e) provides that:
   When a motion for summary judgment is made and supported as provided in this rule [*i.e.*, with affidavits], an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.
   In other words, failure to raise a genuine issue as to a material fact constitutes a concession that the uncontested fact is true for purposes of summary judgment.

mary judgment as well as his request for attorney's fees and costs. In its brief order, the court held the material to be protected from disclosure under Exemption 2, citing this court's decision in *Cox v. United States Dep't of Justice*, 601 F.2d 1 (D.C.Cir.1979). See Order, R. at 13.

Crooker appealed the District Court's decision,[8] and a three-judge panel of this court decided without argument on November 12, 1980, that, under the holding of *Jordan v. United States Dep't of Justice*, 591 F.2d 753 (D.C.Cir.1978) (*en banc*), the withheld portions of the BATF manual were not protected from disclosure by Exemption 2. On January 30, 1981, a majority of the full court of appeals voted to vacate the panel opinion and rehear the case *en banc*. The only issue on appeal before this court is whether certain portions of the BATF manual—"Surveillance of Premises, Vehicles and Persons—New Agent Training"—are exempt from disclosure under Exemption 2 of FOIA.[9]

## II. EXEMPTION 2 AND ITS LEGISLATIVE HISTORY

### A. The Structure of FOIA

Congress enacted the Freedom of Information Act, 5 U.S.C. § 552 (1976 & Supp. III 1979), in 1966 to replace section 3 of the Administrative Procedure Act, finding the existing statute to be "full of loopholes which allow agencies to deny legitimate information to the public." S.Rep.No.813, 89th Cong., 1st Sess. 3 (1965). It is clear that FOIA was designed to embody "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language and to provide a court procedure by which citizens and the press may obtain information wrongfully withheld." *Id.*

As presently enacted, FOIA contains three distinct subsections setting forth the circumstances under which an agency must release information to the public.[10] Section (a)(1) covers information that must be published in the Federal Register, and section (a)(2) covers materials that must be made "available for public inspection and copying . . . unless the materials are promptly published and copies offered for sale." Section (a)(3), under which Crooker requested the BATF manual, provides:

> Except with respect to the records made available under paragraphs (1) and (2) of this subsection, each agency, upon any request for records which (A) reasonably describes such records and (B) is made in accordance with published rules . . . shall make the records promptly available to any person.

5 U.S.C. § 552(a)(3) (1976).

Section (b) of the FOIA sets forth nine exemptions to disclosure.[11] In particular,

---

**8.** Crooker has not appealed the trial court's denial of his request for attorney's fees and costs.

**9.** For the purposes of the *en banc* hearing, this court specially appointed Katherine A. Meyer, David C. Vladeck, and Alan B. Morrison to represent the appellant. This court wishes to thank counsel, and in particular Ms. Meyer, for their outstanding advocacy on the appellant's behalf.

**10.** *See* note 1, *supra.*

**11.** Some circuits have held that by adding the word "administrative" to the phrase "staff manuals" in § (a)(2)(C), *see* note 1, *supra*, Congress implicitly created an additional exemption for law enforcement manuals. *See Hawkes v. Internal Revenue Service*, 467 F.2d 787, 793–96 (6th Cir. 1972); *Cox v. United States Dep't of Justice*, 576 F.2d 1302, 1307–09 (8th Cir. 1978). However, this circuit has con-

sistently held that the exemptions listed in § (b) must provide the sole bases for an agency's decision not to release an agency record to the public. As FOIA itself states:

> [FOIA] does not authorize withholding of information or limit the availability of records to the public, except as specifically stated.

5 U.S.C. § 552(c) (1976). *See* S.Rep.No.813, 89th Cong., 1st Sess. 10 (1965) ("The purpose of [§ 552(c)] is to make it clear beyond doubt that all *materials* of the Government are to be made available to the public . . . unless explicitly allowed to be kept secret by one of the exemptions in subsection [b]") (emphasis in original).

Accordingly, we leave undisturbed the holding in *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 760–63 (D.C.Cir.1978) (*en banc*), that § (a)(2)(C), requiring that "administrative staff manuals" be made available for inspection and copying, does not by itself exempt the BATF manual from disclosure. Whether the

section (b)(2), commonly called Exemption 2, provides that:

> (b) This section [FOIA] does not apply to matters that are—
>
> (2) related solely to the internal personnel rules and practices of an agency.

*Id.* § 552(b)(2). Whether or not portions of the BATF manual are exempt from disclosure depends on the scope of Exemption 2. To answer that question, we examine the language and legislative history of Exemption 2.

## B. *The Language and Legislative History of Exemption 2*

Resort to the legislative history of a statutory provision is not necessary when the meaning of the provision is plain from its language. *See Markham v. Colonial Mortgage Service Co., Associates, Inc.*, 605 F.2d 566, 569 (D.C.Cir.1979). In this case—at least at first blush—the BATF manual appears to be encompassed by the literal language of Exemption 2. Nonetheless, we recognize that other interpretations of the brief language of Exemption 2 are possible. Accordingly, after examining the language of Exemption 2, we will turn to its legislative history to determine the underlying congressional intent.

In *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 763 (D.C.Cir.1978) (*en banc*), this court held that the phrase "personnel rules and practices" in Exemption 2 refers only to "pay, pensions, vacations, hours of work, lunch hours, parking etc." Yet, in cases similar to the present one, involving requests for disclosure of a BATF "Raids and Searches" manual, the Second and Ninth Circuits have come to the opposite conclusion. In denying disclosure, these courts have held that, "[f]rom its wording, [Exemption 2] would appear to apply to the contested portions of the [BATF] manual." *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653, 655 (9th Cir. 1980). *See Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d

544, 546 (2d Cir. 1978). We agree with the conclusions reached by the Ninth and Second Circuits regarding the meaning to be attributed to the statutory language. We thus hold that the words "personnel rules and practices" encompass not merely minor employment matters, but may cover other rules and practices governing agency personnel, including significant matters like job training for law enforcement personnel.

The word "internal" in Exemption 2 plainly limits the exemption to those rules and practices that affect the internal workings of an agency. "Related solely to" limits the exemption to those matters that are truly internal, and not of legitimate public interest.[12] In his concurring opinion in *Vaughn v. Rosen (Vaughn II)*, 523 F.2d 1136 (D.C.Cir.1975), Judge Leventhal aptly observed that:

> In some attenuated sense, virtually everything that goes on in the Federal Government, and much that goes on outside of it, could be said to be "related" through some chain of circumstances to the "internal personnel rules and practices of an agency." The potentially all-encompassing sweep of a broad exemption of this type undercuts the vitality of any such approach. The legislature added the qualification that limited the exemption to items "relating solely" to internal personnel practices. Various opinions have relied on "solely" as a means of limiting the range of the (b)(2) exemption. That phrase too is open to an all-or-nothing interpretation; there are few events in our society today that occur without so much as a tiny ripple effect outside their area of prime impact. Thus pushed to their logical ends, "relating" is potentially all-encompassing while "solely" is potentially all-excluding. It seems unlikely that Congress intended either extreme, and that "solely" in this context has to be given the construction, consonant with reasonableness, of "predominantly."

language and legislative history of § (a)(2)(C) shed light on the congressional intent underlying Exemption 2 is another matter. *See* section III.A, *infra*.

**12.** As we discuss later in this opinion, it is not for the courts to determine when disclosure is in the public interest; rather, the courts are to decide what Congress intended with respect to the scope of Exemption 2. *See* note 60, *infra*.

*Id.* at 1150–51 (Leventhal, J., concurring) (footnote omitted). Pursuing this rationale in his concurring opinion in *Jordan*, Judge Leventhal, joined by Chief Judge Robinson, concluded that:

> Exemption 2 is applicable where the document consists of internal instructions to such government officials as investigators and bank examiners. In such a case disclosure would permit circumvention of the law, and there is no substantial, valid external interest of the community at large in revelation. That composite presents a matter that involves solely internal personnel rules and internal practices of an agency for purposes of making Exemption 2 applicable.

*Jordan v. United States Dep't of Justice,* 591 F.2d at 783 (Leventhal, J., concurring).

We agree with this interpretation of the literal meaning of Exemption 2. Accordingly, we believe that the disputed portions of the BATF manual for new agents—setting forth law enforcement investigatory techniques—fall within the compass of Exemption 2.

**13.** In 1967 Congress amended FOIA so that §§ (a)–(d) appeared in §§ (a)(1)–(a)(4), respectively. Section (e), which originally contained the exemptions, became § (b). *See* Pub.L.No. 90–23, 81 Stat. 54 (1967). Thus, although the formal designation of Exemption 2 changed, its language did not.

**14.** The Senate bill, S. 1160, was introduced on February 17, 1965. *See* 111 Cong.Rec. 2780 (1965). The principal House bill, H.R. 5012, was introduced the same day. *See id.* at 2946.

Prior to the Eighty-ninth Congress, several bills, including S. 1666, were introduced in the Senate to amend § 3 of the Administrative Procedure Act. *See* S.Rep.No.813, 89th Cong., 1st Sess. 3–4 (1965). During the Eighty-eighth Congress, the Senate passed S. 1666, but not in time for full consideration by the House. Nonetheless, S. 1666 is useful in determining the congressional intent behind Exemption 2 since the Senate Report accompanying S. 1160, which eventually became FOIA, asserted that "[t]he present bill [S. 1160] is substantially S. 1666, as passed by the Senate." *Id.* at 4.

S. 1666 contained two "Exemption 2's." The first one, which applied only to materials to be published in the Federal Register, was identically worded to the original Exemption 2 of the discredited § 3 of the APA: materials need not be disclosed "to the extent there is involved

Despite our conclusion regarding the reasonable interpretation to be given the language of Exemption 2, we recognize that other interpretations are plausible. Consequently, we look to the legislative history of the exemption to determine whether it is possible to find a congressional intent that is plainly contrary to the meaning that we ascribe to Exemption 2.

Exemption 2 was a part of the original FOIA enacted in 1966. Despite amendments to FOIA in 1967, 1974, 1976, and 1978, the language of Exemption 2 has remained unchanged.[13] Consequently, the principal sources of legislative history concerning the exemption are the congressional hearings, reports, and debates prior to the 1966 enactment of FOIA.

### 1. FOIA in the Senate

"Freedom of Information Act" bills were introduced in both the House and the Senate during the First Session of the Eighty-ninth Congress.[14] In mid-May 1965, the Senate held extensive hearings on its version of the new FOIA, S. 1160, receiving

... (2) any matter relating solely to the internal management of an agency." The second Exemption 2, which applied to agency opinions, orders, rules, and records, was identical to the current Exemption 2 as enacted in FOIA. The language of this second Exemption 2 is "similar to [the exemption] in subsection (a) [for Federal Register materials], but more tightly drawn." S.Rep.No.1219, 88th Cong., 2d Sess. 12 (1964). The only conclusion we may fairly draw from the language in S.Rep.No.1219 and the language of Exemption 2 as it evolved to its present form is that the current Exemption 2 is more narrow than the original Exemption 2 of § 3 of the APA. How much more narrow, however, depends on the congressional intent as expressed in the reports, debates, and hearings preceding enactment of FOIA.

During the Senate hearings on S. 1666, the subcommittee members made only one comment in response to fears expressed by some witnesses that S. 1666 would impede law enforcement efforts. When Paul Dixon, Chairman of the Federal Trade Commission, spoke in opposition to the bill, Senator Long reassured him that: "The committee, I am sure, and the Congress, wouldn't want to do anything that would seriously hurt the law enforcement provision of any agency." *See Freedom of Information: Hearings before the Subcommittee on*

comments from numerous private groups and federal agencies.[15] As with an earlier version, S. 1666, which had been introduced and passed by the Senate in the previous Congress,[16] several federal agencies vigorously opposed passage of the bill.[17] The Senators themselves, however, made no comments on the witnesses' objections or on the scope of Exemption 2.[18] Consequently, the Senate hearings provide little enlightenment as to Congress' intent concerning Exemption 2.[19]

The principal expression of the Senate's understanding of FOIA, and in particular Exemption 2, is found in the Senate Report, S.Rep.No.813, 89th Cong., 1st Sess. (1965). In the section outlining the purpose of the bill, the Senate Report identified the inadequacies of the existing section 3 of the Administrative Procedure Act, and claimed that the new bill would "establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Id.* at 3. But, the Report also took note of certain "cross-currents" explicitly enacted into the bill:

> At the same time that a broad philosophy of "freedom of information" is enacted into law, . . . [i]t is also necessary for the very operation of our Government to allow it to keep confidential certain material, such as the investigatory files of the Federal Bureau of Investigation.

*Id.* Thus, the Senate Report clearly recognized that the broad policy of full disclosure must be tempered in order to protect the "operation of our Government."

The Senate Report's description of Exemption 2 is brief, providing only a non-exclusive list of examples of matters exempt from disclosure:

> Exemption No. 2 relates only to internal personnel rules and practices of an agen-

---

*Administrative Practice and Procedure of the Committee on the Judiciary on S. 1666 and S. 1663,* 88th Cong., 1st Sess. 166 (Oct. 28–31, 1963) (statement of Paul R. Dixon).

**15.** *See Administrative Procedure Act: Hearings before the Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary on S. 1160, S. 1336, S. 1758, and S. 1879,* 89th Cong., 1st Sess. (May 12–21, 1965) [hereinafter *Senate Hearings on S. 1160*]. The legislative history of Exemption 2 has been recounted by this court in *Jordan v. United States Dep't of Justice,* 591 F.2d 753 (D.C.Cir. 1978) (*en banc*), and *Vaughn v. Rosen (Vaughn II),* 523 F.2d 1136 (D.C.Cir.1975). However, because the case before us was heard *en banc,* and because the outcome of the case turns on congressional intent as expressed in the legislative history, we feel that the history merits a fresh review.

**16.** *See* note 14, *supra.*

**17.** Some witnesses specifically objected to Exemption 2. For example, Edwin Raines, the Assistant General Counsel of the Department of the Treasury stated that: "The second exemption . . . [does not go] far enough. There are many other internal agency documents which should not be released. The investigative manuals of the Secret Service and the Bureau of Narcotics, for example, contain information the release of which would only be of assistance to criminals in telling them how to plot their crimes so as best to escape detection. Surely such information should be protected." *Senate Hearings on S. 1160, supra*

note 15, at 34 (statement of Edwin F. Raines). *See also id.* at 439 (Letter from General Counsel of Dep't of Treasury to Senator Eastland, Chairman of the Committee on the Judiciary, reiterating the Department's views).

**18.** Of course, a decision not to act on the objections to Exemption 2, especially on those raised by witnesses who opposed the entire bill, does not create an inference that the exemption would have permitted disclosure of all law enforcement manuals. The Senators may have felt that the existing language of Exemption 2 adequately dealt with the expressed fears of these witnesses. *Cf. Federal Public Records Law (Part 1): Hearings before a Subcommittee of the Committee on Government Operations on H.R. 5012 et al.,* 89th Cong., 1st Sess. 29 (Mar. 30–Apr. 5, 1965) (Rep. Moss, in response to similar objections, stating that Exemption 2 was intended to cover "the guidelines given to an FBI agent").

**19.** Some witnesses at the Senate hearings testified that the provision requiring "staff manuals" to be available for inspection and copying [now contained in § (a)(2)(C)] would permit investigative techniques and manuals to be released to the public. *See Senate Hearings on S. 1160,* at 178 (statement of Professor Kenneth C. Davis); *id.* at 292 (Memorandum of the Securities and Exchange Comm'n to the Comm. on the Judiciary); *id.* at 381–82 (Detailed Analysis of S. 1336 by the U. S. Dep't of Agriculture). The Senate later dealt with these objections. *See* section III. A, *infra.*

cy. Examples of these may be rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like. *Id.* at 8. There is no additional discussion of Exemption 2 in the Senate Report, and there was absolutely no debate in the Senate on S. 1160.[20]

### 2. *FOIA in the House*

During the First Session of the Eighty-ninth Congress, several bills to amend section 3 of the APA were introduced in the House. The House Subcommittee on Foreign Operations and Government Information held hearings on these bills from March 30 to April 5, 1965, *nearly a month and a half before the Senate hearings on S. 1160.*[21] The principal House measure under consideration was H.R. 5012,[22] which provided in part:

> (c) This section does not authorize withholding information from the public or limiting the availability of records to the public except matters that are . . . (2) related solely to the internal personnel rules and practices of any agency.

**20.** The Senate hearings were completed on May 21, 1965. S.Rep.No.813, which recommended passage of S. 1160 with minor amendments, was issued on October 4, 1965. The Senate passed the amended bill on October 13, 1965, *see* 111 Cong.Rec. 26820 (1965), and referred it to the House Committee on Government Operations on October 14. *See id.* at 27055.

**21.** *See Federal Public Records Law (Part 1): Hearings before a Subcommittee of the Committee on Government Operations on H.R. 5012 et al.,* 89th Cong., 1st Sess. (Mar. 30–Apr. 5, 1965) [hereinafter *House Hearings on H.R. 5012*].

**22.** H.R. 5012 was introduced by Congressman Moss, who chaired the House hearings. Several other identical bills were considered at the same time.

**23.** In fact, the other exemptions listed in H.R. 5012 were substantially identical to those listed in S. 1160.

**24.** The entire exchange is reprinted here:
Mr. Kass. Mr. Schlei, what is your interpretation of exemption No. 2? What information would fall under those records relating solely to the internal personnel rules and

*House Hearings on H.R. 5012, supra* note 21, at 3. In all material respects the language of Exemption 2 in H.R. 5012 was identical to the language in the Senate bill that later became law.[23]

The House hearings unequivocally reveal that Exemption 2 was intended to cover investigatory materials. During an exchange involving Congressman Moss, the principal sponsor of the bill and chairman of the subcommittee holding the hearings, Mr. Kass, counsel to the subcommittee, and Mr. Schlei, Assistant Attorney General, Congressman Moss said, in response to Mr. Schlei's objection that Exemption 2 "did not go far enough:"

> What [Exemption 2] was intended to cover was instances such as the manuals of procedure that are handed to an examiner—a bank examiner, or a savings and loan examiner, or the guidelines given to an FBI agent.

*Id.* at 29.[24]

Several months after completion of the Moss hearings on H.R. 5012, the House Committee on Government Operations took

practices of an agency? How does your agency interpret that?
Mr. Schlei. Well, we're inclined to be critical of that exception because it did not seem to us actually that the personnel rules and practices of an agency, many of them, ought to be exempt. They ought to be public. How you handle various personnel problems and where somebody goes to complain if he is treated wrongly by his superior, and so on. All those things I would suppose should be public. They should be upon a bulletin board.
And there are some personnel rules and practices that ought to be exempt, and I think that—let's see—
Mr. Kass. It is No. 2.
Mr. Schlei. And so that exception, it seemed to us, protected from disclosure things that did not need protection, as well as perhaps not going far enough as to some aspects of information that the Government gets about its employees.
Mr. Kass. Where an individual is, let's assume, fired from the agency—for cause we hope—would the facts and circumstances surrounding this discharge fall within the personnel practices of an agency as you read it?
Mr. Schlei. I should not think so, although you are talking here about records that are

up consideration of S. 1160,[25] and reported the bill without amendment on May 9, 1966. *See* 112 Cong.Rec. 10053 (1966). The House Report on S. 1160, H.R.Rep.No.1497, 89th Cong., 2d Sess. 3 (1966), reiterates the general view expressed in the Senate Report that section 3 of the APA "has become the major statutory excuse for withholding Government records from public view."

In its description of Exemption 2, the House Report stated:

> related to the "practices" of an agency, and conceivably a record, although it contained only a summary of some facts, say, might be related to the "practices, personnel practices," of the agency, part of a file, part of a series of documents.
>
> I am just talking off the top of my head about that problem, but I would say that you could get a situation where a factual statement or document came within that exception.
>
> Mr. Kass. We are all talking, as you say, off the top of our heads. We are trying to create legislative history to determine what we intend.
>
> Mr. Moss. What this was intended to cover was instances such as the manuals of procedure that are handed to an examiner—a bank examiner, or a savings and loan examiner, or the guidelines given to an FBI agent.
>
> Mr. Schlei. Ah! Then the word "personnel" should be stricken. Because "personnel" I think connoted certainly to use the employee relations, employee management rules and practices of an agency. What you meant was material related solely to the internal rules and practices of any agency for the guidance of its employees—something like that.
>
> I do agree that there should be protection for the instructions given to FBI agents and bank examiners; people who, if they are going to operate in expectable ways, cannot do their jobs. Their instructions have to be withheld.
>
> But I think that word "personnel" does not do the job well enough, Mr. Chairman. I am sure it can be done.
>
> Mr. Moss. We will hope to seek a way of doing the job without exempting internal rules and practices.
>
> Mr. Schlei. I suppose that could cover quite a lot of ground, Mr. Chairman.
>
> Mr. Moss. Because I am afraid that we would there open the barn door to everything.
>
> Mr. Schlei. Well, it is one of those things, Mr. Chairman, that just shows how hard it is to cover the whole Government with a few words. There are a number of problems.

2. Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all "matters of internal management" such as employee relations and working conditions and routine administrative procedures which are withheld under the present law.

> Mr. Moss. Oh, we recognize the difficulty and the complexity, but we are perfectly willing to work at it.
>
> Mr. Schlei. All right, sir.

*House Hearings on H.R. 5012*, at 29–30 (statement of Norbert A. Schlei).

In *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 766 (D.C.Cir.1978) (*en banc*), this court recognized that Representative Moss "wanted investigative manuals covered by [Exemption 2]." The opinion, however, also implies that Mr. Schlei's interpretation of the wording of Exemption 2 should be given greater weight than that of Representative Moss. Since in this case we are seeking *congressional* intent, we cannot follow the suggestion that Mr. Schlei's interpretation of Exemption 2 is to be given predominant weight over that of a congressman and chief sponsor of the bill. Other witnesses before the House subcommittee apparently felt that no problem existed under Exemption 2. For example, Clark Mollenhoff, Vice Chairman of Sigma Delta Chi's Committee for Advancement of Freedom of Information, indicated his belief that Exemption 2 should cover "instructions to FBI agents:"

> Mr. Kass. Would a definition of personnel rules include, in your estimation, instructions to FBI agents, or instructions to Secret Service agents, as exempt from disclosure?
>
> Mr. Mollenhoff. I think those should be exempt.
>
> Mr. Kass. They should be exempt?
>
> Mr. Mollenhoff. Yes. I don't think that that particular area is something that we should want to get into. The only time that that should be gone into is extraordinary circumstances where a proper committee of Congress would feel there is something wrong with the way it is being handled.
>
> Mr. Kass. But as to the relationship between the executive and the public, they should not be given even that information?
>
> Mr. Mollenhoff. No.

*House Hearings on H.R. 5012*, at 151 (statement of Clark R. Mollenhoff).

**25.** *See* note 20, *supra.*

*Id.* at 10. Plainly, the House Report's brief description of Exemption 2 differs from the Senate Report's description in important respects.

This deviation has been discussed in other opinions,[26] and it comes to this: The Senate Report expressly states that documents concerning minor matters of employment—like sick leave policy—are exempt from disclosure, whereas the House Report indicates that such matters should be released. The so-called contradiction between the House and Senate Reports, however, exists only with respect to the exemption of trivial employment matters. The House Report's statement that Exemption 2 permits exemption of more substantive matters—such as "manuals of procedure for Government investigators or examiners"—is uncontroverted by the Senate Report.[27]

Another important source of congressional intent is the House debate on S. 1160.[28] Congressman Moss, who had introduced similar legislation (H.R. 5012) in the House, and had conducted hearings on S. 1160, carefully noted the cross-currents of congressional concern expressed in the bill:

> [T]he committee has, with the utmost sense of responsibility, attempted to achieve a balance between a public need to know and a necessary restraint upon access to information in specific instances. The bill lists nine categories of Federal documents which may be withheld to protect the national security or permit effective operation of the Government.

112 Cong.Rec. 13641 (1966) (remarks of Rep. Moss). Representative Dole also spoke in support of S. 1160, indicating his belief that

> the bill takes into consideration the right to know of every citizen while affording the safeguards necessary to the effective functioning of Government.

*Id.* at 13655 (remarks of Rep. Dole). Representative Gallagher was even more specific:

> I would like to reiterate that the bill also prevents the disclosure of other types of "sensitive" Government information such as . . . income tax auditors' manual.

>      .        .        .        .        .

> Income tax auditors' manual would be protected under No. 2—"related solely to internal personnel rules and practices."

*Id.* at 13659 (remarks of Rep. Gallagher).

From these brief, but uncontradicted, statements in the House debate on S. 1160, we can see that the members of the House recognized that the unrestricted release of government documents might interfere with the "effective operation of the Government," and that the nine exemptions were included in S. 1160 to prevent such interference. More specifically and importantly, supporters of S. 1160 were not challenged in their claim that government investigatory manuals were protected under Exemption 2.

We believe that the remarks from the debate are highly instructive. Particularly because in the present case Crooker has not disputed that release of the BATF manual will help individuals to evade the law, we are loathe to construe the statute in a way contrary to the express feelings of one house, on a point on which the other house made no comment.

### III. OTHER INDICATIONS OF CONGRESSIONAL INTENT

The legislative history of Exemption 2 is not the only source of congressional intent regarding its scope. Indeed, it is

> fundamental that a section of a statute should not be read in isolation from the

---

26. *See, e.g., Department of the Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); *Sladek v. Bensinger,* 605 F.2d 899 (5th Cir. 1979); *Jordan v. United States Dep't of Justice,* 591 F.2d 753 (D.C.Cir.1978) (*en banc*); and *Vaughn v. Rosen (Vaughn II),* 523 F.2d 1136 (D.C.Cir.1975).

27. By noting that "the primary focus of the House Report was on exemption of disclosures .

that might enable the regulated to circumvent agency regulation," the Supreme Court in *Rose* recognized that the conflict between the committee reports exists only as regards minor employment matters. *See* 425 U.S. 366–67, 96 S.Ct. 1601–02.

28. As stated above, S. 1160 passed the Senate without debate or objection.

context of the whole Act, and that in fulfilling our responsibility in interpreting legislation, "we must not be guided by a single sentence or member of a sentence, but [should] look to the provisions of the whole law, and to its object and policy."

*Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962) (footnote omitted).[29] As this court stated in *Certified Color Mfrs. Ass'n v. Mathews*, 543 F.2d 284, 296 (D.C.Cir.1976), "[i]t is a fundamental rule of statutory construction that legislative enactments be construed in a manner designed to give effect to all parts while avoiding a result contrary to the apparent intent of Congress."[30]

As we have seen above, Congress believed that FOIA resolved two crucial but potentially conflicting interests: the right of the citizenry to know what the Government is doing, and the legitimate but limited need for secrecy to maintain the effective operation of Government. Two other subsections of FOIA, section (a)(2)(C) and section (b)(7)(E) [Exemption 7(E)], reinforce the conclusion that Congress was aware of the need to protect investigative techniques from disclosure, and that Congress took action to prevent their disclosure. In short, these provisions reveal that Congress did not intend that FOIA would frustrate law enforcement efforts. While the congressional purpose behind these two sections is not dispositive to the question regarding Exemption 2, their inclusion in FOIA points to the conclusion that Congress believed that FOIA would not mandate release of

materials containing law enforcement investigative techniques.

### A. Section (a)(2)(C)

Section (a)(2)(C) provides:

(2) Each agency, in accordance with published rules, shall make available for public inspection and copying—

(C) administrative staff manuals and instructions to staff that affect a member of the public;

unless the materials are promptly published and copies offered for sale.

When S. 1160 was originally introduced in the Senate, the provision that was later to become section (a)(2)(C)[31] referred to "staff manuals" and not "administrative staff manuals." During Senate hearings on S. 1160, several witnesses expressed their fears that this language would mandate release of information that could damage or hinder law enforcement efforts. For example, Professor Kenneth C. Davis stated that the provision

goes too far and needs to be cut back. For instance, one who is investigated may be affected by instructions to the investigator about how to investigate, but some such instructions are properly confidential.

*Senate Hearings on S. 1160, supra* note 15, at 178 (statement of Kenneth C. Davis). The Securities and Exchange Commission, while declining to give an opinion on the scope of the provision, stated that

we fear its possible effect on our investigative and other enforcement activities.

---

**29.** Quoting *Mastro Plastics Corp. v. National Labor Relations Board*, 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956), quoting from *United States v. Boisdore's Heirs*, 8 How. 113, 122, 12 L.Ed. 1009 (1850).

**30.** We note that we do not find it particularly significant that Congress enacted in 1976 a provision in the Government in Sunshine Act identically worded to Exemption 2 of FOIA. *See* Pub.L.No.94–409, § 3(a), 90 Stat. 1241 (1976). The House Report described the Sunshine Act provision as

intended to protect the privacy of staff members and to cover the handling of strictly internal matters. It does not include discussions or information dealing with agency pol-

icies governing employees' dealings with the public, such as manuals or directives setting forth job functions or procedures.

H.R.Rep.No.880 (Part I), 94th Cong., 2d Sess. 9 (1976). We cannot follow the suggestion in *Jordan*, 591 F.2d at 770–71, that the House, in an entirely different act, repudiated its understanding of a provision in FOIA. Had the House meant to invest Exemption 2 in FOIA with a different meaning, it would have done so at any of the several times Congress amended FOIA.

**31.** At that time § (a)(2)(C) was designated § (b)(C). *See* note 13, *supra.*

We agree that the public should have access to such materials as will facilitate compliance with the law and transactions with the agency. But disclosure of investigative techniques set out in staff training manuals, for example, would virtually provide a blueprint for evading the law to prospective violators.

*Id.* at 292 (Memorandum of the Securities and Exchange Commission to the Comm. on the Judiciary). The Department of Agriculture concurred:

The Department is strongly opposed to this provision. There are many types of staff manuals and instructions to staff that may affect members of the public but should not be published or made available for public inspection and copying. For example, staff manuals concerning investigation procedures or techniques to develop evidence of alleged violations of regulatory statutes ... may affect members of the public but they are internal in nature and should not be published or made available to the public.

*Id.* at 381 (Detailed Analysis of S. 1336 by the U. S. Dep't of Agriculture).

Although the members of the Senate subcommittee did not respond directly to these comments, the committee report recommended adding the word "administrative" to the expression "staff manual." *See* S.Rep.No.813, 89th Cong., 1st Sess. 1 (1965). In discussing the proposed amendment to S. 1160, the Senate Report stated that:

The limitation of the staff manuals and instructions affecting the public which must be made available to the public to those which pertain to administrative matters rather than to law enforcement matters protects the traditional confidential nature of instructions to Government personnel prosecuting violations of law in court, while permitting a public examina-

tion of the basis for administrative action.

*Id.* at 2.

The House Report explained in more detail the scope of the provision:

[A]n agency may not be required to make available those portions of its staff manuals and instructions which set forth criteria or guidelines for the staff in auditing or inspection procedures, or in the selection or handling of cases, such as operational tactics, allowable tolerances, or criteria for defense, prosecutions, or settlement of cases.

H.R.Rep.No.1497, 89th Cong., 2d Sess. 7–8 (1966), U.S.Code Cong. & Admin.News 1966, pp. 2418, 2424.

Clearly, one of the "cross-currents" apparent from reviewing section (a)(2)(C) and its legislative history is Congress' deep concern that manuals setting forth guidelines for auditing or inspection procedures should not be released to the public. Moreover, Congress acted specifically to prevent such a result, consistent with the secondary emphasis in the statute—that FOIA not be drafted so as to interfere with the effective operation of Government.

B. *Section (b)(7)(E)*

Similar indications of congressional intent are apparent from the 1974 amendments to FOIA. Following the Act's passage in 1966, it became clear to many members of Congress that a number of federal agencies were using Exemption 7 to block legitimate requests for information.[32] In response to the intransigence of these agencies, Congress revised Exemption 7 as a part of the 1974 amendments to FOIA.

As reported by the Senate Judiciary Committee, the original version of S. 2543, which later emerged as the 1974 legislation amending FOIA, left Exemption 7 intact. *See* S.Rep.No.854, 93d Cong., 2d Sess. (1974).[33] During the Senate debate, how-

---

**32.** The original provision, as enacted in FOIA in 1966, read:

The provisions of this section shall not be applicable to matters that are ...

(7) investigatory files compiled for law enforcement purposes except to the extent available by law to a private party.

**33.** In fact the Senate Report specifically stated that "S. 2543 does not amend the substance of the exemptions to disclosure spelled out in sub-

## 1064

ever, Senator Hart offered an amendment listing the specific circumstances under which a document would be exempt under Exemption 7. In part, his proposal provided that records need not be disclosed if they are:

(7) Investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... (D) disclose investigative techniques and procedures. ·

See 120 Cong.Rec. 17033 (1974). In this amendment, Senator Hart recognized the legitimate law enforcement need for withholding some materials from disclosure:

[T]he amendment would protect against the release of investigative techniques and procedures where such techniques and procedures are not generally known outside the Government.

Id. at 17034 (remarks of Sen. Hart).

Senator Kennedy, speaking in support of the amendment, made it clear that Senator Hart's addition was necessary to force courts to follow the original intent of Congress in enacting FOIA:

[W]hether or not this amendment is adopted, I would like to make it clear that I believe the courts have, in narrowly and mechanically interpreting the seventh exemption, strayed from the requirements and the spirit of the Freedom of Information Act .... I thus want the record to show that by accepting the Sen-

ator's amendment we will be reemphasizing and clarifying what the law presently requires.

Id. at 17034–35 (remarks of Sen. Kennedy) (emphasis added). After the debate, the Senate adopted Senator Hart's amendment and the entire bill.

The House, meanwhile, considered a similar bill, H.R. 12471. As reported out of committee, the House bill included no changes to Exemption 7. See H.R.Rep.No. 876, 93d Cong., 2d Sess. (1974), U.S.Code Cong. & Admin.News 1974,· p. 6267; 120 Cong.Rec. 6814 (1974) (remarks of Rep. Fascell) ("The pending legislation, therefore, does not change the language of eight of the nine exemptions.") The bill, as reported, was passed in the House.

The conference committee appointed to iron out the differences between the Senate and House bills [34] adopted the Senate amendment to Exemption 7 and added an additional provision,[35] see H.R.Rep.No.1380, 93d Cong., 2d Sess. 12 (1974), but its explanation of Exemption 7(E) adds little to the language of the amendment.[36] Both the House and the Senate passed the bill, as reported by the conference committee, which now included Senator Hart's amendments to Exemption 7.[37]

Again, the legislative history of Exemption 7(E) is not dispositive of the issue before this court, but it is instructive.[38] Be-

section (b)." Id. at 1. At the same time, by leaving the language of the exemptions unchanged, the Committee did not mean to imply acceptance of "judicial decisions which unduly constrict application of the Act." Id. at 7.

**34.** In order to enable both houses formally to consider the same bill, the Senate struck the whole text of H.R. 12471 and substituted the text of S. 2543 in its entirety.

**35.** Because of another conference committee change, the "investigative techniques and procedures" provision was moved from § (b)(7)(D) to its present place at § (b)(7)(E).

**36.** The Report simply noted that:

The conferees wish to make clear that the scope of this exception against disclosure of "investigative techniques and procedures" should not be interpreted to include routine techniques and procedures already well

known to the public, such as ballistics tests, fingerprinting, and other scientific tests or commonly known techniques. Nor is this exception intended to include records falling within the scope of subsection 552(a)(2) of the Freedom of Information law, such as administrative staff manuals and instructions to staff that affect a member of the public. Id. at 12–13.

**37.** Although President Ford vetoed the bill, both the House and the Senate promptly overrode the veto.

**38.** The usefulness of Exemption 7(E) in our analysis is illustrated by Lesar v. United States Dep't of Justice, 636 F.2d 472, 486 (D.C.Cir. 1980), in which this court relied on Exemption 7(D) in deciding that "the public has no legitimate interest in gaining information that could lead to the exposure of confidential sources."

cause Exemption 7(E) was not added to change FOIA but to "reemphasize and clarify" Congress' original intent, the 1974 Amendments provide valuable insight into Congress' intent when it enacted FOIA, and Exemption 2, in 1966.

## IV. CONCLUSIONS TO BE DRAWN FROM THE LEGISLATIVE HISTORY

At this point in the discussion, it is appropriate to set forth certain critical conclusions distilled from the legislative history of FOIA. Clearly, FOIA was primarily envisioned as a workable disclosure statute that would eliminate the pervasive secrecy of the Federal Government. But our recognition of this explicit purpose should not obscure a secondary, but nevertheless fundamental, aspect of the bill—*i.e.* to exempt certain limited categories of documents from mandatory disclosure in order to protect individual rights and to permit the effective operation of the Government. In order to implement this secondary purpose, Congress included in FOIA nine exemptions from mandatory disclosure.

From the House, we have unequivocal statements in the hearings, the House Report, and the debate that Exemption 2 was intended to shield internal instructions to law enforcement agents from mandatory disclosure.[39] The Senate gives us less guidance since the Senators made no useful comments during the Senate hearings, and held no debate at all on FOIA. The Senate Report indicates that Exemption 2 covers minor employment matters, but it does not expressly limit the scope of Exemption 2 to such matters. Thus, the legislative history from the Senate and House is not contradictory as regards materials that would "aid in circumvention of the law." Instead the Senate was silent on this point, and the

House stated that such materials would be exempt from mandatory disclosure.

Other provisions of FOIA also demonstrate the "cross-currents" of concerns that Congress hoped to resolve in FOIA. In both sections (a)(2)(C) and (b)(7)(E) [Exemption 7(E) ], Congress acted to block the production of materials that would result in the disclosure of investigatory techniques. In attempting to interpret FOIA as a consistent whole, we must recognize that these two sections are at least indicators of what Congress believed FOIA would do. It would be inconsistent to no small degree to hold that Exemption 2 would not bar the disclosure of investigatory techniques when contained in a manual restricted to internal use, but that Exemption 7(E) would exempt the release of such techniques if contained in an "investigatory record." We see no reason, absent some persuasive evidence in the legislative history, to attribute such confused motives to Congress.

Furthermore, upon reflection, it would appear that the Senate and House interpretations of Exemption 2 may be reconcilable. The Senate's concern in Exemption 2 was with matters so minor as to be of no genuine public concern, as opposed to "more substantial matters which might be the subject of legitimate public interest." *Vaughn v. Rosen (Vaughn II)*, 523 F.2d at 1142. The House, however, felt that certain substantial matters were not "the subject of legitimate public interest," notably investigatory techniques used by law enforcement agencies. ·From *both* houses, however, comes the common intent to use Exemption 2 to exempt from disclosure those internal personnel matters not "the subject of legitimate public interest."

This is not to say that it is up to the courts to decide what matters are of legiti-

Because the public had no "legitimate interest," the court held that the information was exempt under Exemption 2.

**39.** It bears repeating that the House hearings were completed before the Senate held hearings on and passed S. 1160. Consequently, it is hardly sensible to disregard other consistent indications of House intent occurring after pas-

sage of the Senate bill on the speculative grounds that some members of the House engaged in "last minute chicanery" to undermine the Senate's action. *See Jordan*, 591 F.2d at 768–69. The House expressed its intent on Exemption 2 both before *and* after the Senate expressed its views on the matter in the Senate Report.

mate public interest. *Congress* has made the determination that except for certain specified materials, all government documents are of legitimate public interest. In the present case we are not deciding what is in the public interest. Rather, by application of the statutory language, and direct reference to the legislative history, we must determine what matters Congress sought to exempt from disclosure. It will not do to apply individual provisions of the statute woodenly, oblivious to Congress'. intention that FOIA not frustrate law enforcement efforts. Rather it is our job to interpret the law as we believe Congress meant it to be read.

## V. THE CASE LAW ON EXEMPTION 2

Several courts of appeals have considered whether to release documents similar to the BATF manual sought by Crooker in the present case. A review of these cases shows that each of these circuits, except for the District of Columbia Circuit, has refused to order the release of such materials. Some of these decisions have rested on Exemption 2, others on section (a)(2)(C).

### A. *Supreme Court Precedent*

The starting point for most circuit court decisions on Exemption 2 is the Supreme Court's decision in *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). In *Rose* the respondents sought to obtain case summaries of honor and ethics hearings at the Air Force Academy. Although the District Court ruled that Exemption 2 protected the summaries from disclosure, the Supreme Court reversed, holding that the summaries must be released.

In its discussion of Exemption 2, the Supreme Court recognized the explicit contradiction in the House and Senate Reports concerning whether minor employment matters are exempt from disclosure. The Court concluded that, "in this regard," the Senate Report was the more authoritative. *See id.* at 367, 96 S.Ct. at 1602. But the

Court was also careful to note the emphasis in the House Report on the availability of Exemption 2 to prevent the release of materials that would result in the disclosure of investigative techniques. In this regard, the Court wrote:

> Those cases relying on the House, rather than the Senate, interpretation of Exemption 2, and permitting agency withholding of matters of some public interest, have done so only *where necessary to prevent the circumvention of agency regulations* that might result from disclosure to the subjects of regulation of the procedural manuals and guidelines used by the agency in discharging its regulatory function. . . . Moreover, the legislative history indicates that *this was the primary concern of the committee drafting the House Report.*

*Id.* at 364, 96 S.Ct. at 1600 (citations omitted) (emphasis added).[40] Later in the opinion the Court repeated that it accepted the Senate interpretation of the exemption on minor employment matters in part "because we think the primary focus of the House Report was on exemption of disclosures that might enable the regulated to circumvent agency regulation." *Id.* at 366–67, 96 S.Ct. 1601–02. Finally, the Court noted:

> In sum, we think that, *at least where the situation is not one where disclosure may risk circumvention of agency regulation,* Exemption 2 is not applicable to matters subject to such a genuine and significant public interest.

*Id.* at 369, 96 S.Ct. at 1603 (emphasis added).

Clearly, *Rose* left open the question that faces us in the present case. At the same time, it is equally clear that the Supreme Court considered as substantial the argument that Exemption 2 might be construed to cover internal agency materials where disclosure might risk circumvention of the law.

### B. *D.C. Circuit Case Law*

The first significant case in this circuit dealing with the scope of Exemption 2 was

---

**40.** The Court acknowledged that *Rose* was not a case where knowledge of administrative procedures might help individuals to circumvent the law. *See id.* at 364, 96 S.Ct. at 1600.

*Vaughn v. Rosen (Vaughn II)*, 523 F.2d 1136 (D.C.Cir.1975). In *Vaughn II*, the plaintiff had sought the release of "Evaluation of Personnel Management" reports, prepared by the Civil Service Commission, to provide advice to agencies on how to improve their personnel programs. After considering the conflict between the Senate and House Reports, the court of appeals concluded "that the Senate Committee Report is authoritative and that Exemption 2 exempts from disclosure only routine 'house-keeping' matters in which it can be presumed the public lacks any substantial interest." *Id.* at 1141. The court believed that "the Senate Report indicates that the line sought to be drawn is one between minor or trivial matters and those more substantial matters which might be the subject of *legitimate* public interest." *Id.* at 1142 (emphasis added). As a consequence of its analysis, the court ordered the reports released.

Part of the rationale underlying the decision in *Vaughn II* is that FOIA is a broad disclosure statute, and that any uncertainty in interpreting the Act "requires us to choose that interpretation most favoring disclosure." *Id.*[41] Yet this interpretative approach may be too superficial, for it fails to take into account all of the "cross-currents" of concerns expressed by those members of Congress supporting the enactment of FOIA.[42]

Judge Leventhal, who concurred separately in *Vaughn II*, considered the majority's analysis—that the Senate Report should be given greater weight than the House Report because the bill was passed first in the Senate—to be

a novel and totally unpersuasive canon of statutory construction .... The argument that the Senate Report was "available" to the House members is theoretical: The members of the House committee did have the Senate Report, but they departed from it.

*Id.* at 1148.[43] Moreover, he believed that even if the Senate Report afforded more disclosure, and thus was "more in keeping with the overall purpose of disclosure[,] that does not answer questions about the construction of any particular provision." *Id.*

In considering Exemption 2, Judge Leventhal reasoned that it "apparently signified a determination that the public interest would not be furthered by a requirement of public disclosure of certain 'internal' matters." *Id.* at 1150. Since, however, the documents sought in *Vaughn II* were neither solely nor even predominantly[44] related to the internal practices of an agency, he believed that they should be released.

In 1978, this court decided *Jordan v. United States Dep't of Justice*, 591 F.2d 753

---

**41.** The *Vaughn II* opinion also follows the analysis in *Hawkes v. Internal Revenue Service*, 467 F.2d 787, 794 (6th Cir. 1972), that the Senate Report must be given predominant weight since it was the only report available to the members of both houses. *See* 523 F.2d at 1142–43. In support of its argument, the *Vaughn II* court quotes Professor Davis that "[t]he basic principal is quite elementary: The content of the law must depend upon the intent of both Houses, not of just one." *Id.* at 1142, quoting Davis, Administrative Law Treatise, § 3A.31 (1970 Supp.) at 175. Yet the problem before us is that the intent of the House and that of the Senate, as expressed in the Committee Reports, are not identical. It is the job of this court to find an interpretation that best comports with the understanding of both houses.

**42.** In *Rose*, the Supreme Court quoted extensively from *Vaughn II* for the proposition that, in general, the Senate Report's interpretation of

Exemption 2 is preferable to the House Report's. The Supreme Court, however, carefully limited its approval to matters where disclosure would *not* risk circumvention of the law. *See* 425 U.S. at 369, 96 S.Ct. at 1603.

**43.** Judge Leventhal also noted that "the realities of the legislative process" were that the House members voting on the bill had only copies of the bill and the House Report, and probably never saw the Senate Report. *Id.*

**44.** As noted above, Judge Leventhal reasoned that the word "solely" in § (b)(2) must mean "predominantly" since "[solely] is open to an all-or-nothing interpretation; there are few events in our society today that occur without so much as a tiny ripple effect outside their area of primary impact." *Id.* at 1150. Concluding that Congress could not have intended such an extreme interpretation, he settled on "predominantly."

(D.C.Cir.1978) (*en banc*).[45] The plaintiff, Jordan, sought from the Justice Department two documents relating to guidelines for prosecutorial discretion. In an affidavit, the United States Attorney stated that release of these documents would permit individuals to "exploit these policies [of prosecutorial discretion] by committing crimes within these select categories, thereby escaping prosecution." 591 F.2d at 758.[46] Examining the language of Exemption 2, the majority in *Jordan* held that the "[t]he Manual or Guidelines of the type at issue are simply not 'personnel' rules or practices," and that, therefore, "from the face of the statute . . . the Guidelines at issue here are not within the specific language of Exemption 2." *Id.* at 763. Apparently in partial justification of this holding, the majority opinion added that "Exemption 2 was not designed to protect documents whose disclosure might risk circumvention of agency regulation." *Id.* at 771.

Regarding the legislative history of Exemption 2, the majority in *Jordan* concluded that the interpretations of Exemption 2 in the House and Senate Reports conflicted, and that the Senate Report gave the preferred construction. The majority accepted the Senate Report to the exclusion of the House Report because it believed that the Senate Report was more consistent with the language of Exemption 2, that the House Report offered no useful guidelines for agency officials, that the House interpretation was too sweeping (and thus inconsistent with the overall purpose of FOIA), and that "the House Report was the product of last minute chicanery by interested members of the House." *Id.* at 768.

A total of five judges signed the majority opinion. One of them, Judge Bazelon, also wrote separately to emphasize his belief that "an important feature of [the] decision" was to eliminate "secret law," such as the guidelines for prosecutorial discretion. *Id.* at 781 (Bazelon, J., concurring).

Judge Leventhal, with Chief Judge Robinson joining him, concurred separately. Judge Leventhal wrote that where "disclosure would permit circumvention of the law, and there is no substantial, valid external interest of the community at large in revelation," internal instructions to investigators would be exempt under Exemption 2. *Id.* at 783. He argued that while the House Report was not as persuasive generally as the Senate Report, it was "not a nullity." *Id.* Nonetheless, he and Chief Judge Robinson joined in affirming the District Court since they believed that *Jordan* was not

> a case of predominant internality, but rather a case of substantial public interest in disclosure that is not offset by an interest in preventing circumvention of law or regulations.

*Id.* at 784.

Judge MacKinnon, joined by Judge Robb, dissented, largely on the basis that section (a)(2)(C) exempted the documents from disclosure. *See id.* at 785–96 (MacKinnon, J., dissenting).

Following *Jordan*, this circuit issued *Cox v. United States Dep't of Justice*, 601 F.2d 1 (D.C.Cir.1979). In a brief *per curiam* opinion,[47] the court held that a "Marshal's Manual"—which gave details concerning the U. S. Marshals' weapons and handcuffs, and their transportation of prisoners—was protected from disclosure under Exemption 2

---

**45.** Although a fuller discussion of the impact on *Jordan* by our decision today is given in the next section, a brief synopsis is useful here in order to understand the development of the case law regarding Exemption 2.

**46.** The District Court, however, made no factual finding that release of the documents would aid individuals in circumvention of the law. *See Jordan v. United States Dep't of Justice*, C.A. No. 76–0276 (D.D.C. Jan. 18, 1977). Moreover, unlike in the present case, the plaintiffs disputed the Government's assertion that

release of the prosecutorial guidelines would hinder law enforcement in that the guidelines did not involve law enforcement techniques and methods. *See* Plaintiff's Memorandum in Opposition to Defendant's Cross-Motion for Partial Summary Judgment, at 6–8.

**47.** Judges MacKinnon and Robb, who dissented in *Jordan*, signed the opinion for the court. Judge Wright, who joined the majority in *Jordan*, concurred in the result.

since the "deleted portions of the Manual unquestionably fall within subsection (b)'s exemption for routine matters of merely internal interest." *Id.* at 4. The court sought to distinguish *Jordan* in that:

> The undisclosed material [sought by Cox] does not purport to regulate activities among members of the public. Nor does it set standards to be followed by agency personnel in deciding whether to proceed against or to take action affecting members of the public.

*Id.* at 5.

In *Lesar v. United States Dep't of Justice*, 636 F.2d 472 (D.C.Cir.1980), the plaintiff sought reports and documents from the Justice Department concerning the FBI's investigation of the assassination of Martin Luther King. On the basis of Exemption 2, the Department resisted disclosure of "symbols used to refer to FBI informants in FBI documents and records." *Id.* at 485. This court held:

> We also find that the informant codes plainly fall within the ambit of Exemption 2. The means by which the FBI refers to informants in its investigative files is a matter of internal significance in which the public has no substantial interest.

*Id.* at 485–86. In support of the proposition that "the public has no legitimate interest in gaining information that could lead to the exposure of confidential sources," *id.* at 486, the court cited Exemption 7(D), which exempts from disclosure "information that would disclose the identity of a confidential source in investigatory records." *Id.* at n.78. Thus, in *Lesar*, the court referred to the language of another FOIA provision in order to determine the congressional intent underlying Exemption 2. It is also significant that *Lesar* does not restrict the scope of Exemption 2 to minor employment matters, as the court did in *Jordan*.[48]

From these cases it is plain that there is some uncertainty in this circuit regarding the scope of Exemption 2: While *Cox* purports to follow the analysis in *Jordan*, its result seems inconsistent with the rationale of *Jordan*.[49] Moreover, the logic and even

---

**48.** There is one other case of some significance in this circuit. In *Allen v. Central Intelligence Agency*, 636 F.2d 1287 (D.C.Cir.1980), the court held that portions of agency documents that contained "filing and routing instructions" were not exempt from disclosure under Exemption 2. *See id.* at 1289–90. Although the court noted that the narrow scope of Exemption 2, as reflected in the Senate Report, would not exempt the filing and routing instructions from disclosure, it also noted that it "is even doubtful that the filing and routing instructions would be exempt under the broader reading of the exemption given in the House report," since disclosure "would not cause such 'circumvention of agency regulations.'" *Id.* at 1290 n.20.

**49.** One case that apparently has caused some confusion is *Ginsburg, Feldman & Bress v. Federal Energy Administration*, 591 F.2d 717 (D.C. Cir.1978), *vacated and aff'd by an evenly divided court*, 591 F.2d 752 (D.C.Cir.1978) (*en banc*). In *Ginsburg* the appellant sought an agency manual containing guidelines and instructions to agency employees who audit oil refineries. The District Court had denied the manual to the appellant.

Because the panel opinion was vacated (on the same day *Jordan* was issued), and the District Court decision was affirmed by an equally divided court, there is no opinion of the court. The confusion arises largely because the five judge majority in *Jordan* (which ordered release of the document) shrank to four judges in *Ginsburg*. Moreover, Judge Leventhal, who wrote a concurrence in *Jordan*, did not take part in the decision of *Ginsburg*. For whatever reason, the court felt differently about the release of the FEA auditor's manual in *Ginsburg* than it did about the United States Attorney's prosecutorial discretion guidelines in *Jordan*. We do not rely on *Ginsburg* in deciding the case before us, but we feel that the apparent inconsistency in the *results* in *Jordan* and *Ginsburg* indicates the need to resolve any doubts about the law of Exemption 2 in this circuit.

Further evidence of confusion about the meaning of *Jordan* may be found in several recent unpublished District Court decisions. *See Zamnik v. United States Dep't of State*, C.A. No. 79–1072 (D.D.C. Aug. 28, 1979) (using Exemption 2, as well as Exemption 7(E), to deny the plaintiff access to a State Department manual relating to protective services for the President); *Cox v. United States Dep't of Justice*, C.A. No. 78–1944 (D.D.C. May 8, 1979) (using Exemption 2 to protect certain DEA manuals from disclosure); *Sturgeon v. Dep't of Treasury*, C.A. No. 77–1961, mem. op. at 4–5 (D.D.C. Jan. 30, 1979) (using Exemption 2 to exempt portions of a Secret Service Manual that involved "internal instructions to government investigators relating to the methods they are to use in investigating crimes").

result of *Lesar* seem at odds with that in *Jordan.* In *Lesar* the court referred to Exemption 7(D) to decide whether the public had a legitimate interest in disclosure sufficient to overcome Exemption 2. To the extent *Jordan* holds that Exemption 2 does not exempt law enforcement training or investigative manuals, despite the language of Exemption 7(E), it would appear to be inconsistent with the approach followed in *Lesar.*

## C. Case Law in Other Circuits

The cases from other circuits may be divided into two categories: those that have exempted law enforcement investigatory manuals under section (a)(2)(C); and those that have used Exemption 2 to exempt internal law enforcement manuals whose disclosure would risk circumvention of the law.[50]

### 1. Cases Relying on Section (a)(2)(C)

The first court of appeals decision to consider the conflict between the Senate and House Reports was *Hawkes v. Internal Revenue Service*, 467 F.2d 787 (6th Cir. 1972). In *Hawkes* the appellant sought an IRS tax manual in order to prepare his defense on charges of criminal tax fraud. The Sixth Circuit held that the Senate and House Reports were in complete contradiction, and that the language of the Senate Report was controlling.[51] As a result, the court concluded that it was unlikely that Exemption 2 barred the disclosure of the manual since "we believe that the internal practices and policies referred to in (b)(2) relate only to the employee-employer type

**50.** A third category of cases involves those circuits that have not decided whether Exemption 2 applies to documents whose disclosure would risk circumvention of the law. *See Maroscia v. Levi*, 569 F.2d 1000 (7th Cir. 1977); *Nix v. United States*, 572 F.2d 998, 1005 (4th Cir. 1978) (using Exemption 2 to exempt "file numbers, routing stamps, cover letters and secretary initials" from disclosure since these matters "are ordinarily not of such genuine and significant public interest as to require FOIA disclosure"). Significantly, neither of these circuits has interpreted "internal personnel rules and practices" strictly to mean "those rules and practices that concern relations among the employees of an agency," as did this court in *Jordan.* Thus, even the Fourth and Seventh Circuits do not appear to follow *Jordan.*

In *Ferri v. Bell*, 645 F.2d 1213 (3d Cir. 1981), the court rejected the Government's argument that information regarding procurement and control of electronic surveillance services involved "trivial housekeeping matters" and thus were exempt under Exemption 2. *Id.* at 23. Nonetheless, the court did not reject the applicability of Exemption 2. "It remains open to the government on remand to demonstrate by detailed affidavit that disclosure would impede the agency's law enforcement effectiveness." *Id.* at 24. The court, however, declined to rule definitively on the legal issue—involving the applicability of Exemption 2 where disclosure risks circumvention of the law—until after the Government "has demonstrated on remand *how* its effectiveness would be threatened by disclosure in this case." *Id.* (emphasis in original).

In *Stokes v. Brennan*, 476 F.2d 699 (5th Cir. 1973), the plaintiff sought disclosure of a manual entitled "Training Course for Compliance Safety and Health Officers." The District Court ordered the materials released under § (a)(2)(C), and the appellate court affirmed that decision, largely on the basis of *Hawkes v. Internal Revenue Service*, 467 F.2d 787 (6th Cir. 1972), and its finding that disclosure of the manual would not help the public to evade the law. *Id.* at 701–02.

In a subsequent case, *Sladek v. Bensinger*, 605 F.2d 899, 902 (5th Cir. 1979), the Fifth Circuit held that since

disclosure of the sections of the DEA manual [on handling confidential informants and search warrant procedures] requested by Sladek would not impede law enforcement efforts there is no need for us to choose between the Second Circuit's and the D. C. Circuit's interpretation of Exemption 2 when disclosure would risk circumvention of the law.

**51.** The *Hawkes* court felt that the Senate Report was controlling since "the plain import of the (b)(2) language clearly favors the Senate's interpretation" 467 F.2d at 797, and because only the Senate interpretation was before both Houses of Congress. "To adopt the statutory interpretation put forward in the House Report would be to allow a single house of the Congress to effectively alter the meaning placed on proposed legislation by the other house without altering a word of the text. We do not believe that this represents a wise approach to statutory interpretation." *Id.* *But see* note 41, *supra*, and note 63, *infra*.

concerns upon which the Senate Report focused." *Id.* at 797.[52]

Despite its ruling on Exemption 2, the court in *Hawkes* found that the Senate had added the word "administrative" in section (a)(2)(C) of FOIA, *see* note 1, *supra*, "to bar disclosure of information which, if known to the public, would *significantly impede* the enforcement process." *Id.* at 795 (emphasis in original).[53] Thus, although the Sixth Circuit held that Exemption 2 does not exempt certain internal manuals describing investigative techniques, it ruled that Congress had exempted the manuals under another section of FOIA.

In 1978, the Eighth Circuit decided *Cox v. United States Dep't of Justice* (*Cox I*), 576 F.2d 1302 (8th Cir. 1978), in which federal agencies cited Exemption 2 and section (a)(2)(C) to resist disclosure of a "Drug Enforcement Agency [DEA] Agents Manual." The court quoted extensively from the Sixth Circuit's opinion in *Hawkes v. Internal Revenue Service*, 467 F.2d 789 (6th Cir. 1972), and the Fifth Circuit's opinion in *Stokes v. Brennan*, 476 F.2d 699 (5th Cir. 1973), in holding that materials that may aid in evasion of the law would be exempt under section (a)(2)(C). The court also wrote that

> (b)(7) does not apply directly to the present case. It does, however, demonstrate an intention by Congress to restrict public access to some law enforcement information, and the section serves as a practical guide for determining which information in the DEA Agents Manual may be withheld from the public.

*Id.* at 1308. The court's sole reference to Exemption 2 was to state that "(b)(2) ex-

empts only 'housekeeping' matters in which 'the public could not reasonably be expected to have an interest.' " *Id.* at 1309–10, quoting *Department of the Air Force v. Rose*, 425 U.S. at 369–70, 96 S.Ct. at 1603.

This opinion was followed one year later by *Cox v. Levi*, 592 F.2d 460 (8th Cir. 1979), in which the plaintiff sought the "FBI Manual of Rules and Regulations" and the "FBI Manual of Instructions." The District Court had held that Exemption 2 exempted those portions of the Manual of Instructions that related to FBI investigative techniques and procedures, "the disclosure of which would impede the agency in its efforts to carry out its law enforcement responsibilities." *Id.* at 462. The Eighth Circuit affirmed the judgment of the District Court holding, however, that those pages whose disclosure would impede law enforcement efforts were exempt not under Exemption 2, but under section (a)(2)(C). The court expressly noted that in *Cox I*, it had "adopted the narrow interpretation of exemption (b)(2) contained in the Senate Report on the FOIA." *Id.* In a footnote, the court stated that *Cox I* "implicitly rejected" the House Report. *Id.* at n.6.[54]

Thus, the Sixth and Eighth Circuits have rejected the argument that Exemption 2 exempts agency manuals whose disclosure may risk circumvention of the law. However, both of these circuits have found that section (a)(2)(C) exempts such materials from disclosure, thus lending support to the proposition that Congress did not want these materials released.[55]

### 2. *Cases Relying on Exemption 2*

After the Eighth Circuit decided *Cox I*, the Second Circuit issued *Caplan v. Bureau*

---

**52.** The court remanded the case to the District Court to reconsider the appellant's disclosure request in light of the principles announced in *Hawkes*.

**53.** As an example of what it meant, the court stated: "Similarly interrogation techniques or the mechanics of an F.B.I. 'stakeout' arrangement properly could be excluded from disclosure under (a)(2)(C)." *Id.*

**54.** In a recent case, *Kuehnert v. Federal Bureau of Investigation*, 620 F.2d 662, 667 (8th Cir.

1980), the court expressed its doubts that "information for investigative lead purposes" falls within Exemption 2. The court remanded the case for an *in camera* inspection of the documents.

**55.** Professor Davis also believes that § (a)(2)(C) permits an agency to exempt from disclosure law enforcement manuals. *See* Davis, Administrative Law Treatise § 5.4, 5.30 (2d ed.) (1980 Supp.).

of *Alcohol, Tobacco & Firearms*, 587 F.2d 544 (2d Cir. 1978), in which the plaintiff had sought a BATF pamphlet entitled "Raids and Searches." The Court of Appeals agreed with the District Court's specific finding that "the release of such parts of the pamphlet would hinder investigations, enable violators to avoid detection and jeopardize the safety of Government agents." *Id.* at 545. The Second Circuit relied heavily on language in the Supreme Court's decision in *Rose* where the Court had qualified its holding: "at least *where the situation is not one where the disclosure may risk circumvention of agency regulation*, Exemption 2 is not applicable to matters subject to such a genuine significant public interest." *Id.* at 547, quoting *Rose*, 425 U.S. at 369, 96 S.Ct. at 1603 (emphasis in *Caplan*). The Second Circuit opinion reasoned that the disputed pamphlet did not involve "secret law," but focused "on the techniques for apprehending those who engage in breaking the law." *Id.* at 548. Considering "the full Senate Report," including its discussion of section (a)(2)(C), the court was "persuaded that the (b)(2) exemption, as the Supreme Court suggested in *Rose*, includes internal material such as the withheld portions of the BATF manual where disclosure may risk circumvention of agency regulation." *Id.*[56]

Following *Caplan*, the Ninth Circuit issued *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653 (9th Cir. 1980). As in *Caplan*, the plaintiff sought portions of a manual entitled "Raids and Searches." In an affidavit, BATF "explained how disclosure would enable violators to evade or hinder law enforcement personnel." *Id.* at 655. The court wrote that, but for the conflicting House and Senate Reports, "[f]rom its wording, [Exemption 2] would appear to apply to the contested portions of the manual here." *Id.*

The court in *Hardy* specifically rejected the Fifth, Sixth, and Eighth Circuits' reliance of section (a)(2)(C) to exempt the material. It also rejected the D. C. Circuit's rationale in *Cox v. United States Dep't of Justice*, 601 F.2d 1, 4 (D.C.Cir.1979), denying disclosure because the materials were those "in which the public could not reasonably be expected to have a legitimate interest," since such a rule "places courts in the difficult position of determining when the interest of the public in governmental matters is 'legitimate.'" 631 F.2d at 656.

Instead, the Ninth Circuit followed the rationale in *Caplan* that materials were exempt from disclosure under Exemption 2 if "the disclosure . . . may risk circumvention of agency regulation." *Id.* The court believed that Exemption 2's language was fully applicable since "[m]aterials instructing law enforcement agents on how to investigate violations concern internal personnel practices." *Id.* The court remanded the case to the District Court "to determine whether [deleted portions of the manual] involve law enforcement material, the disclosure of which would risk circumvention of agency regulation." *Id.* at 658.[57]

From this survey, it appears that the case law on Exemption 2 is scattered. It is important to note, however, that every circuit that has considered the issue, except the District of Columbia Circuit in *Jordan*, has held that FOIA does not mandate the release of investigatory manuals where disclosure may risk circumvention of agency regulation.

## VI. DISPOSITION OF THE PRESENT CASE

Our review of the statutory language of Exemption 2, its underlying legislative history, and the other provisions in FOIA leads us to agree with the Second and Ninth Circuits that the portions of the

---

**56.** *See also Polymers, Inc. v. National Labor Relations Board*, 414 F.2d 999, 1005–06 (2d Cir. 1969), *cert. denied*, 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970) (relying on the House Report to exempt from disclosure an "internal advisory document for the use of Board personnel").

**57.** Crooker concedes that *Caplan* and *Hardy* are not distinguishable from his case. *See* Appellant's brief at 23.

BATF manual withheld in this case are protected from disclosure under Exemption 2.

We stress that the language of Exemption 2 supports our conclusion of nondisclosure. The instructions to BATF agents contained in the BATF manual are not written to regulate the public. Likewise, the manual does not embody any "secret law" of the agency.[58] Rather, the deleted portions of the manual refer to investigative techniques, in the form of prescribed rules and practices for agency personnel. Indeed, it is uncontroverted that the disputed rules here have been developed predominantly for internal uses.

Obviously, the deleted portions of the manual, as with any "internal personnel rules and practices of an agency," have some effect on the public-at-large. As Judge Leventhal noted in *Vaughn II*, "there are few events in our society today that occur without so much as a tiny ripple effect outside their area of prime impact." 523 F.2d at 1150 (Leventhal, J., concurring). The critical considerations here, however, are that the manual is used for predominantly internal purposes; it is designed to establish rules and practices for agency personnel, *i.e.*, law enforcement investigatory techniques; it involves no "secret law" of the agency; and it is *conceded* that public disclosure would risk circumvention of agency regulations. Given these considerations, we hold that the deleted portions of

the BATF manual are exempt from disclosure under Exemption 2.

Although the majority opinion in *Jordan* stated that the language of Exemption 2 "would seem to refer to those rules and practices that concern relations among the employees of an agency," 591 F.2d at 763, and that "personnel" "normally connote[s] matters relating to pay, pension, vacations, hours of work, lunch hours, parking, etc.," *id.*, we feel that the meaning of Exemption 2 is not so limited. In fact, as observed above, two other circuits agree that "[f]rom its wording, [Exemption 2] would appear to apply to the contested portions of the manual here." *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653, 655 (9th Cir. 1980). Thus, while we recognize that the language of Exemption 2 alone may not answer the issue presented in this case, we conclude that it supports our judgment.

To the extent that the legislative history underlying FOIA is helpful, it also supports our conclusion. In both the House hearings and the House debates, members of the House spoke without contradiction that Exemption 2 was designed to protect law enforcement investigatory manuals from disclosure. The House Report reiterates that point. The Senate hearings give little indication of congressional intent and there were no Senate debates. The Senate Report, while helpful in providing some guidance in interpreting the language of Exemption 2, is *not* inconsistent with the

---

**58.** In *Rose*, the Supreme Court stated that Exemption 2

was not designed to authorize withholding of all matters except otherwise secret law bearing directly on the propriety of actions of members of the public. Rather, the general thrust of the exemption is simply to relieve agencies of the burden of assembling and maintaining for public inspection *matter in which the public could not reasonably be expected to have an interest.*

425 U.S. at 369–70, 96 S.Ct. at 1603 (emphasis added). With respect to "matter in which the public could not reasonably be expected to have an interest," the Court, at 425 U.S. 370, n.7, 96 S.Ct. 1603 n.7, cited the concurring opinion of Judge Leventhal in *Vaughn v. Rosen (Vaughn II)*, 523 F.2d at 1150, which reads in part:

there is still a legislative inclination that while the public has a right to know all the activities of an agency that bear on its intentions concerning outsiders, whether formal or informal interpretations and instructions, when purely "internal" matters are involved there is a combination of diminished valid interest in the outsiders relative to the administrative burden imposed, plus a recognition that management of government needs some elbow room in developing and revising internal practices, so as to achieve efficiency, without becoming embroiled in continuous public discussion. The problem is to give effect to both of these policy goals without rendering either of them nugatory by a too broadly sweeping construction of the statutory provisions.

House Report with respect to the question of investigative manuals.[59]

We are also concerned that every other circuit considering the issue has barred the mandatory release of these materials, whether through the use of Exemption 2 or section (a)(2)(C). In particular, the Second and Ninth Circuits have specifically held such materials exempt under Exemption 2. Embracing the language of the Supreme Court in *Rose*, they have held "that law enforcement materials, disclosure of which may risk circumvention of agency regulation, are exempt from disclosure." *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653, 657 (9th Cir. 1980); *Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544, 548 (2d Cir. 1978). These decisions are hardly surprising since the overall design of FOIA, the explicit comments made in the House, the cautionary words of the Supreme Court in *Rose*, and even common sense, would seem to belie any suggestion that Congress enacted a statute whose provisions undermined its criminal statutes and the effectiveness of law enforcement agencies.

It is not up to this court to balance the public interest in disclosure against any reason for avoiding disclosure.[60] Congress has done the necessary balancing and enacted FOIA to represent the "cross-currents" of concern.[61] Rather, our job is to determine congressional intent. In determining that intent, we, of course, look to the statute, its structure, and its purpose as expressed in the legislative history. Consequently, we must construe Exemption 2 narrowly in order to be consistent with congressional intent that FOIA be a disclosure statute. Yet, it will not do for us to act on the primary purpose of the statute to the exclusion of all other express congressional concerns. As we have shown above, Congress evidenced a secondary purpose when it enacted FOIA of preserving the effective operation of governmental agencies. We must consider this purpose, too, when we construe Exemption 2.

■ Accordingly, we hold that if a document for which disclosure is sought meets the test of "predominant internality," and if disclosure significantly risks circumvention of agency regulations or statutes, then Exemption 2 exempts the material from mandatory disclosure. In this formulation, we adopt the Supreme Court's language in *Rose* as well as the expression "predominant internality" as used by Judge Leventhal in his concurring opinion in *Vaughn II*. We add the word "significantly" to stress the narrow scope of our construction of Exemption 2; in all cases in which the Government relies on Exemption 2, it remains the Government's burden to prove the "significant risk."

While our decision may appear inconsistent with one of the bare legal holdings in *Jordan, see* 591 F.2d at 771, we nevertheless believe that from the facts as presented in *Jordan*, the *result* in that case would be identical under the test we announce today. It is the rationale in *Jordan* we reject insofar as it suggests that virtually all law enforcement manuals must be disclosed under FOIA.[62]

---

**59.** To the extent that the legislative history of earlier bills is useful, it also supports the conclusion that Congress intended to exempt investigatory manuals from disclosure under Exemption 2. *See* note 14, *supra*.

**60.** Nor is it for this court to decide which disclosures are in the public interest. Thus, to this extent we reject language in *Cox v. United States Dep't of Justice*, 601 F.2d 1, 5 (D.C.Cir. 1979) and in *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 783 (D.C.Cir.1978) (*en banc*) (Leventhal, J., concurring), suggesting that the courts are to decide when there is a legitimate public interest in disclosure.

**61.** We note that in two other exemptions, 7(C) and 6, "the court is called upon to balance the conflicting interests and values involved; in other exemptions Congress has struck the balance and the duty of the court is limited to finding whether the material is within the defined category." *Lesar v. United States Dep't of Justice*, 636 F.2d 472, 486 n.80 (D.C. Cir.1980). *See Department of the Air Force v. Rose*, 425 U.S. at 370–73, 96 S.Ct. at 1603–04.

**62.** At oral argument, appellant's counsel conceded that under *Jordan* nearly every law enforcement manual must be released to the public.

We turn away from the rationale of *Jordan* because it does not appear to comport with the full congressional intent underlying FOIA. The approach suggested in *Jordan*, rather than seeking to reconcile the Senate and House understandings of Exemption 2 in FOIA, chooses one report to the absolute exclusion of the other. We find this approach unacceptable in the context of this case.[63]

*Jordan* goes farther than is necessary to reach its result. While it may have been possible that release of the prosecutorial documents in *Jordan* would help some individuals to evade the law, that fact is not clear from the opinion. First, even though the Government argued the point on appeal, there was no finding in the District Court or the Court of Appeals that release of the documents would risk circumvention of the law.[64] Second, it is not clear that release of such documents would actually risk circumvention. As Judge Leventhal pointed out in his concurrence in *Jordan*, federal prosecutors who resign to go into private practice as defense attorneys "take with them their knowledge of such guidelines [on prosecutorial discretion]." 591 F.2d at 784.[65] Disclosure of the manual in *Jordan* would not help individuals evade detection by law enforcement authorities, but release of the BATF manual in the present case might. *See* note 5, *supra*.

But even assuming that the guidelines in *Jordan* may aid some individuals in evading the law, the guidelines are not "predominantly internal." They are, as Judge Bazelon emphasized in his concurring opinion in *Jordan*, a source of "secret law," as important to the regulation of public behavior as if they had been codified. As this court stated in *Scott v. United States*, 419 F.2d 264, 277 (D.C.Cir.1969),

> the standards which guide prosecutors in the exercise of their discretion are as much a part of the law as the rules applied in court. Indeed, the impact of such standards is more decisive for many defendants than that of any other legal rules.

The guidelines on prosecutorial discretion are instructions to agency personnel (*e.g.*, prosecutors) on how to regulate members of the public. Knowledge of those regulations may be as significant to members of the public as is knowledge of statutory sentencing provisions. The BATF manual, on the other hand, is not concerned with regulating the behavior of the public, but consists *solely* of instructions to agency personnel. There is no attempt to modify or regulate public behavior—only to observe it for illegal activity. Accordingly, under the rule we announce today, the result in *Jordan* —release of the documents on prosecutorial discretion—would be the same.

## VII. CONCLUSION

For the foregoing reasons we affirm the judgment of the District Court in holding that portions of the BATF manual are exempt under Exemption 2.

*So ordered.*

---

**63.** The *Jordan* opinion chose the Senate Report over the House Report in part to prevent "last minute chicanery" in the House from dictating the meaning of the statute. The expressed fear is that Senate intent will never become law if the House writes a conflicting report, but avoids a conference committee by passing the bill without amendment.

Yet, in its vigorous efforts to protect the Senate, the majority in *Jordan* has gone to the opposite extreme, in a sense doing the very thing it feared might happen. Under the *Jordan* interpretation, congressional intent expressed in the House is given no weight at all. Particularly since both houses were considering bills with identical Exemption 2 provisions, and some of the House legislative history predates the Senate legislative history, we should avoid if possible the extreme approach taken in *Jordan*. Instead, we believe the proper route is to try to reconcile legislative intent expressed in the House with that in the Senate.

**64.** *See* note 46, *supra*.

**65.** In the present case, by contrast, the Government submitted an uncontested affidavit to the District Court detailing how release of the entire BATF manual would aid in circumvention of the law. Because it was uncontested, the affidavit is to be taken as true in reviewing a motion for summary judgment. *See* note 7, *supra*.

MacKINNON, Circuit Judge (concurring).

I concur in the majority opinion [1] and the separate opinion of Judge Mikva. In addition it is my opinion that the dissent is largely based on certain factual inaccuracies and flawed analyses that should be pointed out.

## I. THE DISSENT PLACES UNWARRANTED RELIANCE UPON OUR EN BANC OPINION IN JORDAN V. UNITED STATES DEPARTMENT OF JUSTICE

The most pervasive flaw in the dissent, as I perceive it, is the excessive reliance it places on its construction of the *en banc* opinion in *Jordan v. United States Department of Justice*, 591 F.2d 753 (D.C.Cir.1978). This reliance largely overlooks the rationale expressed by the concurring opinions of three of the seven judges that formed the majority. The case was heard *en banc* by nine judges, but only *four* judges concurred in the opinion without some comment or reservation. Thus, there was never a majority of the court in full support of the entire rationale of *Jordan.*

Judge Bazelon's concurrence stressed the "secret law" aspect of the case, 591 F.2d at 781–2. The documentary matter at issue in *Jordan*, as Judge Bazelon noted, set forth "the settled standards which guide the United States Attorney's [prosecutorial] discretion." In his opinion this caused "secret law" to effect the decision. His concurring opinion would indicate that *Jordan* would not necessarily control with respect to a law enforcement manual that did not involve secret law. Judge Leventhal filed a concurring opinion, in which Judge Robinson concurred, voicing material reservations about the majority's opinion concerning Exemption 2. His opinion relied more on the absence of "predominant internality" in *Jordan.* Such "internality" however, is present here. Judge Robb also joined in my dissent and Judge Leventhal expressed agreement with respect to the weight given

in my dissent to exemption 7 in interpreting the Act, 591 F.2d at 784.

My dissent was based in part on the statement in the Senate Report that the legislative intent was to "protect[ ] the traditional confidential nature of *instructions to government personnel prosecuting violations of law* ... S.Rep.No.813, 89th Cong., 1st Sess. 2 (1965) ... ." 591 F.2d at 786. It was my judgment that this statement of congressional intent covered the prosecutorial instructions to United States Attorneys like a glove, and hence they were exempt. I recognize, however, that the Act also sought to make "secret law" discloseable and that the prosecutorial instructions did, to a certain extent, include some "secret law"—but no secret law is involved here. *Jordan* is thus distinguishable.

This court's disposition of the companion case heard *en banc* with *Jordan* also indicates the limited effect which can be given to the court's opinion in *Jordan.* The case was entitled *Ginsburg, Feldman & Bress v. Federal Energy Administration*, 591 F.2d 717 (opinion vacated and reheard *en banc*, district court affirmed by equally divided court, four to four) 591 F.2d 752 (D.C.Cir. 1978). *Ginsburg* involved a law enforcement manual, which set forth law enforcement matter consisting essentially of *internal* auditing instructions for investigators examining the large oil companies to determine if they were complying with government price regulations. Billions of dollars were involved. The instructions did not constitute secret law but knowledge of the instructions could assist those violating the law to evade detection. Judge Leventhal was recused in *Ginsburg*, but his concurring opinion in *Jordan* indicates quite clearly that had he participated he would have voted to hold that the law enforcement manual involved in *Ginsburg* was exempt from disclosure. The critical sentence in his concurring opinion in *Jordan* states:

"And when what is involved are *internal* instructions to such officials as bank ex-

---

1. I would also rule that the effect of the recognized "law enforcement exception" in 5 U.S.C. § 552(a)(2)(C) would exclude the law enforce-

ment matter here involved from disclosure. See discussion at pages 1078–1079, *infra.*

aminers and *investigators*, and revelation would permit circumvention of law and regulations by the regulated and there is no substantial valid external interest, there is the essential quality of predominant internality[6] contemplated by Exemption 2."

[6] *See Vaughn v. Rosen*, 173 U.S.App.D.C. 187, 201–202, 523 F.2d 1136, 1150–51 (1975) (Leventhal, J., concurring) ("solely" is not to be given an extreme construction).

Leventhal, J., concurring, 591 F.2d at 783 (emphasis added).

Judge Leventhal's vote would have provided the fifth vote necessary to affirm the holding of the panel opinion that law enforcement manuals were exempt. The opinion in *Ginsburg* is thus entitled to substantial consideration. This does not mean that I am contending it constitutes controlling precedent.

Of course, the precedential value of a panel opinion under ordinary circumstances is practically nil when the case is placed *en banc*, but when the votes of the judges in *Ginsburg* are coupled with the views expressed by the concurring and dissenting judges in *Jordan*, it is clear that decisive votes in *Jordan* really turned on the *secret law* and *predominant internality* aspects of the facts in that case. Such votes also indicate that a *majority* of all the judges in *Jordan* would exempt a law enforcement manual, such as we have here, where secret law is not involved and where revelation of its contents would permit individuals who were the subjects of investigatory surveillance to evade detection of their criminal activities.

Thus, even though the dissent here is not willing to recognize the extent to which secret law and predominant internality provided the controlling votes in *Jordan*, the votes of the concurring judges in *Jordan* and those who voted to affirm *Ginsburg*, and those who compose the majority here, do distinguish the prosecutorial instructions in *Jordan* from the Surveillance Training Manual in this case on factual grounds that are clearly distinguishable. *Jordan* is thus limited to cases involving secret law and predominant internality where the disclosure would not endanger law enforcement.

## II. THE HOUSE AND SENATE REPORTS ON THE 1966 AMENDMENTS TO THE FREEDOM OF INFORMATION ACT WERE NOT CONTRADICTORY

Exemption 2 of the Freedom of Information Act provides:

(b) This section [The FOIA Act] does not apply to matters that are—. . .

(2) related solely to the internal personnel rules and practices of an agency . . .

5 U.S.C. § 552(b)(2) (1970), 81 Stat. 55.

The dissent takes the rigid position that the Committee Reports in the House and Senate are contradictory with respect to the intent expressed in Exemption 2. Dissent at 1093, 1096–1106. In my opinion they are not.

The Senate Committee Report stated: Exemption No. 2 relates only to the internal personnel rules and practices of an agency. *Examples* of these may be rules as to personnel's use of parking facilities or regulations of lunch hours, statements of policy as to sick leave, and the like.

S.Rep.No. 813, 89th Cong., 1st Sess. 8 (October 4, 1965) (emphasis added). This sparse statement giving only four "examples" of "rules" was all the direct comment in the Senate Report on that exemption. The subsequent House Report on the Senate bill (which was the same as the House Bill), and which was filed during the next session of the 89th Congress, was more detailed as to the intent of Exemption 2. It explained that Exemption 2 was also intended to cover:

2. Matters related solely to the internal personnel rules and practices of an agency: Operating rules, guidelines, and *manuals of procedure for Government investigators or examiners* would be exempt from disclosure, but this exemption would *not* cover all 'matters of internal management' such as employee relations and working conditions and routine administrative procedures which are withheld under the present law.

H.R.Rep.No.1497, 89th Cong., 2d Sess. 10 (May 9, 1966), U.S.Code Cong. & Admin. News 1966, p. 2427 (footnote omitted) (emphasis added).

The dissent and some others contend that Exemption 2 is to be construed as though it read: "related solely to the internal personnel rules and *internal personnel* practices of an agency...." Such construction, however, would construe the exemption to say essentially the same thing twice as there may be little or no difference between an agency's "rules" and "practices." In my opinion, a sounder interpretation would be to read the exemption as extending "internal," but not "personnel," to modify "practices." Then "internal personnel rules" would refer to the agency's relations with its employees as an employer, as described in the Senate Report, and the "[*internal*] practices of an agency" would encompass the matters described in the House Committee Report which limited the "practices" that were not exempted. This would also conform to the intent expressed by Congressman Moss, the principal author of the Freedom of Information Act, when he presided as Chairman on the opening day of the House Committee hearings in 1965:

> Mr. Moss. What this [Exemption 2] was intended to cover was instances such as the manuals of procedure that are handed to an examiner—a bank examiner, or a savings and loan examiner, or the guidelines given to an F.B.I. agent.

591 F.2d at 784.

However, the dissent and some judges and commentators perceive what they consider to be a contradiction between the intent expressed in the Senate and House Committee Reports. In my judgment there is no contradiction expressed or intended. The Senate Committee Report merely gave several "[e]xamples" of the "rules" it intended to exempt and the House Committee report gave several examples of the "[internal] practices of agenc[ies]" that it intended to be exempt. There is nothing in the Senate Report indicating an intent to limit the exempt rules and practices to the few stated "examples." In fact characterizing them as "examples" indicates that the ex-

amples given are not the exclusive exempt matter.

To construe the act as not providing for the exemption from disclosure of "law enforcement matters" would also do violence to the intent of the *Senate* Committee expressed in § 552(a)(2)(C) to *completely exclude* "law enforcement matters" from inspection. What the dissent and many others forget, or never realize, is that the Senate *and the House* were in agreement on this phase of the bill that has been recognized as the "law enforcement exemption." See discussion, *infra.* This exemption was accomplished by amending the bill to provide that only "*administrative* staff manuals and instructions to staff that affect a member of the public" (emphasis added) should be available for public inspection and copying. 5 U.S.C. § 552(a)(2)(C).

In enacting this statute, *both* houses of Congress stated in their Reports that they distinguish between manuals relating to (1) "law enforcement matters" and manuals relating to (2) "*administrative* matters," and *indicated that they did not intend to require disclosure of the former.*

The Senate Committee Report on this section of the bill repeats the statutory language that only "*administrative* staff manuals and instructions to staff that affect a member of the public" (emphasis added) are to be made available, and explains that its reference to "*administrative*" was intended specifically to *exclude* "law enforcement matters" from any disclosure requirement, i.e.:

> The limitation of the staff manuals and instructions affecting the public which must be made available to the public to those which pertain to . *administrative* matters *rather than to law enforcement matters* protects the *traditional confidential nature of instructions to Government personnel prosecuting violations of law in court,* while permitting a public examination of the basis for administrative action.

S.Rep.No.713, 89th Cong., 1st Sess. 2, 7 (1965) (emphasis added). If we are to rely exclusively on the Senate Report, as the dissent suggests, this comment is determi-

native and excludes "confidential" law enforcement matter from disclosure.

The House Committee Report *on this portion of the bill*, moreover, reflects the same intent as the Senate Report, but expresses its intent in greater detail. The House Report specifically states that the legislative intent was to require disclosure of *secret law*, and *not* Agency "guidelines for ... auditing or inspection," i.e. law enforcement matter:

In addition to the orders and opinions required to be made public by the present law, subsection (b) of S. 1160 would require agencies to make available statements of policy, interpretations, staff manuals, and instructions that affect any member of the public. This material is the end product of Federal administration. It has the force and effect of law in most cases, yet under the present statute these Federal agency decisions have been kept secret from the members of the public affected by the decisions.

As the Federal Government has extended its activities to solve the Nation's expanding problems—and particularly in the 20 years since the Administrative Procedure Act was established—the bureaucracy has developed its own form of case law. This law is embodied in thousands of orders, opinions, statements, and instructions issued by hundreds of agencies. This is the material which would be made available under subsection (b) of S. 1160. However, under S. 1160 an agency may *not* be required to make available for public inspection and copying any advisory interpretation on a specific set of facts which is requested by and addressed to a particular person, provided that such interpretation is not cited or relied upon by any officer or employee of the agency as a precedent in the disposition of other cases. *Furthermore, an agency may not be required to make available those por-*

*tions of its staff manuals and instructions which set forth criteria or guidelines for the staff in auditing or inspection procedures, or in the selection or handling of cases, such as operational tactics, allowable tolerances, or criteria for defense, prosecution, or settlement of cases.*

H.R.Rep.No.1497, 89th Cong., 2d Sess. 7–8 (1966), U.S.Code Cong. & Admin.News 1966, pp. 2424–2425 (emphasis added). The italicized comment tracks the Senate Report in reflecting an intent to exempt law enforcement matter when the disclosure would enable law violators to escape detection.

The Senate Report thus clearly indicates that "staff manuals ... which pertain to law enforcement matters" need not be "made available to the public" and the House expresses a similar general intent to the extent that the matter constitutes *internal* practices not directly affecting the public and is not *secret* law. It would be difficult to find a more precise basis for exempting staff manuals relating to law enforcement matters than the congressional intent expressed by the statements in both the Senate and House Committee reports set forth above. Therefore, it must be concluded, when both reports are read in their entirety, that there is no contradiction between the two houses that "staff manuals ... which pertain to law enforcement matters ... [need not be] made available to the public." If we are to rely *only* on the Senate Report, as some suggest, such construction could not be plainer.

The *specific* agreement of the House and Senate Committee Reports to exclude from disclosure "law enforcement matters" and "staff manuals and instructions which set forth criteria or guidelines for the staff in auditing and inspection procedures" forecloses appellant's claim for disclosure regardless of ambiguities alleged to exist in some of the more *general* portions of the statute and the Committee Reports,[2] as spe-

---

2. The general rule of statutory construction is that a specific provision prevails over a more general one. *Fourco Glass Co. v. Transmirra Corp.*, 353 U.S. 222, 228–29, 77 S.Ct. 787, 791–92, 1 L.Ed.2d 786 (1957) stated the rule as follows:

"However inclusive may be the general language of a statute, it 'will not be held to apply to a matter specifically dealt with in another part of the same enactment.... Specific terms prevail over the general in the same or another statute which otherwise

cific statements of legislative intent usually prevail over more general provisions.[3] This forecloses an interpretation of the Act that would exclude law enforcement matter from disclosure under (a)(2)(C) and then turn about and require disclosure by § 552(a)(3).

It is thus foolhardy to look to the Senate Committee Report on Exemption 2 and conclude that a staff manual on a "law enforcement matter" that would endanger law enforcement is not exempt because the portion of the Senate Report that gave some *examples* of matter covered by Exemption 2 did not *repeat* its *prior* exclusion of "law enforcement matter." The Senate Report on Exemption 2 did not need to state that staff manuals on "law enforcement matters" were excluded by Exemption 2 because *the Senate report had already specifically excluded them from all "inspection"* and stated that they were not required to be "made available to the public." See S.Rep.No.713, p. 6, *supra.* Since

*law enforcement matters* were *never included* in material that could be inspected there was no necessity for excluding them by Exemption 2, or by any other provision.

Having said this, it must be recognized that both committee reports treated law enforcement matter the same in (a)(2)(C), *but* the House Report also was specific in indicating that such matter was excluded by Exemption 2. Actually there was no necessity for Exemption 2 excluding "law enforcement matter." The net result, however, was the same, albeit the exemption was accomplished by two comments in the House Committee Report and one in the Senate Report.

A comparison of the House Report on Exemption 2 in the Freedom of Information Act and the Sunshine Act does not reflect, as the dissent indicates, that the House repudiated its 1966 report. The two reports provide:

FOIA Act
1966 House Report

2. Matters related solely to the internal personnel rules and practices of any agency: Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all "matters of internal management" such as employee relations and working conditions and routine administrative procedures which are withheld under the present law.

(H.R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966)).

Sunshine Act
House Report

(2) This exemption includes meetings relating solely to an agency's internal personnel rules and practices. It is intended to protect the *privacy of staff members* and to cover the handling of *strictly internal matters. It does not include discussions or information dealing with agency policies governing employees' dealings with the public, such as manuals or directives setting forth job functions or procedures.* As is the case with all of the exemptions, a closing or withholding permitted by this paragraph should not be made if the public interest requires otherwise.

H.R. Rep. No. 94–880, 94th Cong., 2nd Sess., 9 (1976).

---

might be controlling.' *Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208 [52 S.Ct. 322, 323, 76 L.Ed. 704]." *MacEvoy Co. v. United States,* 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163.

**3.** This is the common intendment of people in writing and conversing, and is recognized in the application of provisos and special statutes over general statements and laws. Where statutes deal with a subject in both general and detailed terms, and there is conflict between the two, the detailed expression prevails. For example, *Preiser v. Rodriguez,* 411 U.S. 475,

489, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973) held that the "specific habeas corpus statute" prevails over the "general" civil rights statute, 42 U.S.C. § 1983; *see also, Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 867, 6 L.Ed.2d 72 (1961); 4 Sutherland, Statutory Construction (Sands) § 51.05, 315 (1973); E. Crawford, Statutory Interpretation § 189 (1940). The same logic would recognize that when the two Houses were in agreement on the application of an act to a special situation, they would not be deemed to intend to override that specific conclusion by general language.

What appears most outstanding about the House Report on the Sunshine Bill is that it recognized and defines two categories of matters. First, "strictly internal matters" and, second, directions setting forth job functions or procedures. Confidential instructions to investigators and examiners addressed to them in their law enforcement function, the disclosure of which would allow circumvention of law, are clearly internal matters. While directions setting forth general job functions and procedures for employees dealing directly with the public are in the second category. The Sunshine Bill Report, dated 1976, reflects the same point as Judge Leventhal's 1978 interpretation of "predominant internality" by stating its intent "to cover the handling of *strictly internal matters.*" That was not as explicit in the 1966 Report. Thus, if anything, the Committee Report on the Sunshine Act instead of repudiating the 1966 House Report indicates the same interpretation as that later placed on the FOIA by Judge Leventhal, and the same result was reached with respect to the law enforcement matter in the contemporaneous panel opinion in *Ginsburg, supra.*

The resulting situation explained above also explains why, as the dissent admits, *no federal court* has ever required the disclosure of a law enforcement manual, such as we have here, where the court found that disclosure would enable violators to escape detection. Dissent at 1112. *Hardy v. Bureau of Alcohol, Tobacco & Firearms,* 631 F.2d 653, 656–57 (9th Cir. 1980) ("Materials that solely concern law enforcement are exempt under Exemption 2 if disclosure may risk circumvention of agency regulation.") We reached the same result in *Cox v. United States Department of Justice,* 601 F.2d 1 (D.C.Cir.1979) (withholding disclosure of United States marshal's manual under Exemption 2); as did the Second Circuit in *Caplan v. BATF,* 587 F.2d 544 (2d Cir. 1978) (BATF Manual describing techniques for apprehending law violators, equipment used in making raids, methods of gaining entry to buildings used by law violators and methods used by law violators to conceal contraband was exempt from disclosure under Exemption 2). The same result is reached in the Eighth, Fifth and Sixth Circuits by applying the "law enforcement exception" implicit in § 552(a)(2)(C). *Cox v. Levi,* 592 F.2d 460, 463 (8th Cir. 1979); *Cox v. United States Dept. of Justice,* 576 F.2d 1302, 1307–09 (8th Cir. 1978); *Sladek v. Bensinger,* 605 F.2d 899 (5th Cir. 1979) (recognized the "law enforcement exception" under (a)(2)(C) but held the contested material in the DEA Manual dealing with informants and search warrants would not obstruct its law enforcement efforts); *Stokes v. Brennan,* 476 F.2d 699, 701–02 (5th Cir. 1973); *Hawkes v. Internal Revenue Service,* 467 F.2d 787, 794–95 (6th Cir. 1972). See 1 K. Davis, Administrative Law Treatise § 5.4 (2d ed. Supp.1980). 631 F.2d at 656–7. Courts can use the (a)(2)(C) provision or Exemption 2 and conform to the intent expressed by both the Senate and House Reports. Such application of the statute also would not be contrary to *Department of Air Force v. Rose,* 425 U.S. 352, 369, 96 S.Ct. 1592, 1603, 48 L.Ed.2d 11 (1976) which based its decision to not apply Exemption 2 on the ground that the requested disclosure would "not risk circumvention of agency regulations"[4] and that there was a "genuine and significant public interest" in the matter, i.e., not "predominately internal" as Judge Leventhal later phrased it. The results in the above cited decisions support the conclusion that the Reports of the two houses are *not* contradictory.

III. THE ANALYSIS OF THE LEGISLATIVE HISTORY BY THE DISSENT IS ALSO FLAWED WITH RESPECT TO THE REASON SLATED FOR PREFERRING THE SENATE REPORT

*Vaughn v. Rosen,* 523 F.2d 1136, 1142 (D.C.Cir.1975) favored "reliance upon the

---

4. *Rose* was the first case to so characterize this as a possible factor in determining exemption.

Senate Report . . . [*because*] *it was the only report that was before both houses of Congress.*" The Supreme Court thereafter in *Department of the Air Force v. Rose, supra,* 425 U.S. at 366–67, 96 S.Ct. at 1601–02 (1976) also stated that such fact was one of the reasons why it relied on the Senate Report but added that it "need not consider in [Rose]" the applicability of Exemption 2 in circumstances where such exemption from disclosure might be

> necessary to prevent the circumvention of agency regulations that might result from disclosure to the subjects of regulation of the procedural manuals and guidelines used by the agency in discharging its regulatory function. See, *e.g., Tietze v. Richardson*, 342 F.Supp. 610 (S.D.Tex. 1972), *Cuneo v. Laird*, 338 F.Supp. 504 (D.C.1972), rev'd on other grounds *sub nom. Cuneo v. Schlesinger*, 157 U.S.App. D.C. 368, 484 F.2d 1086 (1973); *City of Concord v. Ambrose*, 333 F.Supp. 958 (N.D.Cal.1971) (dictum). Moreover, the legislative history indicates that this was the primary concern of the committee drafting the House Report.

425 U.S. at 364, 96 S.Ct. at 1600. The Supreme Court in *Rose* thus did not rule out the House Committee Report because it was not before both houses.

Judge Leventhal's concurring opinion in *Jordan* also points out that the remark quoted from Justice Brennan's opinion does not support an interpretation that the House Report is to be disregarded.

> The Supreme Court was hospitable to the House Report insofar as it provided an "exemption of disclosures that might enable the regulated to circumvent agency regulation." That feature may not be determinative but it is material. And when what is involved are internal instructions to such officials as bank examiners and investigators, and revelation would permit circumvention of law and regulations by the regulated and there is no substantial valid external interest, there is the essential quality of predominant internality contemplated by Exemption 2.

591 F.2d 783.

*Jordan* admits that the Supreme "Court cautiously left open the question of what to do about any exemption where disclosure may risk circumvention of agency regulation." 591 F.2d at 771. That caution was well advised.

The argument that the Senate Report was the only report before two houses possesses a surface plausibility to those unfamiliar with the practical workings of Congress. To others it is unknowledgeable, but because of the ascendancy it has obtained in some of these Exemption 2 cases it should be analyzed. As my colleague Judge Mikva remarked at oral argument in this case: "A Senate report in the House is *functus officio.*" Each House legislates on its own committee report. *Neither* report can be denied. If they are in irreconcilable conflict, then to the extent of the conflict neither report can be given any effect except as support may come from other sources.

The situation with respect to the two committee reports in this case is fully discussed in my opinion in *Ginsburg, Feldman & Bress v. FERC*, 591 F.2d at 727, in which the district court was subsequently affirmed by an equally divided *en banc* court.

> It is foreign to the normal practices and customs of either House to legislate on the basis of a printed report of the other House when it has a printed report of its own, and there is no indication in the legislative record of this bill that reference was made in the House proceedings to the Senate Report or that the letter was actually "before both houses . . . ."

591 F.2d 727. The contention that the Senate Report must prevail because it was "before both Houses," and the House Report was presumably only before the House, is at war with the actual workings of Congress. Thus, to the extent that the dissent relies upon *Jordan* and *Vaughn* it is flawed insofar as it claims that only the Senate Report reflects the true congressional intent.

## IV. THE DISSENT MISCONSTRUES THE SENATE REPORT WITH RESPECT TO THE RESTRICTIVE EFFECT OF THE WORD "ONLY" IN EXEMPTION 2

The dissent at page 1097 asserts:

> The Senate Report states that Exemption 2 relates *only* to "rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like." (Emphasis in original).

However, the Senate Report that. is referred to does *not* support such a restrictive construction. The Senate Report actually states:

> Exemption No. 2 relates *only* to the internal· personnel rules and practices of an agency. *Examples* of these may be rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like.

S.Rep.No.813, 89th Cong., 1st Sess. (1965) (emphasis added). Merely by comparing the dissent's statement with the actual language of the Committee Report it is plain that the dissent misstates and overstates the effect of the limiting word "only" so as to give the impression that the Senate Report supported a more restrictive construction to Exemption 2 than it actually expressed.

In this manner the dissent would read out of the Senate Report .the statement that "personnel's use of parking facilities [and] regulation of lunch hours, statements of policy as to sick leave, and the like" were merely "*examples*" of exemptions and replace it with the incorrect statement that the Senate Report had stated that they were the "*only*" matters exempted from disclosure by Exemption 2. This misstatement of legislative intent is vital and material and is erroneous.

## V. THE DISSENT IMPROPERLY CHARGES THE HOUSE COMMITTEE WITH "CHICANERY" IN DRAFTING ITS COMMITTEE REPORT ON EXEMPTION 2. (DISSENT 1098–1099)

Duplicate bills to amend the Freedom of Information Act were introduced during the 89th Congress, 1st Session in both houses on the same date. Their principal author was Representative Moss who is known in Congress and nationwide as the author of the Freedom of Information Act. The House hearings were held *first*, beginning on March 30, 1965—six weeks before the Senate hearings. Congressman Moss presided as Chairman. Early during the first day of the House Sub-Committee hearings Representative Moss stated, as above set forth, that the intent of Exemption 2, *inter alia*, was to exempt "manuals of procedure [for] . . . examiner[s], or the guidelines given to an FBI agent," *i.e.*, law enforcement manuals. *House Hearings on H.R. 5012*, 89th Cong. 1st Sess. at 29. As the principal author of the law this statement is definitive. In contrast, contrary testimony adduced from a witness admittedly "talking off the top of my head"[5] (Schlei, Kass) is no indication of congressional intent. The Senate hearings on the companion bill did not begin until some six weeks later on May 14th, and the Senate Committee Report, which is so much relied upon by the dissent, was not filed until October 4, 1965. This was over six months after the House hearings began before Congressman Moss in which he made his statement quoted above.

If there were anything to the argument that the separate Houses of Congress legislated upon expressions of legislative intent in the other House, then the House hearings which preceded the Senate Report by seven months would be entitled to as much, or more credence than the Senate Report. However, as explained above, in the *en banc* opinion here and in my opinion in

---

**5.** Hearings Before a Subcommittee of the Committee on Government Operations on H.R. 5012 et al., 89th Cong., 1st Sess. 29 (March 30, 1965).

*Ginsburg*, when the two reports are closely analyzed they are *not* inconsistent, 591 F.2d 723–725. And there was no "chicanery" since the House Report, which issued *after* the Senate had passed the bill, indicated the *same intent* with respect to Exemption 2 as Congressman Moss had stated publicly at the very first hearing which antedated the Senate hearings and the Senate Report. This matter is discussed in full detail in my opinion in *Ginsburg*, 591 F.2d 723–725, which upheld the district court decision.

Therefore, in general, law enforcement manuals, for reasons set forth above, are exempted from disclosure by (b)(2) as well as by (a)(2)(C). Some documents having some relationship to law enforcement, but with special peculiarities such as in *Jordan*, may be treated differently, but this is not such a case.

## VI. THE SUBSEQUENT ENACTMENT OF THE SUNSHINE ACT DOES NOT SUPPORT THE DISSENT'S CONSTRUCTION OF EXEMPTION 2 OF FOIA

In its far fetched search for support for its position the dissent asserts that its construction of Exemption 2 is supported by the subsequent inclusion in the Government in the Sunshine Act (Sunshine Act) P.L. 94–409, Act of September 13, 1976, 90 Stat. 1241 *et seq.*, of a provision similar to Exemption 2 in the Freedom of Information Act. Specifically the dissent asserts:

[I]t is highly significant that the Government in the Sunshine Act, enacted in 1976, carries over verbatim most of the exemptions in the Freedom of Information Act, including the specific language of Exemption 2. Thus, 5 U.S.C. § 552b(c)(2) exempts from the Act's open meeting requirement portions of meetings likely to "relate solely to the internal personnel rules and practices of an agency." *The House Report to the Sunshine Act gives the same narrow interpretation to this exemption as the Senate did in 1965:*

(2) This exemption includes meetings relating solely to an agency's internal

personnel rules and practices. It is intended to protect the privacy of staff members and to cover the handling of strictly internal matters. *It does not include discussions or information dealing with the public, such as manuals or directives setting forth job functions or procedures.* As is the case with all of the exemptions, a closing or withholding permitted by this paragraph should not be made if the public interest requires otherwise.

It thus appears that by 1976 the House of Representatives had repudiated the sweeping language concerning Exemption 2 contained in its 1966 report on the Freedom of Information Act.

Dissent at 1107 (Emphasis in original). Such construction is not supported by the Act—the Sunshine Act. The operative provisions of Exemption 2 provide:

(b) Members shall not jointly conduct or dispose of agency business other than in accordance with this section. Except as provided in subsection (c), every portion of every meeting of an agency shall be open to public observation.

(c) Except in a case where the agency finds that the public interest requires otherwise, the second sentence of subsection (b) shall not apply to any portion of an agency meeting . . . where the agency properly determines that such portion or portions of its meeting or the disclosure of such information is likely to—. . .

(2) relate solely to the internal personnel rules and practices of an agency . . .

We have already seen above that Exemption 2 of the FOIA extends to law enforcement manuals. As Judge Leventhal succinctly noted in *Jordan, supra,*

. . . Exemption 2 is applicable where the document consists of internal instructions to such government officials as investigators and bank examiners. In such a case disclosure would permit circumvention of the law, and there is no substantial, valid external interest of the community at large in revelation.

591 F.2d at 783. This interpretation is supported by *Hardy v. Bureau of Alcohol, Tobacco & Firearms, supra, Cox v. United States Department of Justice,* 601 F.2d 1 (D.C.Cir.1979), *Caplan v. BATF, supra.*

Such an analysis of Exemption 2 of the FOIA readily applies to Exemption 2 of the Sunshine Act as well. Where, as in the instant case, a law enforcement manual is involved, we are, as in the Leventhal quotation, dealing with "internal instruction to such government officers as investigators . . .;" "disclosure," that "would permit circumvention of the law." As such, it must not by the term of Exemption 2 of the Sunshine Act, be permitted.

It is also clear from the face of the Act itself that in addition to Exemption 2, additional exceptions to the general rule of open meetings have been made in Exemption 7 of the Act that would apply to law enforcement matter. The dissent's failure to read these two exemptions *in pari materia* undercuts its argument from the start.

Under Exemption 7 (§ 552b(c)(7)), the disclosure requirements of the Act do not require meetings to be open that would

(7) disclose *investigatory records compiled for law enforcement purposes,* or information which if written would be contained in such records, but only to the extent that the production of such records br information would (A) *interfere with enforcement proceedings,* (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and in the case of a record compiled by a criminal law enforcement authority in the court of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) *disclose investigative techniques and procedures,* or (F) *endanger the life or physical safety of law enforcement personnel*;

According to the dissent, were the contested contents of the BATF manual to be read or discussed at a meeting covered by the Sunshine Act, such information would not qualify for Exemption 2 protection and would be required to be disclosed in full to the public. Whether such construction is correct or not, it ignores the plain language of Exemption 7, which provides in definite terms that an agency need not disclose any information that would (A) interfere with enforcement proceedings; (E) disclose investigative techniques and procedures; or (F) endanger the life or physical safety of law enforcement personnel. Since the BATF manual covers agent "surveillance of premises, vehicles, and persons," it thus contains matter coming within the purview of *all* of the aforementioned subsections. Consequently, if the BATF Manual were the subject of a meeting covered by the Sunshine Act, by the terms of the above quoted clauses of subsection 7, the meeting would be exempt from disclosure. Thus, the Sunshine Act like the Freedom of Information Act does not rely exclusively on Exemption 2 to exempt law enforcement matter.

A specific example is indicated by considering the application to a concrete case of subsection (F) which provides that any meeting need not be open if it would "endanger the life or physical safety of law enforcement personnel." Such exemption would protect a meeting from being open to the "Sunshine" if it was likely to disclose matter in a United States

marshals' manual which dealt with the caliber of weapons and length of barrels on weapons used by marshals, the type of ammunition used and the number of rounds issued, the type of handcuffs used by marshals, the place where handcuff keys are secured, the radio transmission and receiving frequencies of operational units or with arrangements for prisoners during transportation such as procedures for inspecting prisoners during transport for objects to break open handcuffs.

In *Cox v. United States Department of Justice,* 601 F.2d 1 (D.C.Cir.1979) we upheld the exemption of such printed matter from disclosure under the Freedom of Information Act. The dissent criticizes such decision, Dissent, 1110, but such matter is ex-

actly the type of information that, if it were to become public, would "endanger the life [and] physical safety of law enforcement personnel." In this respect the Sunshine Act like the Freedom of Information Act is *specifically* protective of law enforcement matters. The dissent's reliance on the Sunshine Act is accordingly groundless.

For the foregoing reasons, the dissent's assertion that the Sunshine Act and its Exemption 2 supports disclosure of the BATF manual is without foundation. Indeed, those provisions of the Sunshine Act that provide for the exemption of information from disclosure that is integrally related to law enforcement matters mandate precisely the opposite result.

MIKVA, Circuit Judge, concurring:

I join in Judge Edwards' responsible and well-reasoned opinion for the majority. Ordinarily, I would see no need for a separate statement of my views, but I find the dissent troublesome.

I disagree wholeheartedly with Judge Wilkey's conclusion that a "new majority" of this court has "decreed a remarkable reversal in both rationale and result" of *Jordan v. United States Department of Justice*, 591 F.2d 753 (D.C.Cir.1978) (en banc). Dissent at 1093, 1118. The composition of this court is different, but so is the nature of the materials whose release under the Freedom of Information Act (FOIA) is at issue here. *Jordan* concerned "manuals, rules, and guidelines used by a United States Attorney to guide his staff in deciding questions of prosecutorial discretion . . . ." K. Davis, Administrative Law Treatise § 5.4, at 18 (2d ed. 1980 Supp.). These were materials that at least one of the judges in *Jordan* found to be "secret law."

> The settled practices of the government, in deciding which cases to prosecute and which cases to divert from the courts are, if not codified "law," at least as important as any statute to the individual charged with a crime . . . .
>
> The public availability of these general policy manuals will serve fundamental interests in the criminal justice system by

helping to assure that the exercise of prosecutorial discretion is even-handed, rational, and consonant with statutory intent, which are touchstones for the proper exercise of such discretion.

591 F.2d at 781 (Bazelon, J., concurring).

In contrast, this dispute concerns a manual of the Bureau of Alcohol, Tobacco & Firearms (BATF) entitled "Surveillance of Premises, Vehicles and Persons—New Agent Training." This is a pamphlet that tells law-enforcement employees how to catch law-breakers. Michael Crooker, the litigant, is a federal prisoner. He has not disputed that release of the BATF manual will help individuals evade the law. There is a vast difference between the secret substantive and procedural law involved in *Jordan* and "information that would impede law enforcement efforts" such as the BATF material at issue here. *See Cox v. Department of Justice*, 576 F.2d 1302, 1309 (8th Cir. 1978). It may not always be a simple matter to analyze particular materials at the margin, of course, but the general distinction is sound. "Lines are not the worse for being narrow if they are drawn on rational considerations." *10 E. 40th St. Building, Inc. v. Callus*, 325 U.S. 578, 584, 65 S.Ct. 1227, 1230, 89 L.Ed. 1806 (1945) (Frankfurter, J.). The release of material in *Jordan* served fundamental public interests and helped police those who police others. Disclosure of the BATF manual would not serve the same interest, and would unquestionably promote "circumvention of agency regulation." *Department of the Air Force v. Rose*, 425 U.S. 352, 369, 96 S.Ct. 1592, 1603, 48 L.Ed.2d 11 (1976). As the majority opinion emphasizes, nothing in this decision undercuts the result reached in *Jordan*. It is pejorative to suggest that the court "is playing a legislative game" and engaging in "improper" conduct, dissent at 1093, when the composition of the case is so strikingly different.

It may fairly be asked, of course, whether the factual distinctions between *Jordan* and this case also justify different dispositions under the law. The portions of Judge Wilkey's dissent that probe the legislative his-

tory and subsequent commentators are praiseworthy. His careful analysis makes some solid arguments, and the fact that a majority of the court disagrees with his conclusion does not diminish their force.[1] Indeed, disputes over what is relevant evidence of congressional intent are to be expected when the words of the statute are ambiguous and the legislative history is contradictory. In the end, I concur because I agree with Judge Wilkey's statement for the court in *Vaughn v. Rosen*, 523 F.2d 1136, 1142 (D.C.Cir.1975), that even the Senate Report "indicates that the line sought to be drawn is one between minor or trivial matters and those more substantial matters which might be the subject of legitimate public interest." If Judge Wilkey simply disagreed as to which side of this line the BATF manual falls, there would be no need for this concurrence. There is another side to his dissent, however, that invites challenge.

I find implicit in the dissent a lamentable tendency to scorn the legislative process, an indictment that Judge Wilkey has himself leveled at the majority. He emphasizes "the contradictory Senate and House interpretations of Exemption 2," and contends that they cannot be reconciled. Dissent at 1093. He relies on several commentators who have charged that the House Report was an "abuse of legislative history," *id.* at 1099–1100; he calls it "the product of last minute chicanery," *id.* at 1099. Most importantly, he seems to attribute to Congress an obstinate irrationality. Although it is patent that "a reasonable Congress could not have intended to require disclosure of information that would impair law enforcement," K. Davis, *supra* at 21, Judge Wilkey concludes that the swarms of witnesses who warned of this effect seemingly to no avail shows that Congress intended exactly the opposite. Dissent at 1100–1104. Hurling judicial invective at legislators and their product hardly squares with respect for the legislative process.

Admittedly, as Judge Leventhal observed in his concurring opinion in *Vaughn*, the legislative history of Exemption 2 is both "confused" and "obscure."[2] 523 F.2d at

---

1. Several of Judge Wilkey's arguments are less strong than his ardent expression suggests, however. He notes that "the *majority* of persons who spoke on the subject before the House indicated their belief that Exemption 2 did *not* cover law enforcement manuals," dissent at 1105 (emphasis in the original), but none of these witnesses were Members of the House. "Congress has not delegated to unofficial individuals or organizations, which may appear before one of its committees advocating legislation, the authority to construe for it and the public statutes which it enacts. Courts have the authority to do that." *United States v. Kung Chen Fur Corp.*, 188 F.2d 577, 584 (C.C.P.A.1951).

   The dissent also makes much of the fact that the 1976 Government in the Sunshine Act carries over verbatim most of the FOIA exemptions, including the specific language of Exemption 2, but that the House Report to that Act "gives the same narrow interpretation to this exemption as the Senate [Report] did in 1965." Dissent at 1107 (italics omitted). Judge Wilkey concludes that "by 1976 the House of Representatives had repudiated the sweeping language concerning Exemption 2 contained in its 1966 report" on FOIA, *id.* and that under the majority's "absurd" interpretation either "the two identically worded exemptions have precisely opposite meanings" or else we must interpret Exemption 2 of the Sunshine Act "in a

manner contradictory to the unequivocal intent expressed in both committee reports." *Id.* at 1109. Aside from the debatable wisdom of construing legislation that is not now before the court, it is not at all clear that the Sunshine Act "would have to be interpreted" in a contradictory or absurd manner. Did Congress truly intend to open agency meetings held to approve investigative manuals of the sort whose release under FOIA is at issue here? Even if both Houses provided clear, uniform guidance on Exemption 2 of the Sunshine Act, of course, that does not bind our interpretation of legislation whose application is invoked in entirely different contexts. "The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against." Cook, *"Substance" and "Procedure" in the Conflict of Laws*, 42 Yale L.J. 333, 337 (1933).

2. *See, e.g.,* Civiletti, *Post-Watergate Legislation in Retrospect*, 34 Sw.L.J. 1043, 1046 (1981) (on the whole, FOIA "reflects a conscientious attempt by Congress to balance the general need for openness in government against the specific needs of law enforcement," but lack of protec-

1147. This provides no excuse for picking with condescension at bits and pieces of the legislative history, however. For example, nothing in the Supreme Court's offhand statements in *Rose* forecloses doubt as to whether the Senate Report or the House Report is more reliable. Judge Leventhal, whose expertise on issues of legislative history was second to none, thoroughly demonstrated the error in the argument Judge Wilkey tries to make from their chronology:

> The argument that the Senate Report was "available" to the House members is theoretical: The members of the House *committee* did have the Senate Report, but they departed from it. . . . As to the mass of members of the House, the realities of the legislative process advise that what they had furnished to them for floor consideration is the bill (here there' were no differences from the Senate bill) and the House Report. They could theoretically send for the Senate Report, but what occasion would there be for such a rare step . . . ? Again as a matter of the legislative reality of the legislative process, each House regards its own position as distinctive, and its members rarely if ever refer to reports of the other chamber.

523 F.2d at 1148 (emphasis added). I suspect that entirely too much has been made of the apparent conflict between the House and Senate Reports both by courts and scholarly commentators, certainly more than any reasonable perspective on the legislative process can support. May not judicial notice be taken of the fact that committee reports are often authored entirely by staff members, and that in the rush and flurry of events active congressmen may never have an opportunity to read these reports at all? As Justice White observed in *Cass v. United States,* 417 U.S. 72, 83, 94 S.Ct. 2167, 2173, 40 L.Ed.2d 668 (1974), "In resolving ambiguity, we must allow ourselves some recognition of the existence of

sheer inadvertence in the legislative process" (quoting *Schmid v. United States,* 436 F.2d 987, 992 (Ct.Cl.1971)). *Cf. Perry v. Commerce Loan Co.,* 383 U.S. 392, 401, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966) (inclusion of section in statute found to have been "a legislative oversight").

Congress is composed of two bodies and 535 individuals; it is too much to expect that it will always speak with flawless consistency and clarity. When it does not, however, the task of courts is to reconcile ambiguous words with congressional policies in order to find a result consonant with what Congress intended to do.[3] "There is no invariable rule for the discovery of that intention. To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute . . . ." *United States v. American Trucking Ass'ns.,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). If there is a general precept, however, it is that courts must strain to interpret the results of the legislative process as reasonable and not ridiculous. "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character." *United States v. Kirby,* 74 U.S. (7 Wall.) 482, 486–87, 19 L.Ed. 278 (1868); see *Jacobson v. Massachusetts,* 197 U.S. 11, 39, 25 S.Ct. 358, 366, 49 L.Ed. 643 (1905).

The canon in favor of strict construction is not an inexorable command to override common sense and evident statutory purpose. . . . No rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences. And the absence of any signifi-

---

tion for criminal investigation materials may have been "a legislative error").

**3.** *See, e.g., Minor v. Mechanics' Bank,* 26 U.S. (1 Peters) 46, 64, 7 L.Ed. 47 (1828) ("But no general rule can be laid down upon this subject,

further than that that exposition ought to be adopted in this, as in other cases, which carries into effect the true intent and object of the legislature in the enactment.").

cant legislative history, other than has been related, may be indicative that Congress considered that there was no such problem as is now sought to be injected in the statutory wording . . . .

*United States v. Brown*, 333 U.S. 18, 25–27, 68 S.Ct. 376, 379–380, 92 L.Ed. 442 (1948). In the instant case, it is irrefutable that Congress did not intend the Freedom of Information Act to provide criminals with the means to evade detection and arrest. "Granted that the present problem could have been obviated by even more astute draftsmanship," *id.* at 25, 68 S.Ct. at 379, there is no excuse for a court to strain to reach such an absurd and unreasonable result.[4] I agree with Judge Wilkey that it is not for us to correct errors of Congress, dissent at 1119, but neither may we ascribe to Congress errors that it clearly did not intend. Judge Wilkey urges a result that makes scofflaws of the Congress, or at least some of its members, and such contumely is unnecessary, unwise, and injudicious.

My second difficulty with Judge Wilkey's dissent grows out of the first. He tells us that "[t]he test of a judge who has taken an oath to uphold the law is the objectivity with which he interprets and enforces laws of which he thoroughly disapproves." Dissent at 1121. Where the meaning of legislation is plain, "it must be obeyed." *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805) (Marshall, C.J.). It is an equally venerable principle, however, that courts have the duty discussed above to reject constructions that are "absurd" and "to expound [the words of a statute] so as to give some effect to the legislative will. Some latitude of construction, then, must be used." *Wilson v. Mason*, 5 U.S. (1 Cranch) 45, 102, 2 L.Ed. 29 (1801) (Marshall, C. J.). See *Huidekoper v. Douglass*, 7 U.S. (3 Cranch) 1, 66, 2 L.Ed. 347 (1805). "The

interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function." *United States v. American Trucking Ass'ns., supra*, 310 U.S. at 544, 60 S.Ct. at 1064.

If statutory interpretation were the simple, even mechanical task that Judge Wilkey implies, there might be a stronger basis for his dissent. There also would be a need for fewer judges, and appeals, and opinions. Unfortunately, our work is not that simple, and his statement that the majority is "playing . . . a legislative game," dissent at 1093, may come across as a denunciation of far more distinguished judges than we. As Justice Frankfurter explained in *Carpenters' Union v. NLRB*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958):

> The problem raised by these cases affords a striking illustration of the importance of the truism that it is the business of Congress to declare policy and not this Court's. The judicial function is confined to applying what Congress has enacted after ascertaining what it is that Congress has enacted. But such ascertainment, that is, construing legislation, is nothing like a mechanical endeavor. It could not be accomplished by the subtlest of modern "brain" machines. Because of the infirmities of language and the limited scope of science in legislative drafting, inevitably there enters into the construction of statutes the play of judicial judgment within the limits of the relevant legislative materials.

*Id.* at 100, 78 S.Ct. at 1016. See *United States v. American Trucking Ass'ns., supra*, 310 U.S. at 544, 60 S.Ct. at 1064 (Justice Reed); *United States v. Kirby, supra*, 74 U.S. at 487 (Justice Field) ("The reason of the law in such cases should prevail over its letter"); *Civil Rights Cases*, 109 U.S. 3, 26,

---

4. See *United States v. Kirby*, 74 U.S. (7 Wall.) 482, 487, 19 L.Ed. 278 (1868):

> The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, "that whoever draw blood in the streets should be punished with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same

> common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire—"for he is not to be hanged because he would not stay to be burnt."

3 S.Ct. 18, 32, 27 L.Ed. 835 (1883) (Justice Harlan) ("It is not the words of the law but the internal sense of it that makes the law: the letter of the law is the body; the sense and reason of the law is the soul"); *Church of the Holy Trinity v. United States* 143 U.S. 457, 472, 36 L.Ed. 226 (1892) (Justice Brewer) ("the act, although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute"). Judge Wilkey's test is either simplistic, or tars so many distinguished judges that the brush is wider than he could possibly defend.

Put another way, Judge Wilkey misapprehends the true distinction between the legislative and the judicial function. An appellate judge as much as a legislator, in Edmund Burke's words, owes his society "not his industry only, but his judgment." There are similarities between the two roles that cannot be denied. *See, e.g.*, B. Cardozo, The Nature of the Judicial Process (1921); Hazard, *The Supreme Court as a Legislature*, 64 Cornell L.Rev. 1 (1978). Both roles require application of reason to statutes, analysis of facts, and the rational treatment of complex issues. This by no way means that appellate judges and legislators are the same, of course, although polemicists with hidden agendas may try to twist the point. The judge becomes an illicit legislator when he goes beyond a dispassionate interpretation of the intent and meaning of the legislature that enacted the law before him.

This observation must raise the question of who it is that truly seeks to legislate here. The majority opinion has applied the Freedom of Information Act in view of the intent of the several legislatures that passed, amended, or resisted amending it. We may have judged erroneously, of course. To paraphrase Justice Jackson, we are neither infallible nor final. Nevertheless, although our judgment may be wrong, it is no less a judgment in good faith. Judge Wilkey rejects any attempt to judge the intent of Congress, and woodenly focuses only on the words of the statute: "Its literal meaning should be given effect." Dissent at 1104. His version of the literal

meaning leads to an absurd result that could not have been contemplated by Congress. Indeed, as Judge Wilkey stated in his decision for the panel that has been vacated, "we may regret that Congress has mandated the disclosure . . . ." *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, No. 80–1278 (D.C.Cir. November 12, 1980). He commends the literal application of the statute with an eye toward "an effort to rewrite substantially the Freedom of Information Act" now underway in Congress, dissent at 1120, and confides that "[a]s a policy matter, I hope the Congress does a complete job of revision . . . ." *Id.* at 1120. Who, then, actually exceeds the bounds of the judicial role and seeks to legislate instead? Who, then, is truly diminishing public confidence in the work of our court?

Finally, I regret that Judge Wilkey chooses to "test" the bonafides of judicial oaths "to uphold the law," *id.* at 1121. I think Judge Wilkey can be true to his oath and the rest of the court can be true to theirs even though we disagree as to whether an adjudged felon is authorized by FOIA to utilize the BATF Manual on "Surveillance of Premises, Vehicles and Persons" for his own ends. I wish it had not been necessary to concur in a separate opinion, but the ironies of Judge Wilkey's dissent should not go unremarked.

GINSBURG, Circuit Judge, concurring:

The panel decision in this case followed the court's en banc decision in *Jordan v. United States Department of Justice*, 591 F.2d 753 (D.C.Cir.1978). The court, again sitting en banc, now turns away from the *Jordan* rationale but adheres to the result reached in that case. Maj. op. at 1053, 1074–75. I find the current opinion a plausible interpretation of the language of Exemption 2, consistent with decisions in other circuits, "the overall design of FOIA, the explicit comments made in the House, the cautionary words of the Supreme Court in *Rose*, and even common sense." Maj. op. at 1074. I therefore concur in the opinion, with reservations limited to the explanation the

court offers for preserving the *Jordan* judgment. The court concludes that "the *result* in *[Jordan]* would be identical under the test we announce today." Maj. op. at 1053, 1074. The manner in which the court's opinion spares the *Jordan* judgment while abandoning the *Jordan* rationale, in my view, clouds an otherwise clear pronouncement.

*Jordan* held that Exemption 2 does not shield documents whose disclosure might risk circumvention of the law. 591 F.2d at 771. It was immaterial, in the view of the *Jordan* district court, *id.* at 758,[1] and this court's majority on appeal, whether disclosure of the guidelines for prosecutorial discretion there in question "would 'tip off' potential violators on how to break the law and avoid prosecution." *Id.* at 780. Even if release of the documents would significantly risk circumvention, the *Jordan* majority held, disclosure was required. Hence, as the court now points out, no fact finding on circumvention attended the *Jordan* disposition. Maj. op. at 1068 n.46, 1075 & n.64.

The court holds today that Exemption 2 protects documents from mandatory disclosure if a two-pronged test is met: the document is used for predominantly internal purposes, maj. op. at 1073, *and* disclosure significantly risks circumvention of agency regulations or statutes. Maj. op. at 1074. Therefore, to hold that "the result in *Jordan*—release of the documents on prosecutorial discretion—would be the same," maj. op. at 1075, the court must have determined that (1) the guidelines for prosecutorial discretion are *not* used for predominantly internal purposes, *see* maj. op. at 1073, or (2) disclosure of the prosecutorial documents would *not* significantly risk evasion of the law. *See* maj. op. at 1074.

The second of these two *Jordan*-sparing determinations can be quickly dispatched. This court of review did not resolve in the first instance the fact it identifies as disputed and unresolved in *Jordan*—whether, as the United States Attorney contended, release of the prosecutorial discretion guidelines would benefit "those who seek to circumvent the law." 591 F.2d at 780. No factual finding was made by the *Jordan* district court on that point, and no such finding can be decreed by this court *nunc pro tunc.*

Since the court cannot say one way or the other whether disclosure of the *Jordan* documents significantly risked evasion of the law,[2] its assurance that the *Jordan* result "would be the same" under the test announced today must rest on a conviction that the prosecutorial discretion guidelines were *not* used (should not have been used?) for predominantly internal purposes. *See* maj. op. at 1073, 1074. On this score, the court suggests, with scant elaboration, that the guidelines are not "predominantly internal" because they are a source of "secret law." Maj. op. at 1075. *See also id.* at 1068, 1072 & n.58, 1073.

The BATF manual, the court points out, instructs agency personnel on observation, not regulation, of public behavior, while the guidelines on prosecutorial discretion instruct personnel on "how to regulate members of the public." Maj. op. at 1075. But the prosecutorial guidelines do not regulate public behavior by distinguishing legal from illegal conduct; they do not inform law-abiding citizens how to conform their conduct to statutory or regulatory requirements. The United States Attorney in *Jordan* urged that public announcement of prosecution policy, far from bearing on the

---

1. The information-seeking plaintiff in *Jordan* prevailed on a motion for summary judgment. Although presented with the United States Attorney's affidavit attesting to "the pernicious consequences" of disclosure, 591 F.2d at 758, the district court held that the records were required to be disclosed pursuant to § 552(a)(2)(C) and were not exempt under § 552(b)(2). *Jordan v. United States Dep't of Justice,* No. 76–0276 (D.D.C. Jan. 18, 1977).

2. In commenting on whether disclosure of prosecutorial guidelines would help individuals evade the law, the court points out, maj. op. at 1075, that federal prosecutors who resign and go into private practice as defense attorneys retain knowledge of the guidelines. But former federal prosecutors may also retain knowledge of other law enforcement manuals, perhaps even the BATF Manual involved in this case.

propriety of actions of members of the public, would give "carte blanche" to and encourage "certain criminal activity." 591 F.2d at 780. Specifically, the Department of Justice stressed in *Jordan:*

> Public disclosure of these materials would alert members of the public to those situations, persons, and offenses for which prosecution is withheld, selectively applied, or disposed of by pre-trial diversion. Individuals could then successfully exploit these policies by committing crimes within these select categories, thereby escaping prosecution. For example, publication of a policy of non-prosecution (or prosecution at a lesser degree of seriousness) for possession of certain quantities of specific narcotic drugs would serve only to encourage dealers and users of narcotics to carry lesser quantities of the drug than those specified in our guidelines.... [A]n offender could avoid full prosecution merely by stealing property valued at less than our *de minimus* [*sic*] standards.

*Id.* at 758. I find unavoidable the conclusion that the guidelines for prosecution are

like the BATF Manual to this extent: both instruct agency personnel how to do their job; neither instructs the public on the propriety of contemplated activity.

It may be that the result in *Jordan* should be the same and that an opinion could be written explaining why. I believe the court hints at, but has not written, such an opinion. *Jordan* and this case cannot be distinguished on the ground that *Jordan* involved no significant risk of law circumvention, or on the ground that the prosecutorial guidelines, unlike the BATF Manual, are public conduct-regulating rules not designed for predominantly internal use. To the extent that the court points to these factors as separating *Jordan* from *Crooker*, the opinion muddles where it should illuminate. The court does say *Jordan* involved, as this case does not, "secret law" of an agency. Maj. op. at 1075.[3] Had the opinion focused on that point, and offered more by way of elaboration,[4] the district court, which must decide whether future cases are governed by the *Crooker* reasoning or by the *Jordan* result, might have had a more secure guide.

### OUTLINE

|  |  | Page |
|---|---|---|
| I. | ANALYSIS OF EXEMPTION 2 | 1094 |
| A. | The Language of Exemption 2 | 1094 |
| B. | The House and Senate Reports | 1096 |
| | 1. The conflict between the two reports | 1096 |
| | 2. The background on passage of the FOIA | 1098 |
| | 3. The significance of the House and Senate hearings | 1100 |
| C. | Section (a)(2)(C) of the FOIA | 1105 |
| D. | The Overall Purpose of the FOIA | 1106 |

---

**3.** *Cf.* 591 F.2d at 774, 775 (guidelines "express the settled and established policy of the U.S. Attorney's Office," they "were promulgated as general standards to guide the Government lawyers in determining whether or not to bring an individual to trial in the first place"); *id.* at 782 (Bazelon, C.J., concurring) (public and courts should "be informed of the general criteria which prosecutors apply in selecting which cases to prosecute and what charges to bring").

**4.** Judge Mikva, in his concurring statement, presents a brief exposition of the theme that

might be developed. He asserts that *Jordan* involved "secret substantive and procedural law," and comments that release of the information sought in *Jordan* would serve "fundamental public interests" and help "police those who police others." Judge MacKinnon's concurring opinion also refers to the "secret law" concern in *Jordan*. However, the concurring remarks do not offer clear guidance on distinguishing "secret law" subject to disclosure from "law enforcement matter" that may be withheld.

II.  SIGNIFICANCE OF LATER CONGRESSIONAL ACTS _____ 1107
    A.  The Government in the Sunshine Act _____ 1107
    B.  Section (b) (7) (E) of the FOIA _____ 1109
III.  CASE LAW ON EXEMPTION 2 _____ 1111
    A.  *Department of Air Force* v. *Rose* _____ 1111
    B.  D.C. Circuit Case Law _____ 1111
    C.  Case Law in Other Circuits _____ 1112
IV.  THE MAJORITY'S NEW TEST _____ 1114
V.  THE MAJORITY'S ATTEMPT TO DISTINGUISH THE RESULT IN JORDAN _____ 1117
VI.  CONCLUSION _____ 1118

WILKEY, Circuit Judge, dissenting:

Today this court has determined en banc to repudiate the majority opinion in this court's 1978 en banc decision in *Jordan v. United States Department of Justice*.[1] The rationale in *Jordan*—endorsed without reservation by five judges, a majority of the court—was one of strict construction of the exemptions to the Freedom of Information Act (FOIA), consonant with the avowed overall intent of Congress and a long line of our own decisions. The result compelled disclosure of documents whose publication may·arguably handicap the Government's law enforcement efforts, a fact which was openly recognized by both majority and dissent.

Now this court has decreed a remarkable reversal in both rationale and result. Yet the words of the statute remain the same; and the actions of the Congress in enacting and amending the FOIA are undeniable historical facts, as certain in 1978 as in 1981. Indeed, not one additional *fact* in the legislative history is relied on in Judge Edwards' opinion, although there is a great deal of new *interpretation*. The *Jordan* majority opinion itself has been virtually ignored, as if it were natural and proper for this court to conduct an entirely de novo determination of the issue resolved decisively by a majority in the *Jordan* case. And, of course, if this court can switch its interpretation of Exemption 2 so completely in three years, it would not be difficult to *switch back* again in, say, ten years.

What this court is playing is a legislative game. The role it has assumed, years after the event, is that of a conference committee to reconcile the contradictory Senate and House interpretations of Exemption 2. Because of the legislative situation in 1966, such a reconciliation could not be achieved. Only one of these interpretations is correct; to my mind all evidence shows it must be the Senate version, a conclusion reached by virtually all commentators who have addressed the issue, and one we reached in *Jordan* three years ago. Clearly this court should not attempt to perform the omitted legislative act and work out a compromise which it *thinks* years after the event *might have been* acceptable to both houses.

It is not only improper for this court to work out a legislative compromise between the two houses as of 1966, it is also superfluous, because in practical effect that legislative compromise was worked out in 1976 with the enactment of the Government in the Sunshine Act containing the identical language in its Exemption 2 as in Exemption 2 of the Freedom of Information Act. What happened in 1976 was that *both* houses of Congress adopted the Senate interpretation of the identical phraseology used in both the FOIA and the Sunshine Act. In effect, the House determined that the meaning to be attributed to these words was that specified in the original Senate Report.

If the House is now in accord with the Senate interpretation of the English lan-

---

1.  591 F.2d 753 (D.C.Cir.1978) (en banc).

guage used in Exemption 2 of *both* the FOIA and the Sunshine Act, then it is the height of presumption for this court to go back to the House position of 1966 and assert that position today over the position of the Senate maintained in both 1966 and 1976. Such an assertion of legislative power, combined with the disregard shown for the decision issued by a majority of this en banc court a mere three years ago, can serve only to undermine the prestige of this court and diminish the respect which will be paid its decisions.

## I. ANALYSIS OF EXEMPTION 2

### A. *The Language of Exemption 2*

Exemption 2 provides that mandatory disclosure under the FOIA does not apply to matters that are "related solely to the internal personnel rules and practices of an agency."[2] In *Jordan* the majority conducted an in-depth analysis of this language and concluded that its meaning was quite clear:

It is almost impossible to look at this short, simple exemption on its face, "related solely to the internal personnel rules and practices of an agency," and say that this description was intended to cover the Manual and Guidelines here. The word "personnel" would normally connote matters relating to pay, pensions, vacations, hours of work, lunch hours, parking, etc.—precisely the kind of trivia that was indeed described by the Senate's comment on the coverage of this particular exemption.[3]

Today the majority asserts, without any explanation whatsoever, that "at least at

first blush ... the BATF manual appears to be encompassed by the literal language of Exemption 2."[4] From where comes this new interpretation, directly counter to that of *Jordan*? Judge Edwards cites two circuit court decisions adopting a similar reading, apparently implying that he is simply following the weight of federal authority. He makes no mention of the other courts which have read Exemption 2 as *Jordan* did. The Sixth Circuit, for example, held that "the plain import of the (b)(2) language" supported a narrow interpretation and that the "emphasis on personnel rules and practices suggests concern with conditions of employment and the like."[5]

What is worse is that the majority makes no attempt to refute the analysis of *Jordan.* Given that *Jordan* found that "personnel" was the real problem for the Government agency seeking to avoid disclosure by virtue of Exemption 2, one might have thought that the majority would confront *Jordan's* reading of the word and explain why it rejects that reading. But the majority opinion says nothing about what the specific word "personnel" means in Exemption 2 or why Congress used it, and it fails even to indicate a recognition that the word was central to *Jordan's* analysis. The majority merely holds that "the words 'personnel rules and practices' encompass not merely minor employment matters, but may cover other rules and practices governing agency personnel, including significant matters like job training for law enforcement personnel."[6] This detailed definition, it turns out, derives entirely from two passages written

---

2. 5 U.S.C. § 552(b)(2) (1976).

3. *Jordan*, 591 F.2d at 763.

4. Majority opinion (maj. op.) at 1056.

5. *Hawkes v. IRS*, 567 F.2d 787, 797 (6th Cir. 1972); *see Cox v. United States Dep't of Justice*, 576 F.2d 1302, 1309–10 (8th Cir. 1978); *Stokes v. Brennan*, 476 F.2d 699, 703 (5th Cir. 1973); *Benson v. GSA*, 289 F.Supp. 590, 594 (W.D.Wash.1968) ("plain words of the statute ... seem to provide an exemption for material dealing solely with the physical management of the agency's work force"), *aff'd on other*

*grounds*, 415 F.2d 878 (9th Cir. 1969) (Exemption 2 issue not argued on appeal).

6. Maj. op. at 1056. Judge MacKinnon adheres to his *Jordan* view that the word "internal" modifies both "rules" and "practices," but that "personnel" modifies only "rules." Concurring opinion of Judge MacKinnon at 1078. Not even the majority opinion adopts this interpretation, which *Jordan* made clear "is violative of basic rules of English grammar, contrary to the legislative history of the exemption, and incompatible with the general purpose of the Act." *Jordan*, 591 F.2d at 764.

by Judge Leventhal in *Vaughn v. Rosen (Vaughn II)*[7] and *Jordan.*

The first passage is used obviously to alter the meaning of the words used by Congress. "Related solely to," under this novel construction, actually means "related *predominantly* to."[8] In other words, the actual language of the exemption turns out to indicate a meaning contrary to that preferred by the majority; so the unambiguous word "solely" is changed to "predominantly," a much more malleable word that enables a court to support whatever result it finds desirable.

That this construction is wrong was made quite clear by the Supreme Court in *Department of Air Force v. Rose.*[9] The Court had before it the *Vaughn II* decision, and it chose to adopt the reasoning of the majority rather than that of Judge Leventhal's concurring opinion. In determining that the Senate Report better comported with the intent underlying Exemption 2, the Court cited with approval the *Vaughn II* majority's finding that the distinction between exempt " 'minor or trivial matters' " and nonexempt " 'substantial matters' " was " 'a standard, a guide, which an agency and then a court, if need be, can apply with some certainty, consistency and clarity'. . . ."[10] This unequivocal Supreme Court endorsement is precisely why *Jordan* rejected the vague and uncertain standard of "predominant internality" suggested by Judge Leventhal. And not only did *Rose* adopt this clear interpretation of Exemp-

tion 2, it specifically stated that the materials at issue could not be withheld because "[t]hey are not matter with *merely* internal significance" and "do not concern only *routine* matters."[11] Had the Court meant to adopt Judge Leventhal's standard it obviously would have used the word "predominantly" rather than "merely." That the Court chose "merely," which is a close approximation of the actual word "solely," shows that the Court preferred a literal interpretation. Thus the Court followed the view of the *Vaughn II* majority. By resurrecting Judge Leventhal's standard, the majority today has adopted what the Supreme Court in *Rose* demonstrated is an erroneous interpretation of Exemption 2.

The second passage quoted by the majority is from Judge Leventhal's concurrence in *Jordan* :

> Exemption 2 is applicable where the document consists of internal instructions to such government officials as investigators and bank examiners. In such a case disclosure would permit circumvention of the law, and there is no substantial, valid external interest of the community at large in revelation.[12]

Apparently content that this passage is sufficient explanation, Judge Edwards simply concludes by saying that "[w]e agree with this interpretation of the literal meaning of Exemption 2."[13]

I submit that the latter passage is manifestly *not* an interpretation of the *literal*

---

7. 523 F.2d 1136 (D.C.Cir.1975).

8. Maj. op. at 1056–1057 (quoting *Vaughn II*, 523 F.2d at 1150-51 (Leventhal, J., concurring)) (emphasis added).

9. 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976).

10. *Id.* at 365, 96 S.Ct. at 1601 (quoting *Vaughn II*, 523 F.2d at 1142).

11. *Id.* at 370, 96 S.Ct. at 1603 (emphasis added).

12. Maj. op. at 1057 (quoting *Jordan*, 591 F.2d at 783 (Leventhal, J., concurring)).

13. *Id.* Although Judge Edwards thus relies almost entirely on Judge Leventhal's interpreta-

tion of Exemption 2, he goes on to repudiate the essence of Judge Leventhal's standard, namely that Exemption 2 is applicable where there is "no substantial, valid external interest of the community at large in revelation." *Jordan*, 591 F.2d at 783 (Leventhal, J., concurring). The majority declares that "nor is it for this court to decide which disclosures are in the public interest" and that "we reject language [in *Cox* and in Judge Leventhal's concurring opinion in *Jordan* ] suggesting that the courts are to decide when there is a legitimate public interest in disclosure." Maj. op. at 1074 n.60. As discussed below, this leaves the majority with a test it cannot apply, except by mere assertion as a means of justifying its desired result. *See* pp. 1072–1073 *infra.*

meaning of Exemption 2. The first sentence simply *asserts* that Exemption 2 covers internal instructions to government officials, and the second sentence is purely a statement of one view of what the appropriate *policy* should be, i.e., not to permit disclosure where it would allow circumvention of the law and where there is no important external interest in revelation. There is no hint in Exemption 2 that the goal is to keep instructions secret to prevent circumvention of the law. *"Law enforcement" or a similar phrase would convey such an intent, but "personnel" does not.*[14] Such concerns can be derived only from certain aspects of the legislative history, not from an analysis of the specific language of Exemption 2. The result is that the majority has side-stepped *Jordan's* analysis of the language of Exemption 2. In its place the court has simply inserted, without further elaboration or justification, a different definition which was rejected in *Jordan* and in *Rose.*

### B. *The House and Senate Reports*

#### 1. *The conflict between the two reports*

The heart of the controversy over the meaning of Exemption 2 is the conflict between the House and Senate Reports on the FOIA. The Senate Report states:

Exemption No. 2 relates only to the internal personnel rules and practices of an agency. Examples of these may be rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like.[15]

The House Report's statement on Exemption 2 is completely different:

Operating rules, guidelines, and manuals of procedure for Government investigators or examiners would be exempt from disclosure, but this exemption would not cover all "matters of internal management" such as employee relations and working conditions and routine administrative procedures which are withheld under the present law.[16]

The *Jordan* majority declared that "rarely can there be found two such contradictory explanations of a statute's meaning than in the Senate and House Reports."[17] The Sixth Circuit found that "[t]he disagreement between the houses is total."[18] Many other commentators have called the two reports "diametrically opposed"[19] and have joined the *Jordan* majority in determining that the background of the two reports indicates that the Senate Report should be given effect.[20]

14. "[I]f the FOIA's drafters had intended a complete exemption for law enforcement manuals, they could easily and unambiguously have provided such an exemption in subsection (b). The failure to do so indicates that this was not their intent." Comment, *The Status of Law Enforcement Manuals Under the Freedom of Information Act*, 75 Nw.U.L.Rev. 734, 747 (1980) [hereinafter Northwestern Comment].

15. S.Rep.No.813, 89th Cong., 1st Sess. 8 (1965).

16. H.R.Rep.No.1497, 89th Cong., 2d Sess. 10 (1966).

17. *Jordan*, 591 F.2d at 767.

18. *Hawkes v. IRS*, 467 F.2d 787, 796 (6th Cir. 1972); *see Stokes v. Brennan*, 476 F.2d 699, 702 (5th Cir. 1973) ("definite conflict").

19. *See* Note, *The Freedom of Information Act: A Critical Review*, 38 Geo.Wash.L.Rev. 150, 154 (1969) [hereinafter Geo.Wash.Note]; Northwestern Comment, *supra* note 14, at 748; Note, *The Freedom of Information Act: Shredding the Paper Curtain*, 47 St. John's L.Rev.

694, 716 (1973) ([hereinafter St. John's Note]. *See also* Note, *The Freedom of Information Act—The Parameters of the Exemptions*, 62 Geo.L.J. 177, 183 (1973) ("conflicting" reports); Project, *Government Information and the Rights of Citizens*, 73 Mich.L.Rev. 971, 1051 (1975) (Senate Report "quite different" from House Report); Comment, *The Freedom of Information Act: A Survey of Litigation Under the Exemptions*, 48 Miss.L.J. 784, 792 (1977) ("conflicting congressional reports") [hereinafter Miss.Note].

20. *See, e.g.*, J. O'Reilly, I Federal Information Disclosure § 12.03, at 12–6 (1980) ("courts should restrict their reading to the literal text and its initial Senate Report explanation"); Davis, *The Information Act: A Preliminary Analysis*, 34 U.Chi.L.Rev. 761, 785–86 (1967) (Senate Report "seems fully faithful to the words of the statute," whereas House Report "tries to change the meaning of the legislative language"); Geo.Wash.Note, *supra* note 19, at 153–54; Miss.Note, *supra* 19, at 793; Northwestern Comment, *supra* note 14, at 758; St. John's Note, *supra* note 19, at 717.

In today's opinion, however, the majority comes up with a startling new conclusion: the two reports are not really contradictory at all. Judge Edwards declares that "[t]he so-called contradiction between the House and Senate Reports ... exists only with respect to the exemption of trivial employment matters. The House Report's statement that Exemption 2 permits exemption of more substantive matters—such as 'manuals of procedure for government investigators or examiners'—is uncontroverted by the Senate Report." [21] Because the Senate Report provides "only a non-exclusive list of examples of matters exempt from disclosure," and because "it does not expressly limit the scope of Exemption 2 to [minor employment] matters," [22] the majority determines that the two different statements can simply be added together to form one coherent explanation of the intent behind Exemption 2.

This is one of the most remarkable and novel principles of construction I have seen in a long time. Apparently the majority believes that if a report is silent on matter X, then that report fails to create even an inference that matter X is not within the legislative intent—even where the report lists examples of what it *does* cover which are quite different than matter X. I submit that the implausibility of this view in general is obvious. [23] And applied here it flies in the face of all other existing inter-

pretations of these two reports. [24] The Senate Report states that Exemption 2 relates *only* to "rules as to personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick leave, and the like." [25] Under the majority's interpretation it would be perfectly natural for the Report to have contained the phrase "instructions on conducting surveillance" in place of the phrase "and the like." Perhaps my colleagues believe there is no difference between rules regarding parking facilities, lunch hours, and sick leave and those regarding covert surveillance by federal agents, but I think the difference between the two could not be greater.

Not only does the majority attempt to find no material conflict between the House and Senate Reports, it actually goes on to imply that the House Report should be given *greater* weight. Judge Edwards asserts that "the Senate gives us less guidance since the Senators made no useful comments during the Senate hearings, and held no debate at all on FOIA." [26] The implication is that the Senate Report should be given little weight because of this lack of debate. Such a holding is directly contrary to the Supreme Court's opinion in *Rose*. The Court noted that "[a]lmost all courts that have considered the difference between the Reports have concluded that the Senate Report more accurately reflects the

---

21. Maj. op. at 1061.

22. *Id.* at 1058, 1065. Judge Edwards also cites passages from the Senate Report which deal with the overall philosophy of the FOIA, and he concludes that "the Senate Report clearly recognized that the broad policy of full disclosure must be tempered in order to protect the 'operation of our government.'" *Id.* at 1058. Yet this only goes to undermine the majority's own position. If the Senate Report "clearly recognized" the need to protect Government operations, it surely would not have been silent about this concern in relation to Exemption 2 had Exemption 2 been intended to account for it.

23. The majority's argument runs directly counter to the well-known maxim of statutory interpretation "*Expressio unius est exclusio alteri-*

*us.*" This maxim "is a product of 'logic and common sense.' It expresses the learning of common experience that generally when people say one thing they do not mean something else." C. D. Sands, 2A Sutherland Statutory Construction § 47.24, at 127 (4th ed. 1973).

24. Not even the Second and Ninth Circuits, which have agreed with the majority on the meaning of Exemption 2, felt capable of denying the direct conflict between the House and Senate Reports. *See Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544, 546–47 (2d Cir. 1978); *Hardy v. Bureau of Alcohol, Tobacco & Firearms*, 631 F.2d 653, 655 (9th Cir. 1980).

25. S.Rep.No.813, 89th Cong., 1st Sess. 8 (1965).

26. Maj. op. at 1065.

congressional purpose," [27] and it relied upon the Senate Report in reaching its decision. If, as the majority opinion implies, the Senate Report should be given little weight because of the lack of senatorial debate on the issue, surely it should have been disregarded in *Rose* as well.

Judge Edwards seeks to explain his reliance on the House Report on the ground that "[u]nder the *Jordan* interpretation, congressional intent expressed in the House is given no weight at all." [28] To avoid this "extreme approach" he asserts that "the proper route is to try to reconcile legislative intent expressed in the House with that of the Senate." [29] *But under the majority opinion the central thrust of the Senate Report is utterly repudiated.* Quite to the contrary of the majority's interpretation, the clear meaning of the Senate Report is not that minor employment matters are *among* those exempted under Exemption 2, it is that *only* such minor matters are covered. No fair reading of the Senate Report can lead to the conclusion that it meant to include investigative manuals within Exemption 2. It is true that under *Jordan* the House Report is disregarded. *But that is a result of the House's own attempt to amend the meaning of the Senate version of Exemption 2 without actually changing the words of the statute.* If the House had intended that Exemption 2 have a different meaning from that given to it by the Senate Report, it should have made changes in the legislation and then attempted to resolve the differences in conference.

### 2. The background on passage of the FOIA

Crucial to this court's holding in *Jordan* was analysis of the background surrounding the issuance of the two committee reports, especially the fact that the House Report

was prepared only *after* the Senate had unanimously adopted the FOIA, including Exemption 2, based on the Senate Report. As the Supreme Court found in *Rose*, quoting with approval from *Vaughn II*, " 'The second major consideration favoring reliance upon the Senate Report is the fact that it was the only committee report that was before both houses of Congress. The House unanimously passed the Senate Bill without amendment, therefore no conference committee was necessary to reconcile conflicting provisions' . . . ." [30] As Professor Davis has said, "no one will ever know whether the Senate Committee or the Senate would have concurred in the restrictions written into the House committee report." [31] The Supreme Court in *Rose* adopted *Vaughn II*'s statement of the significance of this fact:

> " . . . [W]e as a court viewing the legislative history must be wary of relying upon the House Report, or even the statements of House sponsors, where their views differ from those expressed in the Senate. As Professor Davis said: 'The basic principle is quite elementary: The content of the law must depend upon the intent of both Houses, not of just one.' By unanimously passing the Senate Bill without amendment, the House denied both the Senate Committee and the entire Senate an opportunity to object (or concur) to the interpretation written into the House Report (or voiced in floor colloquy). This being the case, we choose to rely upon the Senate Report." [32]

How does the majority respond to this key argument in *Jordan*, which was specifically adopted by the Supreme Court in *Rose*? It only cites Judge Leventhal's concurring opinion in *Vaughn II* (five months before *Rose*), which found this " 'a novel

---

27. *Rose*, 425 U.S. at 363–64, 96 S.Ct. at 1600–01.

28. Maj. op. at 1075 n.63.

29. *Id.*

30. *Rose*, 425 U.S. at 366, 96 S.Ct. at 1601 (quoting *Vaughn II*, 523 F.2d at 1142).

31. K. Davis, Administrative Law Treatise, § 3A.31 at 175–76 (1970 Supp.), *quoted in Jordan*, 591 F.2d at 769.

32. *Rose*, 425 U.S. at 366, 96 S.Ct. at 1601 (quoting *Vaughn II*, 523 F.2d at 1142) (citation omitted).

and totally unpersuasive canon of statutory construction.' " [33]   Though Judge Edwards does not specifically adopt this view, he appears to agree with it as he cites it directly following his criticism of the *Vaughn II* majority. *And he makes no mention of the fact that* Rose *specifically quoted the* Vaughn II *majority with approval on this point, thus necessarily rejecting Judge Leventhal's position. Thus the majority has either taken a position directly contrary to the Court in* Rose *or, recognizing that the Court's view refutes its own interpretation of the legislative history, it has chosen to avoid commenting on the analysis entirely.*

This analysis becomes even more powerful when it is recognized that "the expansive gloss placed on Exemption 2 and other sections of the Act by the House Report was the product of last minute chicanery by interested members of the House *after* the Senate had passed the bill and just as the full Committee in the House was about to report out the bill." [34]   Professor Davis has aptly termed this an "abuse of legislative history." [35]   Another commentator noted that the House Report "differed so substantially from its Senate counterpart . . . that it, in effect, amended the bill," and cited the House Report's discussion of Exemption 2 as the "most blatant example" of the House's attempt to restrict the FOIA by committee report.[36]   And the most damning evidence of all was provided by the testimony of Benny L. Kass, who was counsel to the Foreign Operations and Government Operations Committee from 1962 to 1965.

In 1973 testimony at the Senate hearings on proposed amendments to the FOIA, Mr. Kass explained "why the House report is so different from the rest of the bill":

The basic reason that the House bill is different was after the Senate passed the Freedom of Information Act and it was about to be reported out of the House Government Operations Committee, the Justice Department—Mr. Katzenbach, Mr. Wozencraft—*came up and talked to Congressman Moss and said, look, we cannot support the bill. There are a number of changes that have to be made.*

I kind of appeared as an emissary on behalf of the former chairman of this subcommittee to Congressman Moss and I said it is our reading from the Senate that the *Senate has already passed this bill twice, that there should be no amendments.* We wanted to move forward with it. We have played with it long enough.

So basically what was done under really almost an implied veto—I don't think they ever specifically said they would veto it but there was an implied threat—*we tried to compromise a number of the specific objections into the House report.* I don't think time permits going into these details. I have a very brief analysis which I was going to submit. I have to type it and I will submit it for the record, pointing out where the *House kind of gave in to what the Justice Department wanted.*

The majority also states in a footnote that "the problem before us is that the intent of the House and that of the Senate, as expressed in the Committee Reports, are not identical. It is the job of this court to find the interpretation that best comports with the understanding of both houses." Maj. op. at 1067 n.41. This does not respond to the issue whether the Senate Report should be given "predominant" weight; it simply begs the question.

**33.**  Maj. op. at 1067 (quoting *Vaughn II,* 523 F.2d at 1148 (Leventhal, J., concurring)). Judge Mikva also adopts Judge Leventhal's position on this issue, stating that "Judge Leventhal, whose expertise on issues of legislative history was second to none, thoroughly demonstrated the error in the argument Judge Wilkey tries to make from [the chronology of the reports]." Concurring opinion of Judge Mikva at 1088.  Granting Judge Leventhal's recognized expertise on legislative issues, it nonetheless is strange that Judge Mikva unabashedly contends that Judge Leventhal "thoroughly demonstrated" the error of a particular argument that was accepted by a majority of this court in *Vaughn II,* by a majority in *Jordan,* and by a majority of the Supreme Court in *Rose.*

**34.**  *Jordan,* 591 F.2d at 768 (emphasis in original).

**35.**  *Id.* at 769 (quoting K. Davis, *supra* note 31, § 3A.31, at 175–76.

**36.**  Geo.Wash.Note, *supra* note 19, at 153.

Mr. Kass then pointed out eight sections in the House Report in which the Justice Department was able to get the language it wanted. Not surprisingly, the seventh area was the Report's description of Exemption 2. Mr. Kass concluded:

> I don't think it was a sellout but in any event it was really the price of getting the bill. It was my legal advice to both the chairman of this committee and the chairman, Congressman Moss, that *the legislative history only interprets and does not vitiate in any way the legislation and that the legislation was strong and was there.*

> I think this is important just for the record to point out why the House report is different. Fortunately, as Mr. Dobrovir said, there have been a number of cases all of which have said that the House report is so different that we have to look to the statute and that *the House report should not in any way undermine the basic statute that was passed by Congress in 1966.*[37]

How do my colleagues respond to this compelling evidence that the House Report was an effort to change the meaning of the bill the Senate had already passed, not by amending the language but by inserting a contradictory legislative intent? *They ignore it.* Mr. Kass' testimony, which was so central to the opinion in Jordan, is not quoted, cited, or rebutted in any point of Judge Edwards' opinion. Professor Davis' strong views condemning the House's ac-

tions as "an abuse of legislative history" are ignored as well. The majority merely asserts that since "the House hearings were completed before the Senate held hearings on and passed S. 1160," "it is hardly sensible to disregard other consistent indications of House intent occurring after passage of the Senate bill on the speculative grounds that some members of the House engaged in 'last minute chicanery' to undermine the Senate's action."[38] This use of the word "speculative" highlights the majority's unwillingness to join issue with the reasoning of the Jordan opinion. Mr. Kass' testimony, which is not contradicted by the majority nor by the testimony of any other person involved in the congressional activities leading to the enactment of the FOIA, leaves no doubt that such an "abuse of legislative history" did in fact occur. Faced with this uncontroverted fact, so damaging to its position, the majority pretends it does not exist.

### 3. The significance of the House and Senate hearings

In addition to ignoring evidence supporting the Jordan majority's rationale, the majority misconstrues the legislative history in attempting to demonstrate that the House actually expressed its intent on Exemption 2 prior to the Senate's actions. The opinion asserts that "[t]he House hearings unequivocally reveal that Exemption 2 was intend-

---

37. *Jordan*, 591 F.2d at 769 (quoting *Freedom of Information, Executive Privilege, Secrecy in Government: Hearings on S. 1142 et al. Before the Subcomms. on Administrative Practice and Procedure and the Subcomm. on Separation of Powers of the Senate Comm. on Judiciary and the Subcomm. on Intergovernmental Relations of the Senate Comm. on Government Operations (Volume 2),* 93d Cong., 1st Sess. 122 26 (7, 8, 11, 26 June 1973) (testimony of Benny L. Kass)) (emphasis in original opinion).

38. Maj. op. at 1065 n.39. Judge Mikva's concurring opinion likewise notes the arguments about the House's abuse of legislative history without saying more than that such arguments indicate "a lamentable tendency to scorn the legislative process." Concurring opinion of Judge Mikva at 1087. I find this refusal to treat the argument seriously especially ironic

coming from Judge Mikva, since the basic thrust of his opinion is that judges should look past the evidence contained in hearings and reports to gain a "reasonable perspective on the legislative process." *Id.* at 1088. This is precisely what Jordan did in focusing on the testimony of Mr. Kass as to what actually went on in preparing the House Report. Judge Mikva, like the majority, does not deny that this "abuse of legislative history" occurred. He might have been expected, then, to discuss why this evidence can be ignored or why he thinks it has been misused. But he does neither. It is surprising that his desire to inquire into the realities of the legislative process stops where that inquiry produces evidence that one house has attempted unilaterally to change the meaning of what the other house has enacted.

ed to cover investigatory materials." [39] When one checks closely the discussions cited by Judge Edwards, one finds that this "unequivocal" intention of "the House" actually derives from a single statement by Congressman Moss: "What [Exemption 2] was intended to cover was instances such as the manuals of procedure that are handed to an examiner—a bank examiner, or a savings and loan examiner, or the guidelines given to an FBI agent." [40] The majority quotes the statement in text standing alone, as if it indicates beyond all doubt that this was the intent behind Exemption 2. It relegates to a footnote and fails even to discuss the exchange *subsequent* to Congressman Moss' statement, an exchange which makes clear that while Congressman Moss may in fact have *wanted* Exemption 2 to cover such manuals, he recognized that its language would have to be changed to accomplish that purpose:

> Mr. Moss. *What this was intended to cover was instances such as the manuals of procedure that are handed to an examiner—a bank examiner, or a savings and loan examiner, or the guidelines given to an FBI agent.*
>
> Mr. Schlei. *Ah! Then the word "personnel" should be stricken.* Because "personnel" I think connoted certainly to us the employees relations, employee management rules and practices of an agency. What you meant was material related solely to the internal rules and practices of any agency for the guidance of its employees—something like that.
>
> I do agree that there should be protection for the instructions given to FBI agents and bank examiners; people who, if they are going to operate in expectable ways, cannot do their jobs. Their instructions have to be withheld.

> *But I think that word "personnel" does not do the job well enough, Mr. Chairman. I am sure it can be done.*
>
> Mr. Moss. *We will hope to seek a way of doing the job* without exempting internal rules and practices.
>
> Mr. Schlei. I suppose that could cover quite a lot of ground, Mr. Chairman.
>
> Mr. Moss. Because I am afraid that we would there open the barn door to everything.
>
> Mr. Schlei. Well, it is one of those things, Mr. Chairman, that just shows how hard it is to cover the whole Government with a few words. There are a number of problems.
>
> Mr. Moss. Oh, *we recognize the difficulty and the complexity, but we are perfectly willing to work at it.*[41]

The *Jordan* opinion makes clear the significance of this exchange:

> [Congressman Moss] apparently wanted investigative manuals covered by the exemption, *but he was told flatly that the word "personnel" precluded such interpretation.* He acknowledged this, but stated his concern that excising "personnel" would "open the barn door" by leaving a broad exemption for all "internal rules and practices." [42]

The majority's response is simply that "[s]ince in this case we are seeking *congressional* intent, we cannot follow the suggestion [in *Jordan*] that Mr. Schlei's interpretation of Exemption 2 is to be given predominant weight over that of a congressman and chief sponsor of the bill." [43]

This reflects an obvious misunderstanding of the significance of Mr. Schlei's testimony. The end result of the discussion between Mr. Schlei and Congressman Moss was that the latter indicated that he understood that the language of Exemption 2 did

---

39. Maj. op. at 1059.

40. *Id.* at 1059 (quoting *Federal Public Records Law (Part I): Hearings Before a Subcomm. of the Comm. on Government Operations on H.R. 5012 et al.*, 89th Cong., 1st Sess. 29 (30 Mar.–5 Apr. 1965) [hereinafter *House Hearings on H.R. 5012*]).

41. *Jordan*, 591 F.2d at 766 (quoting *House Hearings on H.R. 5012, supra* note 40, at 29–30) (emphasis added).

42. *Jordan*, 591 F.2d at 766 (emphasis in original).

43. Maj. op. at 1059 n.24 (emphasis in original).

not accord with his preferred interpretation of the purpose of the exemption. He most certainly did not in any way indicate that he thought the present language was satisfactory. Had he done so and thus disagreed with Mr. Schlei, his statement would be much, stronger evidence of the legislative intent underlying the specific words ultimately enacted into law. But all he said, and all that the majority concedes that he said, was that he *wanted* to protect investigatory records and that he would be "willing to work at it." Thus this is not at all a question of deciding to give greater weight to the interpretation of a witness than to that of a congressman. It is rather one of relying on the fact that a witness' interpretation of the exemption was *not* controverted by the congressman, who rather indicated that he would try to see if changes could be made to correct the deficiencies in the language.

This understanding is made even stronger by the fact that many other witnesses at the House hearings gave uncontroverted testimony that Exemption 2's language did *not* extend far enough to protect sensitive internal information necessary to carry out agency functions. The Department of Defense submitted the following commentary on Exemption 2:

> Although the second exception for "internal personnel rules and practices of any agency" is desirable as far as it goes, it makes no provision for the many other kinds of internal rules and practices equally deserving of protection and of no legitimate interest outside the agency. Moreover, it raises a question concerning the status of matters which cannot satisfy the requirement of relating "solely" to personnel rules and practices but involving other matters as well. It appears to be the intent of the provision to give no

protection to those portions of records which relate to internal rules and practices of an agency when they are mixed with other information. An example of the kind of internal management rule that would receive no protection under section 1(c)(2) of H.R. 5012 is found in DOD Directive 4105.46 which prescribes the permissible price latitudes for DOD negotiators in cost-plus-fixed-fee contract negotiations. The undesirability of making such information generally available is obvious, but H.R. 5012 provides no basis for not doing so.[44]

The Treasury Department shared the same basic concern:

> *Exemption* (2).—This exemption reduces the existing exemption for matters "relating solely to the internal management of an agency" to matters related "solely to internal personnel rules and practices." It reflects the view that all other internal management operations of the Government should be disclosed to any person at all. But internal operations include many matters which are of no public interest or which should not be made readily available, as a few examples will illustrate.
>
> As we read the present exemption, it would not protect the Treasury Department if it refused to detail in advance the method it intended to employ in protecting the movement of currency from the Bureau of Engraving and Printing to its own cash room in the main building. Apparently, upon demand, the Treasury would have to supply the records of how it proposed to use its guard force....
>
> The Department recommends that this exemption be revised to exempt any matter relating solely to the internal management or procedure of an agency.[45]

---

44. *House Hearings on H.R. 5012, supra* note 40, at 219 (letter from L. Niederlehner, Defense Dep't General Counsel, to Rep. William Dawson, Government Operations Comm. Chairman).

45. *Id.* at 229 (Treasury Dep't memorandum). The majority asserts that "[o]ther witnesses before the House Subcommittee apparently felt

that no problem existed under Exemption 2." Maj. op. at 1059 n.24. These "other witnesses" turn out to be *only one* witness, Clark Mollenhoff, who, like Congressman Moss, stated only that Exemption 2 *should* exempt instructions to law enforcement agents. He did not give his opinion as to the meaning of the proposed language of Exemption 2. *See House Hearings*

Both of these departments thus read Exemption 2 as applying only to minor personnel matters. Both gave specific examples of documents that might have to be disclosed even though they contained key instructions to agency personnel as to how to carry out their duties; and the Treasury Department example clearly involves the possibility of disclosure resulting in circumvention of the law. Combined with Mr. Schlei's responses to Congressman Moss, these statements should have made clear to the House that the language of Exemption 2 did not appear to outside observers to encompass information such as instructions to agency personnel. If there had been anything close to what the majority calls an "unequivocal" indication that the members of the House wanted to exempt such materials,[46] the Representatives would have responded either by asserting that the proposed language *did* cover them or by subsequently amending the language to do so. They did neither, leading to the conclusion that they agreed with the witnesses' interpretation of the statute as it then stood—and still stands.

As in the House, testimony in the Senate hearings showed that Exemption 2 was not read by any witness as applying to investigative manuals. Mr. Edwin Rains, the Assistant General Counsel of the Treasury Department, objected to Exemption 2 on the specific ground that it would not apply to these documents:

> The second exemption protects matter "related solely to the internal personnel

rules and practices of any agency." This is good so far as it goes. But, we don't believe that it goes far enough. There are many other internal agency documents which should not be released. The investigative manuals of the Secret Service and the Bureau of Narcotics, for example, contain information the release of which would only be of assistance to criminals in telling them how to plot their crimes so as best to escape detection. Surely such information should be protected.[47]

And another independent observer, Mr. Robert Benjamin, Chairman of the ABA Committee on the Code of Federal Administrative Procedure, commented on Mr. Rains' concern about protecting investigative manuals and stated that "we think that if anywhere besides in specific statutes it should be treated in [Exemption] 7, which has to do with investigative matters."[48]

This testimony is fully in accord with that before the House subcommittee. Mr. Rains specifically stated that Exemption 2 did not cover investigative materials, and Mr. Benjamin agreed that Exemption 2 did not cover them and that reference should instead be made to them in Exemption 7.

My colleagues are forced to recognize the existence of this testimony, but they then proceed to contend that it is irrelevant. Judge Edwards' opinion dismisses the House testimony on the ground that Congressman Moss' initial statement on the

on H.R. 5012, *supra* note 40, at 151 (statement of Clark R. Mollenhoff).

46. Maj. op. at 1059, 1065.

47. *Administrative Procedure Act: Hearings Before the Subcomm. on Administrative Practice and Procedure of the Comm. on the Judiciary on S. 1160 et al.*, 89th Cong., 1st Sess. 34 (12–21 May 1965) (statement of Edwin F. Rains [hereinafter *Senate Hearings on S. 1160*]. The Treasury Department also submitted the following criticism:

> The exemptions would not protect the agency's instructions to its staff on methods of law enforcement since the proposed section removes the present exemption for matters of "internal management of an agency" and provides only an exemption for "internal

personnel rules and practices" (2). In fact, subsection (b) would require public inspection of staff manuals and instructions to staff "that affect any member of the public." All Treasury's law enforcement staff manuals affect members of the public, particularly those who would violate the law and those who would be victimized by such violation. The Narcotics Bureau's instructions, for example, could hardly be effectively enforced if any narcotics dealer could examine the Bureau's instructions to Treasury agents.

*Id.* at 31. *See also id.* at 439 (letter from Fred B. Smith, Treasury Dep't General Counsel, to Sen. Eastland, Judiciary Comm. Chairman).

48. *Id.* at 112.

purpose of Exemption 2 is controlling. And the Senate hearings are given equally short shrift:

> The Senators themselves, however, made no comments on the witnesses' objections or on the scope of Exemption 2. Consequently, the Senate hearings provide little enlightenment as to Congress' intent concerning Exemption 2.[49]

The majority further asserts:

> Of course, a decision not to act on the objections to Exemption 2, especially on those raised by witnesses who opposed the entire bill, does not create an inference that the Exemption would have permitted disclosure of all law enforcement manuals. The Senators may have felt that the existing language of Exemption 2 adequately dealt with the expressed fears of these witnesses.[50]

This argument is totally implausible. An inference certainly *is* created about the meaning of proposed statutory language when a house of Congress fails to change the language in the face of uncontradicted testimony by witnesses that such language would have a given result. On the majority's view legislative hearings are irrelevant. What witnesses say about the proposed bill can be completely ignored, while a single congressman's statement about what he would *like* the bill to accomplish can be seized upon as an unequivocal expression of the meaning to be given to specific statutory words. Judge Edwards has not cited a single person present at either the House or Senate hearings who contradicted the testimony of the many witnesses who declared

that the wording of Exemption 2 did not protect investigative manuals. If congressmen had "felt that the existing language of Exemption 2 adequately dealt with the expressed fears of these witnesses," surely one of them would have said so. None did, and yet the language was not changed. Its literal meaning should be given effect.

### 4. *The House debates*

The majority also claims that the House debates are "highly instructive" in showing that the House intended Exemption 2 to cover investigative manuals.[51] Yet two of the three quotes it relies upon are irrelevant to this specific issue. The statements by Representatives Moss and Dole are general statements to the effect that the bill was attempting, as Representative Dole put it, to take "into consideration the right to know of every citizen while affording the safeguards necessary to the effective functioning of Government."[52] Such quotes simply state the obvious and prove nothing about the intent underlying Exemption 2.

The third quotation relied upon by the majority does support its position. Representative Gallagher stated that "the bill also prevents the disclosure of other types of 'sensitive' Government information such as ... income tax auditors' manual.... Income tax auditors' manual would be protected under No. 2—'related solely to internal personnel rules and practices.'"[53] The majority concludes:

> From these brief, but uncontradicted, statements in the House debate on S.

---

49. Maj. op. at 1058. The majority does note one comment by a senator at the Senate hearings on S. 1666, the predecessor to S. 1160:
    > During the Senate hearings on S. 1666 subcommittee members made only one comment in response to fears expressed by some witnesses that S. 1666 would impede law enforcement efforts. When Paul Dixon, Chairman of the Federal Trade Commission, spoke in opposition to the bill, Senator Long reassured him that: "The Committee, I am sure, and the Congress, wouldn't want to do anything that would seriously hurt the law enforcement provision of any agency."
    *Id.* at 1057 (citation omitted). Once again the majority apparently believes that vague and general statements to the effect that Congress

did not want to impede law enforcement constitute convincing evidence that the Congress could not have intended Exemption 2 not to apply to investigative manuals. That it is forced to rely on such statements demonstrates the weakness of its position.

50. Maj. op. at 1058 n.18.

51. *Id.* at 1061.

52. 112 Cong.Rec. 13655 (remarks of Rep. Dole), *quoted in* maj. op. at 1061.

53. *Id.* at 13659 (remarks of Rep. Gallagher), *quoted in* maj. op. at 1061.

1160, we can see that the members of the House recognized that the unrestricted release of government documents might interfere with the "effective operation of the Government," and that the nine exemptions were included in S. 1160 to prevent such interference. More specifically and important, supporters of S. 1160 were not challenged in their claim that government investigatory manuals were protected under Examination 2.[54]

The majority's claim that "these statements" by "supporters" of the bill were important is misleading given that there was only *one* such statement. Only Representative Gallagher, in an extremely brief remark, asserted that income tax auditors' manuals would be exempt from disclosure under Exemption 2. His remark was not echoed by anyone else and it was not made during any specific debate over Exemption 2. Thus it is not surprising that no one "challenged" the claim. There is no obligation on the part of congressmen to challenge one representative's isolated statement in order to keep it from becoming the definitive expression of the intent of the entire House. Judge Edwards' opinion characterizes this single comment as constituting "the express feelings of one house,"[55] when actually the *majority* of persons who spoke on the subject before the House indicated their belief that Exemption 2 did *not* cover law enforcement manuals.

C. *Section (a)(2)(C) of the FOIA.*

*Jordan* held that section (a)(2)(C), which provides that agencies shall make available for public inspection "administrative staff manuals and instructions to staff that affect a member of the public,"[56] does not operate to exempt law enforcement manuals from disclosure under the FOIA. The

majority explicitly affirms that part of the *Jordan* holding, yet goes on to argue that section (a)(2)(C)'s legislative history supports the finding that Exemption 2 covers such manuals. Judge Edwards notes that "several witnesses expressed their fears that [the phrase "staff manuals"] would mandate release of information that could damage or hinder law enforcement efforts,"[57] and that the Senate Report then recommended adding the word "administrative" to the expression "staff manuals" in an apparent effort to protect law enforcement information. The majority concludes that this indicates "Congress' deep concern that manuals setting forth guidelines for auditing or inspection procedures should not be released to the public."[58]

In my view the legislative history of section (a)(2)(C) works against the majority's conclusion. It is ironic that substantial reliance is placed on the testimony of witnesses at hearings on section (a)(2)(C) to the effect that its language would require release of information damaging to law enforcement efforts; the majority dismisses similar testimony about the language of Exemption 2 as indicative of nothing whatsoever. Moreover, the fact that the Senate subcommittee responded to these concerns by adding the word "administrative" and by including specific discussion of the need for protecting law enforcement information in the committee reports only goes to point out that there was an easily available way for Congress to implement its desire to protect law enforcement manuals. In sharp contrast to its actions in response to the testimony on section (a)(2)(C), neither house responded to the many witnesses who complained about the language of Exemption 2. Thus, the fact that "Congress acted specifically to prevent such a result"[59] with re-

---

54. Maj. op. at 1061.

55. *Id.*

56. 5 U.S.C. § 522(a)(2)(C) (1976).

57. Maj. op. at 1062.

58. ·*Id.* at 1063.

59. *Id.* Indeed, if Congress did "act specifically to prevent" disclosure of law enforcement man-

uals under section (a)(2)(C), it obviously did not then think that the existing Exemption 2 prevented the identical result.

Apparently not realizing that the two arguments analytically cancel each other, Judge MacKinnon, as in his dissent in *Jordan*, argues that both Exemption 2 and section (a)(2)(C) were intended specifically to exclude law enforcement matters from disclosure. He cites generously from the legislative history of sec-

gard to section (a)(2)(C) provides a strong indication that, in the last analysis, it did not provide similar protection in Exemption 2, as it made no effort to change the latter's language.

### D. The Overall Purpose of the FOIA

In *Jordan* the majority addressed the fact that the House Report on Exemption 2 cuts strongly against the overall purpose of the FOIA. It noted that "the sweeping interpretation of Exemption 2 favored by the House Report was incompatible with Congress' expressed intent to cut back on the previous exemption for 'internal management'" and that "the language of the House Report seemed less consonant with the overall scheme and general purpose of the Act than did the Senate Report." [60] Quoting *Vaughn II*, the majority in *Jordan* concluded that "faced with a conflict in legislative history, the recognized principal purpose of the FOIA requires us to choose that interpretation most favoring disclosure." [61] Other commentators have observed the same thing about the House Report.[62]

The basic principle of construction of the FOIA has been enunciated by the Supreme Court, by this court, and by virtually all other courts on so many occasions that it is now quite familiar: disclosure is by far the overriding purpose of the FOIA. Indeed the Supreme Court in *Rose* quoted with approval the exact same passage relied on by *Jordan*:

"[W]e have repeatedly stated that '[t]he policy of the Act requires that the disclosure requirements be construed broadly, the exemptions narrowly.' Thus, faced with a conflict in the legislative history, the recognized principal purpose of the FOIA requires us to choose that interpretation most favoring disclosure." [63]

Apparently undaunted by the Supreme Court's adoption of this principle of construction from *Vaughn II*, the majority proceeds to criticize it as "too superficial" because "it fails to take into account all of the 'cross-currents' of concerns expressed by those members of Congress supporting the enactment of FOIA." [64] Thus, in direct contrast to the expressed view of the Supreme Court itself, the majority has chosen to emphasize not disclosure but rather the "two crucial but potentially conflicting interests: the right of the citizenry to know what the Government is doing, and a legitimate but limited need for secrecy to maintain the effective operation of Government." [65] The phrase "cross-currents" is repeated again and again in Judge Edwards' opinion, and the need for effective Government operation is held to be "fundamental" to the statutory scheme.[66] The majority finally concludes that "even common sense . . . would seem to belie any suggestion that Congress enacted a statute whose provisions undermined its criminal statutes in

tion (a)(2)(C) and concludes that Congress clearly intended the section to exempt law enforcement manuals and that "there was no necessity for excluding them by Exemption 2." Concurring opinion of Judge MacKinnon at 10. After conceding this, however, he concludes that Exemption 2 was meant to cover this material as well. *Id.*

Obviously, if Exemption 2 already took care of the matter, there was no need to make the change in section (a)(2)(C) relied on by Judge MacKinnon's opinion. Judge Edwards and the majority understand this, and repudiate (as did seven of the nine judges in *Jordan*) Judge MacKinnon's argument. Maj. op. at 1055 n.11. Both Judge MacKinnon and Judge Robb concur in Judge Edwards' opinion without noting that the whole logic of its Exemption 2 basis is a refutation of the MacKinnon-Robb (a)(2)(C) argument in *Jordan* and now here.

60. *Jordan*, 591 F.2d at 768.

61. *Id.* (quoting *Vaughn II*, 523 F.2d at 1142).

62. *See, e.g.*, J. O'Reilly, *supra* note 20, § 12.03, at 12–5 to 12–6; Project, *supra* note 19, at 1053.

63. *Rose*, 425 U.S. at 366, 96 S.Ct. at 1601 (quoting *Vaughn II*, 523 F.2d at 1142) (citations omitted).

64. Maj. op. at 1067.

65. *Id.* at 1062.

66. *Id.* at 1065.

the effectiveness of law enforcement agencies." [67]

If the approach taken by the majority—with the emphasis on "common sense" and on the "cross-currents of concern"—had been followed consistently with regard to all nine exemptions, the FOIA would have had little impact on the Government of this nation. Simply put, "common sense" is not the standard for judicial construction of the FOIA. It is an extraordinary strong statute requiring disclosure of information even where balancing of the costs and benefits would indicate to most people that the Government should be permitted to withhold the information. It is *the Congress* which has made this balancing of costs and benefits, and this court has no higher duty than to carry out what Congress has enacted as law, our personal judgments to the contrary notwithstanding. For this court now to start emphasizing the FOIA's dual purposes rather than its mandate for disclosure is nothing short of a dramatic revision of the intent underlying the Act as well as of fifteen years of judicial interpretation.

## II. SIGNIFICANCE OF LATER CONGRESSIONAL ACTS

A. *The Government in the Sunshine Act*

The majority in *Jordan* supported its interpretation of the meaning of Exemption 2 by reference to the action of the House of Representatives in enacting a provision identical to the wording of Exemption 2 as part of the Government in the Sunshine Act of 1976.[68] *Jordan* stated the following:

> The position of this Court in *Vaughn II* has recently been vindicated by the action of the House of Representatives itself in passing the "Government in the Sunshine Act of 1976." Professor Davis has recently suggested the relevance of the Sunshine Act to interpretation of the Freedom of Information Act:
>
> > The Freedom of Information Act, Advisory Committee Act, Privacy Act, and Government in the Sunshine Act

all deal with the subject matter of openness of records and of meetings. Each of the four statutes has its own function. Each provision of each statute may be interrelated to one or more provisions of the other statutes. Furthermore, the various statutes often use language that is identical with the language of another statute. The meaning of that language may depend not only on legislative history and interpretations with respect to the language of the one statute, but it may depend upon legislative history and interpretations with respect to the identical language that is used in one of the other statutes.

Of course, Professor Davis is correct, for it is a well established principle that courts may look to subsequent legislation as an aid in the interpretation of prior legislation dealing with the same or similar subject matter. Indeed, Chief Justice Marshall stated the principle that, if it can be gathered from a subsequent statute *in pari materia* what meaning the legislature attached to the words of a former statute, this will amount to a legislative declaration of its meaning, and will govern the construction of the first statute.

Applying this principle, it is highly significant that the Government in the Sunshine Act, enacted in 1976, carries over verbatim most of the exemptions in the Freedom of Information Act, including the specific language of Exemption 2. Thus, 5 U.S.C. § 552b(c)(2) exempts from the Act's open meeting requirement portions of meetings likely to "relate solely to the internal personnel rules and practices of an agency." *The House Report to the Sunshine Act gives the same narrow interpretation to this exemption as the Senate did in 1965:*

> (2) This exemption includes meetings relating solely to an agency's internal personnel rules and practices. It is intended to protect the privacy of staff

---

67. *Id.* at 1074.

68. Pub.L.No.94–409, § 3(a), 90 Stat. 1241 (codified at 5 U.S.C. § 552b (1976)).

members and to cover the handling of strictly internal matters. *It does not include discussions or information dealing with agency policies governing employees' dealings with the public, such as manuals or directives setting forth job functions or procedures.* As is the case with all of the exemptions, a closing or withholding permitted by this paragraph should not be made if the public interest requires otherwise.

**69.** *Jordan*, 591 F.2d at 770–71 (footnotes omitted) (emphasis in original opinion).

**70.** Maj. op. at 1062 n.30. Apparently unsatisfied with the majority opinion's failure to respond directly to the Sunshine Act arguments, Judge Mikva makes three responses. First, he complains of "the debatable wisdom of construing legislation that is not now before the court." Concurring opinion of Judge Mikva at 1087 n.1. The answer is that consideration of the Sunshine Act is important because it has a direct bearing on the meaning of the words used in Exemption 2 of the FOIA: "[I]f a subsequent act on the same subject affords complete demonstration of the legislative sense of its own language, the rule which has been stated, requiring that the subsequent should be incorporated into the foregoing act, is a direction to courts in expounding the provisions of the law." *Alexander v. Alexandria*, 9 U.S. (5 Cranch) 1, 7, 3 L.Ed. 19 (1809) (Marshall, C. J.). Judge Mikva's response is that Exemption 2 of the Sunshine Act is unhelpful because its language "is invoked in entirely different contexts." Concurring opinion of Judge Mikva at 1087 n.1. But the FOIA and the Sunshine Act are anything but "entirely different." Both are disclosure statutes designed for the same basic purpose; the drafters of the Sunshine Act clearly recognized the close similarity when they modeled it after the FOIA. Judge Mikva's third and final point evinces a willingness to conclude that the Sunshine Act Exemption 2 *does* cover job function manuals, *even though both committee reports say precisely the contrary. See id.* By asking whether Congress "truly" intended to open meetings discussing investigative manuals he apparently suggests an entirely subjective test under which committee reports can be safely ignored. Indeed, he suggests as much elsewhere in the opinion by asking, "May not judicial notice be taken of the fact that committee reports are often authored entirely by staff members, and that in the rush and flurry of events active congressmen may never have an opportunity to read these reports at all?" *Id.* at 1088. In a case of clear legislative mistake I might agree, but that is not the case here since the Senate Report is consistent with all the testimony before the Senate committee. In my view, Judge Mikva's attempt to obtain a "reasonable perspective on the legislative process," *id.*, is dangerously unconstrained and invites judges to ignore the objective evidence in front of them about what Congress intended.

Judge MacKinnon also responds to the Sunshine Act arguments. He begins by asserting that "the statutory provisions of the Sunshine Act which precede Exemption 2 provide that agency meetings are open 'Except in cases where the agency finds that the public interest requires otherwise' ... 5 U.S.C. § 552b(c). This statutory provision provides an obvious basis for an agency to refuse to disclose law enforcement matter that would permit law violators to evade detection." Concurring opinion of Judge MacKinnon at 1084. This reading of the statute is simply wrong. Section 552b(b) provides that meetings shall be open except as provided in subsection (c), which lists exemptions; subsection (c) contains the further exception, however, that even if an exemption applies the agency may open the meeting if it finds that the public interest so requires. "[E]ven if a matter falls within an exemption, the discussion must be open where the public interest so requires ...." H.R.Rep.No.880, 94th Cong., 2d Sess. 3 (1976). The "public interest" provision thus enables the agency to open a meeting which could be kept closed; it does not, as Judge MacKinnon asserts, provide a blanket public interest exception to the open meeting requirement.

Judge MacKinnon then goes on to assert that my argument is undercut by the fact that Exemption 7 of the Sunshine Act would allow meetings to be closed if the BATF manual here were discussed. In particular he thinks that Sunshine Act Exemption 7(F), exempting law enforcement material that would "endanger the life or physical safety of law enforcement personnel," would apply to the BATF manual. Consequently, he reasons, Exemption 2 of the Sunshine Act would not have to be read to cover the manual. *Id.* at 1085.

I am at a complete loss in trying to comprehend the conclusion Judge MacKinnon draws from this: "[T]he Sunshine Act can be said to be even more *specifically* protective of law enforcement matters than the Freedom of Infor-

---

It thus appears that by 1976 the House of Representatives had repudiated the sweeping language concerning Exemption 2 contained in its 1966 report on the Freedom of Information Act.[69]

The majority's only response is to "note that we do not find it particularly significant that Congress enacted in 1976 a provision in the Government in Sunshine Act identically worded to Exemption 2 of FOIA...."[70] This is remarkable given

that the Senate Report to the Sunshine Act expressly noted the relationship: "This wording parallels the Freedom of Information Act, 5 U.S.C. 552(b)(2). This exemption does not include directions to agency personnel concerning their responsibility vis a vis the public, such as manuals explaining job functions." [71] If both the Senate and the House thought that FOIA Exemption 2 covered instruction manuals, is it conceivable that they would use exactly the same language in the Sunshine Act Exemption 2, which quite clearly does not extend to such manuals? Obviously the answer must be no. Yet under the majority's interpretation *either the two identically worded exemptions have precisely opposite meanings* or else *the Sunshine Act Exemption 2 would have to be interpreted in a manner contradictory to the unequivocal intent expressed in both committee reports.* Either result is absurd.

Rather than attempt to contradict this aspect of the *Jordan* opinion, the majority misconstrues the argument: "We cannot follow the suggestion in *Jordan* . . . that the House, in an entirely different act, repudiated its understanding of a provision in FOIA. Had the House meant to invest Exemption 2 in FOIA with a different meaning, it would have done so at any of the several times Congress amended FOIA." [72] This reflects a failure to consider a basic principle of statutory construction which, as *Jordan* indicated, dates back to the beginning of the American judicial

system. The point is that a clear statement by Congress of the meaning of a statutory phrase sheds considerable light on what Congress intended when it used that phrase in an earlier statute. What we have here are *four committee reports on one specific statutory phrase, three of which are in basic agreement.* By opting for the interpretation contained in the first (and second) Senate Report, *the House in 1976 indicated that it agreed that FOIA Exemption 2 did not extend to instruction manuals.* Thus it is not a question of investing Exemption 2 with a new meaning, it is one of explaining what Exemption 2 meant in the first place. The majority does not respond to this argument because no response is possible. Congress' act in 1976 is clear evidence that *Jordan* was correct and that the majority here is wrong.

### B. *Section (b)(7)(E) of the FOIA*

Judge Edwards' opinion also relies on the congressional intent he derives from the 1974 amendments to the FOIA, one of which revised Exemption 7 to provide that records need not be disclosed if they are "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . disclose investigative techniques and procedures." [73] The majority points out that the purpose of this amendment was to "force the courts to follow the *original* in-

---

mation Act. The dissent's reliance on the Sunshine Act is accordingly groundless." *Id.* at 1086 (emphasis in original). This conclusion is startling given that Exemption 7 of the FOIA provides *exactly* the same protection for law enforcement matters as does Sunshine Act Exemption 7: disclosure is not required where it might "interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A); *id.* § 552b(c)(7)(A), "disclose investigative techniques and procedures," *id.* § 552(b)(7)(E); *id.* § 552b(c)(7)(E), or "endanger the life or physical safety of law enforcement personnel," *id.* § 552(b)(7)(F); *id.* § 552b(c)(7)(F).

The Sunshine Act provides no more protection for law enforcement information than does the FOIA. Thus, if Exemption 7 of the Sunshine Act demonstrates that Exemption 2 of the Sunshine Act does not cover law enforce-

ment manuals, then FOIA Exemption 7 demonstrates equally well that FOIA Exemption 2 does not cover law enforcement manuals. Indeed, I argue below that reading FOIA Exemption 2 as broadly as does the majority makes FOIA Exemption 7(E) entirely unnecessary. *See* p. 1111 *infra.* Perhaps Judge MacKinnon is correct that the BATF manual would have been exempt under the language of Exemption 7(F), but that issue is not before us because the Government did not, for whatever reason, choose to defend its refusal to disclose on the basis of Exemption 7.

71. S.Rep. 354, 94th Cong., 1st Sess. 21 (1975).

72. Maj. op. at 1062 n.30.

73. 5 U.S.C. § 552(b)(7)(E) (1976).

tent of Congress in enacting FOIA."[74] It then draws the conclusion that the 1974 amendment showed that Congress wanted to protect law enforcement information, and that since the amendment was characterized as merely embodying Congress' original intent, Congress necessarily must have desired Exemption 2 also to protect law enforcement manuals.

This argument has several grave defects. First, the majority has stated the history of the 1974 amendments so as to make it seem to have been motivated by a desire to protect law enforcement information. In fact, the direct opposite is true: *the 1974 amendments were a response to broad judicial construction of the exemptions. The motivating pressures to amend were thus in favor of more disclosure.* Congress' purpose in 1974 was to *limit* the law enforcement exemption, not strengthen it, as witness what happened precisely to Exemption 7 itself.

Moreover, there is no necessary connection between a congressional intent to protect law enforcement information under Exemption 7 and a similar intent under Exemption 2. As one commentator has declared, "The fact that Congress decided to protect information on investigatory techniques used in specific investigations does not imply that Congress wished to protect all such information regardless of the context in which it arose."[75] The majority tries to counter this by finding that Exemptions 2 and 7 necessarily go together: "It

would be inconsistent to no small degree to hold that Exemption 2 would not bar the disclosure of investigatory techniques when contained in a manual restricted to internal use, but that Exemption 7(E) would exempt the release of such techniques if contained in an 'investigatory record.' "[76]

Far from being "inconsistent to no small degree," such a construction is perfectly logical. Indeed, Senator Hart, the primary sponsor of the 1974 amendment to Exemption 7, introduced during the floor debates a report of a key bar association committee which explains why *only* techniques in investigative records should be exempt:

> The fear that disclosure of investigative technique *in general* will hinder an agency's operations appears to be illusory. The methods used for such investigations are widely known and relatively limited in type and scope. The realistic problems are those we have already met—the need to preserve the identity of sources of information *in particular cases*, the need to assure an impartial trial and to protect reasonable personal privacy.[77]

Not only does this indicate that Exemption 7(E) is compatible with the *Jordan* interpretation of Exemption 2, it provides yet another independent opinion that Exemption 2 does not apply generally to investigatory techniques; if this had been the reasonable explanation, surely the bar committee or some other observer would have discussed the relationship between the two exemptions.[78] They did not for the simple reason

---

**74.** Maj. op. at 1064 (emphasis in original).

**75.** Northwestern Comment, *supra* note 14, at 763.

**76.** Maj. op. at 1065.

**77.** 120 Cong.Rec. 17034 (1974) (quoting Report of the Committee on Federal Legislation of the Association of the Bar of the City of New York, Amendments to the Freedom of Information Act) (emphasis in original); *see* Northwestern Comment, *supra* note 14, at 763 n.147.

**78.** *See* Reply Brief for Plaintiff-Appellant on Rehearing En Banc at 4 n.2 ("If the two exemptions are as closely related in purpose as the government suggests, one would expect some discussion of that interrelationship in the rele-

vant legislative history. Significantly, however, there is not a single reference to exemption 2 in the legislative history of exemption 7(E).").

Congress' belief that Exemption 2 is unrelated to law enforcement information is further evidenced by the conference report on Exemption 7, which Judge Edwards quotes without discussion:

> The conferees wish to make clear that the scope of this exception against disclosure of "investigative techniques and procedures" should not be interpreted to include routine techniques and procedures already well known to the public, such as ballistics test, fingerprinting, and other scientific tests or commonly known techniques. Nor is this exemption intended to include records falling

that Exemption 2 was not considered a law enforcement exemption.

The relationship between Exemptions 2 and 7 ultimately proves precisely the opposite of the majority's argument. I have shown why it is logical to exempt specific investigatory records while allowing disclosure of general investigatory techniques; the majority has not and, I submit, cannot show why Exemption 7(E) is necessary *at all* if Exemption 2 works to exempt all information regarding investigatory techniques. Under the court's holding today, all such information can be withheld because it is necessarily internal and has the possibility of allowing circumvention of the law. Accordingly, Exemption 7(E) is redundant, and Congress need not have bothered with a long and heated debate on its amendment. That Congress did so bother suggests that it saw Exemption 7(E) as the chief source of protection for law enforcement information and Exemption 2 as unrelated.

## III. CASE LAW ON EXEMPTION 2

### A. *Department of Air Force v. Rose*

In *Rose* the Supreme Court quoted extensively from this court's opinion in *Vaughn II* and decided that the Senate Report should prevail over the House Report in resolving the facts of that case. As Judge Edwards states, "*Rose* left open the question that faces us in the present case." [79] He goes on to assert that "the Supreme Court considered as substantial the argument that Exemption 2 might be construed

to cover internal agency materials where disclosure might risk circumvention of the law." [80] It is true that the Supreme Court deliberately avoided deciding the issue, but the opinion in no way implied that the Court would come out as this court has today. On the contrary, as one commentator has noted,

> *Rose*, while stopping short of applying the *Vaughn* rationale to law enforcement cases, nonetheless endorsed that reasoning. Even if *Rose* did not mandate applying the Senate Report to cases involving law enforcement information, the logic of *Rose* supports such an application. [81]

And, as noted earlier, *Rose* specifically adopted *Vaughn II*'s narrow reading of the words of Exemption 2 rather than Judge Leventhal's construction, revived today by the majority, of the word "solely" as meaning "predominantly." [82] Thus although *Rose* did not decide the issue before us today, its logic and reasoning are directly in accord with the *Jordan* majority opinion which has now been repudiated.

### B. *D.C. Circuit Case Law*

There is not much that need be said here. This court's decision in *Vaughn II* and its en banc decision in *Jordan* completely repudiated the House Report in favor of the Senate Report. The subsequent panel decision in *Cox v. United States Department of Justice*, [83] was an attempt by the two dissenters in *Jordan* to distinguish *Jordan* in a manner utterly inconsistent with the specific hold-

within the scope of subsection 552(a)(2) of the Freedom of Information law, such as administrative staff manuals and instructions to staff that affect a member of the public. Maj. op. at 1064 n.36 (quoting H.R.Rep.No. 1380, 93d Cong., 2d Sess. 12–13 (1974)). This demonstrates both a desire to limit the investigative law enforcement exemption and a recognition of the relationship with section (a)(2)(C); Exemption 2 is not mentioned because Congress considered it irrelevant to the subject matter.

**79.** Maj. op. at 1066. Earlier in the opinion the majority contradicts itself, asserting that *Rose* did in fact decide this issue: "By noting that 'the primary focus of the House Report was on exemption of disclosures that might enable the regulated to circumvent agency regulation,' the

Supreme Court in *Rose* recognized that the conflict between the committee reports exists only as regards minor employment matters." *Id.* at 1061 n.27. This assertion is astonishing given that the Supreme Court quite clearly intended to avoid altogether the issue of which report should control in a case of circumvention of agency regulations.

**80.** *Id.* at 1066.

**81.** Northwestern Comment, *supra* note 14, at 753.

**82.** *See* p. 1095 *supra*.

**83.** 601 F.2d 1 (D.C.Cir.1979).

ing of the case.[84] And the decisions in *Lesar v. United States Department of Justice*[85] and *Allen v. CIA*[86] both relied on *Jordan* and in no way indicated that its reasoning was faulty. The majority's assertion that *Lesar's* "logic and even result . . . seem at odds with that in *Jordan* "[87] cannot survive a fair reading of *Lesar.* The symbols used in FBI records unquestionably were solely of internal significance for administrative convenience and were routine "minor or trivial matters" of no public interest.[88] *Jordan,* in contrast, involved matters of substantive agency policy that clearly were of substantial public interest.

## C.  Case Law In Other Circuits

From the majority's presentation of the Exemption 2 decisions of other circuits one would think that its position had the overwhelming support of the existing case law. Judge Edwards does admit at the end of the discussion that the case law on Exemption 2 is "scattered,"[89] a rather unusual word to describe a situation *in which the circuits are split four to two against his position on the issue.* He goes on to state

that "[i]t is important to note, however, that every circuit that has considered the issue, except the District of Columbia in *Jordan,* has held that FOIA does not mandate the release of investigatory manuals where disclosure may risk circumvention of agency regulation."[90] This perhaps better than any other part of the opinion exemplifies the approach to this case taken by the majority—what matters to them is that their *result* be consistent with that in other circuits, even if many of those cases relied on a rationale that their own opinion repudiates!

That is precisely what has happened in this case. The majority states that "[w]e are also concerned that every other circuit considering the issue has barred the mandatory release of these materials, whether through the use of Exemption 2 or section (a)(2)(C)."[91] It thus finds significance in the fact that the *Sixth and Eighth Circuits* have found that section (a)(2)(C) exempts law enforcement manuals from disclosure— even though these courts *explicitly repudiated the analysis of Exemption 2 adopted*

---

**84.**  *Cox* stated that:

The exemption covers those portions of law enforcement manuals that prescribe the methods and strategy to be followed by law enforcement agents in the performance of their duties.  *See Ginsburg, Feldman & Bress v. Federal Energy Administration,* Civ.No. 76-0027 (D.D.C. June 18, 1976) *aff'd per curiam by an equally divided court,* 192 U.S. App.D.C. 143, 591 F.2d 752 (1978) (en banc), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979).  It does not apply to "secret law" contained in the rules and practices by which an agency regulates its own staff.  *Jordan v. United States Department of Justice,* 192 U.S.App.D.C. 144, 154, 591 F.2d 753, 763 (1978) (en banc).

*Id.* at 4.  This was a total misstatement of the existing law.  The rationale of the *Jordan* majority had nothing to do with "secret law"; and the *Ginsburg* decision was merely one of the district court, since the panel opinion by Judge MacKinnon had been vacated and the district court opinion had been affirmed by an equally divided court.  Moreover, the *Jordan* majority had expressly repudiated the reasoning of the vacated panel opinion in *Ginsburg, see Jordan,* 591 F.2d at 763–64 & n.37.  *Cox* therefore should not have relied on *Ginsburg,* especially since *Jordan* was an en banc and therefore controlling decision.

Nonetheless, Judge MacKinnon insists on citing the panel opinion in *Ginsburg* as valid authority.  He asserts that Judge Leventhal would have voted with the majority in *Ginsburg* and that this makes the *Ginsburg* panel opinion "entitled to substantial consideration." Concurring opinion of Judge MacKinnon at 1077.  This is extrajudicial speculation of the worst kind.  Judge Leventhal recused himself in *Ginsburg.*  Judge MacKinnon ignores this and concludes that since he thinks he knows how Judge Leventhal would have voted, we can treat the *Ginsburg* panel opinion as having been affirmed.  I am appalled at this attempt to construct binding precedent on the basis of the probable vote of a recused, and now late, judge.

**85.**  636 F.2d 472 (D.C.Cir.1980).

**86.**  636 F.2d 1287 (D.C.Cir.1980).

**87.**  Maj. op. at 1069–1070.

**88.**  *Rose,* 425 U.S. at 365, 96 S.Ct. at 1601 (quoting *Vaughn II,* 523 F.2d at 1142).

**89.**  Maj. op. at 1072.

**90.**  *Id.*

**91.**  *Id.* at 1074.

*today* and agreed with the analysis set forth in *Jordan* and even though Judge Edwards' opinion *expressly rejects their interpretation of section (a)(2)(C)*. This truly is a new step in our jurisprudence. · Reliance is placed upon a decision merely because it reaches the same result, even though it is based on an absolutely contradictory analysis of the issues.[92]

What should of course be clear is that the only relevance of these precedents is what they say about the meaning of Exemption 2. An analysis of this issue demonstrates not merely a split in the circuits, but that prior to today's decision *four circuits* had found that Exemption 2 exempts only minor housekeeping matters, while *only two circuits* had held to the contrary.

The Fifth, Sixth, and Eighth Circuits have all ruled that Exemption 2 does not apply to instruction manuals. In *Hawkes v. Internal Revenue Service*[93] the Sixth Circuit found that the Senate and House Reports could not be reconciled and that the Senate Report should be given effect. In a holding similar to that of *Jordan*, the court ruled that Exemption 2 relates "only to the employee-employer type concerns upon which the Senate Report focused."[94] This

decision was relied upon by the Fifth Circuit in *Stokes v. Brennan*,[95] which required disclosure of a training manual for safety and health officials.[96] And the Eighth Circuit relied on *Vaughn II, Rose,* and *Jordan* in two opinions adopting the interpretation contained in the Senate Report and holding that Exemption 2 does not exempt law enforcement manuals.[97]

Prior to today's decision, therefore, the Fifth, Sixth, Eighth, and District of Columbia Circuits had all ruled that the Senate Report should prevail over the House Report and that Exemption 2 relates only to routine employment matters. The opposite conclusion has been reached by two circuits, the Second and Ninth. The major decision was *Caplan v. Bureau of Alcohol, Tobacco & Firearms*,[98] which, as Judge Edwards notes, "relied heavily on language in the Supreme Court's decision in *Rose*."[99] Moreover, the Second Circuit's opinion makes clear that its decision was based primarily upon the policy consideration that "individuals embarked upon clandestine and illicit operations" would be enabled through disclosure to frustrate government investigation."[100] The court's analysis of legislative history consisted solely of citing the

---

**92.** That the majority's approach is explicitly result-oriented is made clear by its decision to organize the discussion of the case law in other circuits into "two categories: those that have exempted law enforcement investigatory manuals under section (a)(2)(C); and those that have used Exemption 2 to exempt internal law enforcement manuals whose disclosure would risk circumvention of the law." Maj. op. at 1070. Were the court really interested in how the other circuits interpreted Exemption 2 it would have divided the cases into those that have exempted law enforcement manuals under Exemption 2 and those that have not.

**93.** 467 F.2d 787 (6th Cir. 1972).

**94.** *Id.* at 797.

**95.** 476 F.2d 699 (5th Cir. 1973).

**96.** *Id.* at 701–02. In a later decision another panel of the Fifth Circuit found that disclosure of a certain manual would not impede law enforcement efforts and thus stated that "there is no need for us to choose between the Second Circuit's and the D.C. Circuit's interpretation of Exemption 2 when disclosure would risk circumvention of the law." *Sladek v. Bensinger,*

605 F.2d 899, 902 (5th Cir. 1979). Under *Stokes,* however, the choice necessarily would be to follow *Jordan.*

**97.** *Cox v. United States Dep't of Justice,* 576 F.2d 1302, 1309–10 (8th Cir. 1978); *Cox v. Levi,* 592 F.2d 460, 462 (8th Cir. 1979). *See also Kuehnert v. FBI,* 620 F.2d 662, 667 (8th Cir. 1980) (expressing doubt that FBI "information for investigative lead purposes" falls under Exemption 2).

**98.** 587 F.2d 544 (2d Cir. 1978).

**99.** Maj. op. at 1071. Such heavy reliance on *Rose,* of course, is misplaced since the Supreme Court's opinion leaves the issue open and, if anything, suggests that the *Jordan* interpretation is correct. *See* p. 1111 *supra.*

**100.** *Caplan,* 587 F.2d at 547. This, of course, is an impermissible concern since the FOIA permits every person, regardless of motive, to take advantage of disclosure. Unfortunately, Judge Mikva makes the same error in his concurring opinion. *See* note 124 *infra.*

Senate and House Reports, and its entire reasoning seems to be that the Supreme Court's refusal to decide the issue in *Rose* left the Second Circuit "free to give weight to the House Report." [101] The major independent commentary on law enforcement manuals and Exemption 2 concludes that

> the *Caplan* opinion's reasoning is suspect. Based upon the Supreme Court's failure to proscribe use of the House Report in the interpretation of exemption 2 in all cases, *the court apparently concluded that it need not justify its preference for the House interpretation of the exemption over that of the State.* The opinion thus failed to deal with the arguments for preferring the Senate Report advanced in *Vaughn* . . . . [102]

Thus while *Caplan* is precedent in support of the majority opinion today, its reasoning is not at all persuasive.

The same is true of the Ninth Circuit's decision in *Hardy v. Bureau of Alcohol, Tobacco & Firearms.*[103] The *Hardy* court engaged in even less analysis of legislative history than *Caplan*. Like *Caplan* and the majority opinion today, *Hardy's* approach was explicitly result-oriented. The court noted that five circuits had refused to release similar materials but that three different rationales were employed; its response was simply to pick which of the three it preferred, without engaging in any substantial analysis of the background of the FOIA. Indeed, the court did not feel that it needed even to acknowledge that the *Caplan* interpretation of Exemption 2 was a minority view, rejected by four other cir-

cuits. The reason was that, like the majority today, it felt that reaching the preferred result was all that mattered.[104]

In sum, even after today's decision, the circuits are completely split on the meaning of Exemption 2. Only if one accepts the majority's result-oriented approach can one find it significant that no circuit has yet found that a law enforcement manual must be disclosed. The issue before us is Exemption 2. In rejecting the *Jordan* rationale, this court will not create a greater consistency among the circuits, but rather will further increase the division that currently exists. If this precedent has any meaning at all, it is that *Jordan* should have been followed.

## IV. THE MAJORITY'S NEW TEST

The majority today holds that "if a document for which disclosure is sought meets the test of 'predominant internality,' and if disclosure significantly risks circumvention of agency regulations or statutes, then Exemption 2 exempts the material from mandatory disclosure."[105] This standard— which is contrary to the standard specifically adopted in *Rose*[106]—is drawn primarily from Judge Leventhal's concurring opinions in *Vaughn II* and *Jordan*. As Judge Leventhal saw it, the distinction was between documents that were for predominantly internal purposes and documents that were of legitimate public interest. The majority adopts this test but then immediately asserts that "it is not for the courts to determine when disclosure is in the public inter-

101.  *Caplan*, 587 F.2d at 547.

102.  Northwestern Comment, *supra* note 14, at 752 (emphasis added). The article went on to note that "[t]he court in *Caplan* did not justify its conclusion that the House Report, despite its relative vagueness and insulation from scrutiny by the Senate, was preferable to the Senate Report; it was no answer to point out that the Supreme Court had not conclusively ruled that the Senate Report must be preferred." *Id.* at 753.

103.  631 F.2d 653 (9th Cir. 1980).

104.  *See id.* at 656–57. The court did acknowledge that courts in the District of Columbia Circuit and the Eighth Circuit had arrived at a

contrary interpretation of Exemption 2, but it made no mention of the fact that courts in the Fifth and Sixth Circuits had come to a similar conclusion. *See id.* at 656. The court also made no mention of the fact that a district court in its own circuit had determined ten years earlier that the Senate Report's interpretation should be given effect over that of the House Report. *Benson v. GSA*, 289 F.Supp. 590, 594–95 (W.D.Wash.1968), *aff'd on other grounds*, 415 F.2d 878 (9th Cir. 1969).

105.  Maj. op. at 1074.

106.  *See* pp. 1095 *supra*.

est." [107]   This latter statement is certainly right, and it may be possible to avoid this kind of judicial policymaking if the *Rose* and *Jordan* approaches are followed and the inquiry is limited by a clear line as to whether the materials are related *solely* to internal personnel rules and practices. As *Rose* found, quoting with approval from *Vaughn II*, the line drawn " 'between minor or trivial matters and those more substantial matters which might be the subject of legitimate public interest . . . is a standard, a guide, which an agency and then a court, if need be, can apply with some certainty, consistency and clarity' . . . . " [108]

In contrast, there is simply no way to employ a fuzzy standard of "predominant internality" without introducing enormous discretion for judges to make their own assessments of the "public interest." If something is predominantly internal, it therefore has only a limited impact on the public. But this can be determined only if the court makes a value judgment that the public has no important interest in disclosure—a judgment which this court has repeatedly held has already been made by Congress.

Moreover, the two parts of the majority's test—both of which must be satisfied if the documents are to be withheld—contradict one another. If certain materials satisfy the test of "predominant internality," meaning they do not have a substantial external impact, how can their disclosure result in circumvention of agency regulations? It makes no sense to suggest that a member of the public could evade the law by acquiring documents which have no external impact on the public. If the infor-

mation disclosed is important enough and of the type to permit persons to circumvent the law, it by definition must have a direct external impact on the public.

It is thus apparent that the majority's standard actually can *never* be met: a document cannot *both* be predominantly internal *and* lead to circumvention of agency regulations, it can only be one or the other. Since the two standards contradict one another, the judge must choose between them. For the majority the choice is clear: the circumvention standard is the crucial one, while the "predominant internality" standard is simply manipulated to support the desired result.

This is made clear by the lengths to which the majority goes in attempting to find that the BATF manual at issue here has only a predominantly internal effect. Judge Edward's opinion asserts that "[t]he instructions to BATF agents contained in the BATF manual are not written to regulate the public." Instead, he claims, it "consists *solely* of instructions to agency personnel. There is no attempt to modify or regulate public behavior—only to observe it for illegal activity." [109]   To find the majority arguing fervently that instructions on covert surveillance techniques for federal agents to use on members of the public do not have an external impact is astonishing. Have my colleagues been asleep for the past ten years while controversy has raged over the investigative practices of the FBI and CIA? Have they failed to observe the controversy over the BATF itself which has been brewing in the past few months, a controversy centering specifically on the

---

**107.**   Maj. op. at 1056 n.12; *see id.* at 1074 n.60.

**108.**   *Rose*, 425 U.S. at 365, 96 S.Ct. at 1601 (quoting *Vaughn II*, 523 F.2d at 1142). The Supreme Court has also held that the nine exemptions "are plainly intended to set up *concrete, workable standards* for determining whether particular material may be withheld or must be disclosed." *EPA v. Mink*, 410 U.S. 73, 79, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973) (emphasis added). The majority's standard is anything but concrete or workable.

**109.**   Maj. op. at 1073, 1075 (emphasis in original). At a different point Judge Edwards states that "it is uncontroverted that the disputed rules here have been developed predominantly for internal uses." *Id.* at 1073. If this is the meaning of the "predominantly internal" standard, then there actually is no standard at all. Every document prepared within an agency to be given to employees of the agency would be exempt because it was "developed predominantly for internal uses" rather than meant for external publication. Such a definition would reduce the FOIA to uselessness.

tactics used by BATF agents?[110] This is not merely a case in which "internal personnel rules and practices have ... a tiny ripple effect outside their area of prime impact."[111] *On the contrary these instructions have an absolutely direct and substantial impact on members of the public.*

The distinction drawn between regulating or modifying public behavior and observing it is ludicrous. Do my colleagues mean to say that if this BATF manual contained instructions on how to use illegal bugging techniques to spy on members of the public they would still find that it was of only predominantly internal concern, since all that would be going on is mere "observation"? If, on the other hand, this manual instructed agents on how to make arrests, would my colleagues thereby allow it to be disclosed because this constitutes a "modification" of public behavior, even though disclosure clearly could result in circumvention of the law?

This is not merely a hypothetical example. Both *Caplan* and *Hardy*, the two precedents on which the majority relies heavily, involved a request for a BATF manual entitled "Raids and Searches."[112] The district judge in *Caplan* "found that the withheld portions of the pamphlet in issue included descriptions of the *equipment used by agents in making raids*, the meth-

ods of gaining entry to buildings used by law breakers, factors relating to the *timing of raids*, and the *techniques used by suspects to conceal contraband*."[113] Surely the majority would not contend that such techniques are mere forms of "observation" rather than methods of "modifying" public behavior. Surely there is not a more direct and extreme form of government regulation of the public than breaking into a building and searching persons suspected of criminal activity. But the majority would have to deny this unless it would decide *Caplan* and *Hardy* differently, ruling that disclosure is required because the documents in question involve regulation and modification of public behavior and therefore is not predominantly internal. I cannot believe my colleagues intend to reach such a result, but to avoid it they would have to repudiate the very standard they create today.

This example makes clear that the distinction proposed by the majority is untenable. Presumably it has been used as a means of buttressing the decision to disclose this particular manual and of appearing to place some limits on the breadth of Exemption 2. But I suspect that it is sufficient for the majority that this can be called a "law enforcement manual" and that these are instructions to agency personnel. Pre-

---

**110.** The National Rifle Association recently came out with "a half-hour television documentary that characterizes the agency as abusive government stormtroopers," a documentary in which a Democratic congressman describes the Bureau "as a 'jack-booted group of fascists who are ... a shame and a disgrace to our country.'" Earley, *NRA Aims at U.S. Agency*, Wash.Post, 23 July 1981, at A1, col. 1. The BATF calls these charges grossly misleading, *see id.* at A34, col. 1, but their accuracy is not the question here. What is important is that there is undeniably an important public controversy about the tactics of BATF agents. *See also* Reply Brief for Plaintiff-Appellant on Rehearing En Banc at 3 (citing studies criticizing methods of BATF agents).

Judge Edwards quotes the concurring opinion in *Vaughn II*, which argued that Exemption 2 was based in part on "'a recognition that management of government needs some elbow room in developing and revising internal practices, so as to achieve efficiency, *without becoming embroiled in continuous public discus-*

sion.'" Maj. op. at 1073 n.58 (quoting *Vaughn II*, 523 F.2d at 1150 (Leventhal, J., concurring) (emphasis added)). Even if this argument were correct, it obviously is inapplicable here. The BATF is already "embroiled in continuous public discussion" because of its controversial tactics, and exempting the manual in this case will not alter this situation.

**111.** 523 F.2d at 1151 (Leventhal, J., concurring). *See Ferguson v. Kelley*, 448 F.Supp. 919, 922 (N.D.Ill.1977) (FBI leads and status information not exempt under Exemption 2 because they "may reveal how the FBI proceeds in investigating a member of a 'subversive organization,' the Socialist Workers Party,—a matter of genuine and significant interest to the public.")

**112.** *Hardy*, 631 F.2d at 655; *Caplan*, 587 F.2d at 545.

**113.** *Caplan*, 587 F.2d at 545.

sumably the BATF and similar agencies will in the future not make the mistake of disclosing a substantial part of their manuals, as the BATF did here, but will rather withhold everything remotely relating to how agency personnel conduct their jobs, at least where those personnel are responsible for enforcing some law or regulation—a large category indeed.

Of course this does not mean that Exemption 2 will always be applied by this court. This new standard leaves this court with enormous discretion in defining what constitutes a sufficient risk of circumvention of agency regulations and what is predominantly internal, thus enabling the court to pick and choose those documents it wants disclosed and those it wants withheld. Predictably, this judicially discretionary standard may become popular with judges who prefer these public policy choices to be made by courts and not the legislature.

## V. THE MAJORITY'S ATTEMPT TO DISTINGUISH THE RESULT IN *JORDAN*

After repudiating the rationale of *Jordan*, Judge Edwards' opinion goes on to assert that the result there would be "identical under the test we announce today." [114] The majority attempts to support this assertion first by noting that no finding had been made in *Jordan* that disclosure would risk circumvention of the law. As Judge

Ginsburg forthrightly acknowledges in her concurring opinion, however, there is no basis for the implication that release of the documents in *Jordan* would not help individuals evade detection by law enforcement agents.[115] On the contrary *Jordan* specifically noted that the Justice Department had warned of the pernicious consequences that would result from disclosure:

> Public disclosure of these materials would alert members of the public to those situations, persons, and offenses for which prosecution is withheld, selectively applied, or disposed of by pre-trial diversion. Individuals could then successfully exploit these policies by committing crimes within these select categories, thereby escaping prosecution. For example, publication of a policy of non-prosecution (or prosecution at a lesser degree of seriousness) for possession of certain quantities of specific narcotic drugs would serve only to encourage dealers and users of narcotics to carry lesser quantities of the drug than those specified in our guidelines.[116]

Not content to rely on the circumvention distinction, the majority goes on to assert that the materials in *Jordan* are distinguishable because they were a source of "secret law," and thus were related to regulation of the members of the public. In contrast, it asserts, the manual in this case relates only to observing public behavior rather than modifying or regulating it.[117]  I

114. Maj. op. at 1074.

115. *See* concurring opinion of Judge Ginsburg at 1091.

116. *Jordan,* 591 F.2d at 758.

117. Maj. op. at 1075. Judge Mikva also reinterprets the basis of *Jordan.* He quotes at length from Judge Bazelon's opinion in *Jordan,* and is now prepared to read that opinion's brief discussion of "secret law" as the true holding of the case. Concurring opinion of Judge Mikva at 1086. Like the majority opinion, Judge Mikva's opinion fails to answer Judge Ginsburg's demonstration that the attempt to distinguish the results in *Jordan* and this case is a failure. And like the majority opinion, his opinion does not find it the least bit troublesome that an en banc majority opinion is repudiated and replaced by the views of a

single judge in that case. This, of course, will serve only to encourage judges to express individual views even when joining those of another, since they can hope that a later court will reinterpret what the original decision meant.

Ironically, Judge MacKinnon also now finds "secret law" to have been important in *Jordan,* even though he dissented without even mentioning the point. Concurring opinion of Judge MacKinnon at 1076. He goes even further, asserting that because Judge Bazelon wrote a separate opinion, "there was never a majority of the court in full support of the entire rationale of *Jordan*." *Id.* This provides yet another example of how the judges in the majority are willing to distort the basic principles of jurisprudence under which we have operated for so long, solely for the purpose of saving themselves from acknowledging forthrightly that they are overruling a recent en banc deci-

find this distinction preposterous. As Judge Ginsburg notes in her concurring opinion, the prosecutorial guidelines in *Jordan* also did not inform citizens as to how to conduct their activities in conformance with statutory requirements, they simply described how government prosecutors go about enforcing the law.[118] As one commentator put it:

> The reasons behind requiring the disclosure of "secret law"—giving members of the public full knowledge of their rights and obligations under the substantive law of the federal government—are inapplicable to enforcement guidelines at issue in Jordan. The guidelines do not inform members of the public of their rights under the law, but rather, their chances of evading the consequences for breaking the law.[119]

This attempt to reinterpret *Jordan* as hinging upon the existence of "secret law" is startling, given that only Judge Bazelon saw fit to raise the point in the *Jordan* decision. And the attempt to preserve *Jordan* on this basis is the final and clearest evidence of the majority's willingness to ignore precedent in implementing its preferred result. Not willing to refute the *Jordan* rationale directly or to reverse the decision completely, this court has determined to hold that a three-year-old en banc decision was based on a ground that only one out of nine members of the court thought important enough even to mention at the time. So much for the binding weight of our en banc decisions, so much for the respect earned and deserved by this court.

## VI.  CONCLUSION

Judge Edwards' opinion for the court expressly repudiates the rationale of the *Jordan* majority. In this dissent I have argued that the majority's construction of the language and legislative history of Exemption 2 is erroneous and that the interpretation adopted by the five-judge majority in *Jordan* should prevail. In conclusion it is worth reiterating a most remarkable fact about Judge Edwards' opinion: he repudiates the rationale of the *Jordan* opinion without refuting or even addressing its critical bases. Why doesn't the majority refute or offer an alternative to the *Jordan* majority's definition of "personnel" in Exemption 2? Why doesn't it challenge or even cite the many commentators who argue, along with the *Jordan* majority, that the House Report constituted an abuse of legislative history and that its interpretation of Exemption 2 should be disregarded in favor of the interpretation contained within the Senate report? Why doesn't the majority challenge or offer any contrary evidence to *Jordan's* finding that the House Report was concocted as an effort to placate the Justice Department without having to go through the appropriate process of amending the language of Exemption 2? And why doesn't it explain why Congress used the same language in Exemption 2 of the Sunshine Act as in the FOIA? (When this court is presented with a Sunshine Act Exemption 2 case, will it follow today's interpretation of the language, thereby rejecting the express intent of Congress declared in *both* committee reports? Or will it follow the two committee reports and read the exemption very narrowly, thus holding that Exemption 2 of the Sunshine Act and Exemption 2 of the FOIA—identically worded provisions in two statutes enacted for the same fundamental purpose—have directly contradictory meanings?)

Surely if the rationale of a three-year old majority opinion for an en banc court is to be discarded, there is an obligation on the part of the new majority to challenge directly and refute the analysis of the exist-

---

sion. Judge Bazelon joined the opinion of the court without stating any reservations whatsoever about its rationale. His decision to make some additional comments did not diminish the meaning of his adherence to the majority opinion, unless Judge MacKinnon wishes now to rewrite the settled practices of our court.

**118.** *See* concurring opinion of Judge Ginsburg at 1092.

**119.** Northwestern Comment, *supra* note 14, at 758.

ing opinion. Yet the court essentially ignores *Jordan's* majority opinion during its lengthy discussion of the legislative history, stating that "[t]he legislative history of Exemption 2 has been recounted by this court in [*Jordan* and *Vaughn II*]," but that "because the case before us was heard *en banc*, and because the outcome of the case turns on congressional intent as expressed in the legislative history, we feel that the history merits a fresh review." [120] Quite obviously neither of these "reasons" explains at all why a "fresh review" is necessary. The fact that this case turns on an interpretation of the legislative history is not a sufficient reason for ignoring a dispositive en banc interpretation of that history; precisely to the contrary, the very purpose of determining issues en banc is to set forth binding precedents for the future. And the fact that this case was heard en banc certainly does not imply that the work of a previous en banc court can be readily discarded. This is especially true given that the majority has not based its reversal on any new evidence bearing on the meaning of Exemption 2, but has rather just rehashed the same evidence that was before the *Jordan* court in 1978.

The true explanation unfortunately is all too evident from the majority's opinion. A "fresh review" is undertaken—no matter at what sacrifice to logic, our own precedent, or specific congressional action in 1966, 1974, and 1976—because applying the *Jordan* rationale would lead to a result disfavored by the majority. This explains why some of the judges who sat in *Jordan* so casually have altered their positions in only three years. *None* of them saw fit three years ago to echo Judge Bazelon's concern about "secret law"; now they agree it was central to the *Jordan* decision. The rest of

*Jordan* lies in shambles: the dissenting opinion's major argument there remains decisively rejected; the "public interest" test which was crucial to Judge Leventhal's concurring opinion has been rejected, thus rendering his approach unworkable; and the majority opinion has been repudiated. Yet these judges are content to see these opinions they once joined rejected, because today's decision promises to support the result they prefer as a matter of policy.

I also prefer that result as a matter of policy, but Congress did not agree in 1966 or in 1976, and it is not my place or that of my colleagues to amend Congress' work.[121] My colleagues have made much of the fact that they find it hard to believe Congress would have intended to allow FOIA to impede law enforcement activities. The answer to that position was given by the Supreme Court in *TVA v. Hill*,[122] which was similar to this case in that it involved another extremely powerful statute, the Endangered Species Act, that mandated a foolish result, the enjoining of the operation of a virtually completed dam in order to save a small number of three-inch fish. Chief Justice Burger noted the strong argument that "the burden on the public through the loss of millions of unrecoverable dollars would greatly outweigh the loss of the snail darter," but he responded that "neither the Endangered Species Act nor Art. III of the Constitution provides federal courts with authority to make such fine utilitarian calculations." [123]

This principle applies with equal force here. Respect for the acts of Congress cannot be an on-again off-again affair. It is not for this court to correct the errors Congress has made, no matter how egregious they might be.[124] There is underway in the

---

**120.** Maj. op. at 1058 n.15.

**121.** Congress intended "to allow only the most limited protection for such manuals. The reasons behind this intent are not entirely clear, but, its existence suggests that courts should not substitute their policy judgments for those properly made by Congress." Northwestern Comment, *supra* note 14, at 737.

**122.** 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

**123.** *Id.* at 187, 98 S.Ct. at 2298.

**124.** Judge Mikva purports to agree with this proposition, but then says that "neither may we ascribe to Congress errors that it clearly did not intend." Concurring opinion of Judge Mikva at 1089. Throughout his concurrence

Congress an effort to rewrite substantially the Freedom of Information Act, including the problems under Exemption 2 which were recognized but not solved in 1966. As

Judge Mikva repeatedly asserts, without elaboration, that Congress could not have intended to permit disclosure of investigative manuals. He finds it "patent," *id.* at 1087, and "irrefutable," *id.* at 1086, that Congress did not intend "such an absurd and unreasonable result," *id.*, and he urges that this result would make "scofflaws of the Congress, or at least some of its members," *id.* No explanation is given other than that Crooker "is a federal prisoner," *id.* at 1086, and "an adjudged felon" who seeks to use FOIA "for his own ends," *id.* at 1090. Yet surely Judge Mikva is aware that the FOIA is available without exception to any person who seeks to invoke it; the fact that Crooker or any other information requester is a criminal is irrelevant to the analysis.

Apparently Judge Mikva feels qualified to decide when a statute's *policy* is erroneous and therefore invalid; the majority of the Supreme Court expressed the opposite view in *TVA v. Hill*, as noted above. And he also feels that it is unnecessary even to respond to arguments showing that the policy has a logical and reasonable basis. During the 1974 debates on amending the FOIA, Senator Hart introduced the argument that information on general investigative techniques need not be kept secret even though information on specific investigations should be made exempt. *See* p. 1110 & note 77 *supra.* Judge Mikva has not attempted to counter this argument. Moreover, he declares that the BATF manual in question here falls in the category of trivial matters in which there is no public interest in disclosure, *see* concurring opinion of Judge Mikva at 1087, without commenting on the incontrovertible fact that the subject of investigative techniques of BATF agents is in fact one of heated public controversy and debate. *See* pp. 1115–1116 & note 110 *supra.* Far from being absurd, then, disclosure of this manual might well contribute to the resolution of this public issue.

More generally, Judge Mikva argues that the views of "many distinguished judges" demonstrate that my analysis must be wrong. Concurring opinion of Judge Mikva at 1090. Although perhaps Judge Mikva believes that a mere mortal judge like myself should fall silent in the face of allegedly contrary views of judges who are distinguished, I venture to suggest that the many passages he cites are inapplicable to the facts of this case. I am in hearty agreement that courts should not reach ridiculous results, but I strongly disagree with Judge Mikva's apparent view that attempting to judge the reasonableness of a statute is the most basic principle of statutory construction. Judges should attempt to find the congressional intent by considering the objective evidence

a policy matter, I hope the Congress does a complete job of revision, but as a judge I can never join in the rewriting of this or any other law by this court.[125]

before them. Certainly they should use sound judgment in assessing that evidence, but only in rare and extreme circumstances should they override that evidence in order to implement a more reasonable, from their perspective, policy result. Judge Mikva appears to advocate frequent resort to his principle of judging what is reasonable policy and implementing the same. Indeed, in this case he has joined the majority in ignoring—not refuting, but simply ignoring—critical evidence concerning the actions of the House in preparing the House Report. *See* p. 1100 & note 38 *supra.* The only conclusion I can reach is that determining what the "reasonable" policy should be is, under the principles of the majority, by far the overriding concern. I am confident that this is far from what Justices Frankfurter, Reed, Field, Harlan, and Brewer had in mind. *See* concurring opinion of Judge Mikva at 1089–1090.

**125.** Judge Mikva suggests that I am the one who seeks to legislate here and that by stating my personal views on the substantive policy matter at issue I have exceeded "the bounds of the judicial role." *Id.* at p. 1090. By implying that I have reached my decision so as to cause Congress to reach a certain legislative result, Judge Mikva ignores the unequivocal record of my views on Exemption 2. In *Vaughn II* (1975), *Jordan* (1978), and again today (1981) I have adhered to a consistent interpretation of the meaning of the words and legislative history of Exemption 2. Those views lead inexorably to the result I would reach in this case. Had I been concerned about reaching a certain legislative result I never would have interpreted Exemption 2 as I did; for Judge Mikva now to imply that that is my goal is rather odd.

Judge Mikva also implies that it is improper for a judge to state publicly his views on a matter of legislative policy. If so, this is a strikingly new conception of the judicial role. American judges have long spoken out on public issues, not only in articles and speeches, but in their judicial opinions as well. *See, e.g., Furman v. Georgia,* 408 U.S. 238, 369, 92 S.Ct. 2726, 2792, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring) ("Assuming knowledge of all the facts presently available regarding capital punishment, the average citizen would, in my opinion, find it shocking to his conscience and sense of justice."); *id.* at 375, 92 S.Ct. at 2796 (Burger, C. J., dissenting) ("If we were possessed of legislative power, I would either join with Mr. Justice BRENNAN and Mr. Justice MARSHALL or, at the very least, restrict the use of capital punishment to a small category of the most heinous crimes."); *id.* at 405–06

My colleagues' concern, expressed both in the majority opinion and in Judge Mikva's concurring opinion, that "absurd" results would occur if the *Jordan* rationale were applied to this and similar cases bespeaks a lack of confidence in the ability of Congress to overcome its prior mistakes. The recent experience regarding a case similar to the one before us shows this view to be mistaken. In *Long v. Bureau of Economic Analysis*,[126] the Ninth Circuit ruled that plaintiffs were entitled under the FOIA to receive copies of computer tapes prepared by the Internal Revenue Service for use with its Taxpayer Compliance Measurement Program, a program designed to aid the IRS in enforcing the income tax laws. When the decision was announced, the Government argued forcefully that release of the data would enable income tax evaders to circumvent the law. While disclosure was stayed pending Supreme Court review, Congress acted swiftly. It attached to a major bill a provision stating that no provision of law "shall be construed to require the disclosure of standards used or to be used for the selection of returns for examination, or data used or to be used for determining

such standards, if the Secretary [of the Treasury] determines that such disclosure will seriously impair assessment, collection, or enforcement under the internal revenue laws."[127] The Supreme Court subsequently vacated and remanded *Long* for reconsideration in light of the new provision.[128] Surely this is the preferable way of correcting policy mistakes. Congress responded directly to the policy problem and cleared up the ambiguity that had previously existed. The courts were left to construing the law, not determining what it should be.

The test of a defender of free speech is his willingness to defend the right to speak of a person with whom he emphatically disagrees. The test of a judge who has taken an oath to uphold the law is the objectivity with which he interprets and enforces laws of which he thoroughly disapproves. By trying to implement their own vision of appropriate policy, in this case attempting to find a "compromise" between what they perceive as conflicting policy goals, my colleagues have adopted an approach which can only diminish public confidence in the work of our court.[129]

---

(Blackmun, J., dissenting) ("I yield to no one in the depth of my distaste, antipathy, and, indeed, abhorrence, for the death penalty .... Were I a legislator, I would vote against the death penalty ...."); *United States v. DeCoster*, 624 F.2d 196, 299–300 (D.C.Cir.1976) (Bazelon, J., dissenting) (stating that "the problem of inadequate representation of the indigent cannot be solved by the courts alone" and recommending steps to be taken by the bar and the legislatures). Indeed, it is ironic that Judge Mikva makes this criticism, since his own opinion expresses the unequivocal view that it would be absurd for a legislature to vote to permit disclosure of investigative manuals, a view disputed by arguments introduced by the late Senator Hart, one of the principals in the FOIA debate. *See* p. 1110 & note 77 *supra*.

**126.** 646 F.2d 1310 (9th Cir. 1981).

**127.** Economic Recovery Tax Act of 1981, Pub. L.No.97–34, § 701(a), 95 Stat. 350 (codified at 26 U.S.C.A. § 6103(b)(2) (West Supp.1981)).

**128.** 450 U.S. 1301, 101 S.Ct. 1073, 67 L.Ed.2d 322 (20 Oct. 1981).

**129.** A last minute deletion by Judge MacKinnon has made note 70, paragraph 2, *supra*, no

longer relevant. Note 70, paragraph 4, *supra*, is also affected by a late revision, as he now apparently agrees that FOIA Exemption 7 has the same scope as Sunshine Act Exemption 7. *See* concurring opinion of Judge MacKinnon at 1085. Unfortunately, his new conclusion is as untenable as his old one. If Exemption 7 of the Sunshine Act would exempt the BATF manual at issue here, and if the FOIA and the Sunshine Act are both "specifically protective of law enforcement matters," *id.* at 1085, then my point in dissent must be right: protection for law enforcement materials was not intended to arise from Exemption 2 in either statute, but from Exemption 7. Judge MacKinnon's argument is now a complete non sequitur.

Two other final additions by Judge MacKinnon are equally erroneous. First, his contention that "[t]he Sunshine Bill Report, dated 1976, reflects the same point as Judge Leventhal's 1978 interpretation of 'predominant internality,'" *see* concurring opinion of Judge MacKinnon at 1081, is clearly wrong. He ignores the fact that Judge Leventhal first set forth his "predominant internality" standard not in 1978, but in 1975—before the Sunshine Act was adopted. *See Vaughn II*, 523 F.2d at 1150–51 (Leventhal, J., concurring). This stan-

dard was available to the Supreme Court in *Rose*, but the Court rejected it by adopting the narrower construction of the *Vaughn II* majority. *See* p. 1095 *supra*. This *Rose* interpretation, based on the *Vaughn II* majority opinion, was specifically adopted by the Sunshine Act Report, which stated that Exemption 2 was adopted "with recognition of the Supreme Court's interpretation of the analogous Freedom of Information Act exemption in *Department of Air Force v. Rose.*" S.Rep.No. 1178, 94th Cong., 2d Sess. 15 (1976) (confer-

ence report). It therefore is nonsense to argue that the Sunshine Act Report in any way reflects the reasoning advocated by Judge Leventhal. Second, the argument that manuals of law enforcement instructions are not encompassed within "discussions or information dealing with agency policies governing employees' dealings with the public, such as manuals or directives setting forth job functions or procedures," *see* concurring opinion of Judge MacKinnon at 1081, is obviously implausible.